# EXHIBIT "1"

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

In re DANIEL L. HENDON, Chapter 11

　　　　　　　Debtor. Case No. 2:11-bk-21-ap-01972-EWH
_____
DIVERSIFIED FUNDING GROUP, LLC,
an Arizona limited liability company;
REYNALDO GUTIERREZ, an individual;
THE FARADJOLLAH FRED
DJAHANDIDEH TRUST, an Arizona Trust;
FRED DJAHANDIDEH as Trustee of The
Faradjollah Fred Djahandideh Trust; HCM
RETIREMENT TRUST, a California Trust;
DREW SHERLINE as Trustee of HCM
RETIREMENT TRUST; RIGHTPATH
INVESTORS, LLC, a limited liability
company; SIROTKA HOLDINGS, LLC, a
limited liability company; iDEA

VIDEO DEPOSITION OF HEATHER HENDON, VOLUME 2

May 23, 2016

10:06 a.m.

Esquire Deposition Solutions

3800 North Central Avenue, Suite 1700

Phoenix, Arizona 85012

Prepared by: Sandra Marruffo, R.P.R., AZ C.R. 50815

1  And that was also prior to the raid.
2      Q.  Right.  Now, did you introduce Mr. Garcia to
3  anyone at the Jackson family?
4      A.  I did not.
5      Q.  Do you know how Jacksons learned that Danny's
6  family companies was up for sale shortly after Verde
7  Investments had purchased the notes?
8      A.  I do not.
9      Q.  Did you have anything at all to do with putting
10 people together in terms of the sale of Danny's Family
11 Companies at any time?
12     A.  No.
13     Q.  Okay.  Let's go back to this note now.  So it's
14 your belief that your father, Danny, and Ellis Rubenstein
15 knew at some point in time prior to December 5th, 2014,
16 that you had $500,000 to lend; is that right?
17     A.  That's correct.
18     Q.  Okay. And the basis of your belief is a
19 conversation that you had with them?
20     A.  A conversation that happened -- I mean, my dad
21 was aware of, obviously, conversations I had had with
22 Ernie.
23     Q.  Okay.  And -- and how was he aware?  Was he
24 part of the conversations or did you have some reason to
25 believe that Ernie and your father were relating what you

1  and Ernie had spoken of?
2      A.  No, I do not believe they were relating.
3  There's documents that you have that spell out a series
4  of agreements that we had, none of which ever came to
5  fruition, but the last one does state that there's a
6  possibility for me to receive a sum of money.
7      Q.  I mean, I understand that.  Yeah, I'm actually
8  asking about conversations between you, Mr. Rubenstein,
9  and your father about you lending E Management
10 Consulting, identified in Exhibit 1, $500,000 in December
11 of 2014.  I'm still trying to understand how you were
12 convinced to do that or how that transaction incepted.
13     A.  Like I said, the two of them approached me
14 about this opportunity and, in all honesty, hounded me
15 and hounded me and hounded me and pressured me and called
16 me and stalked me until I eventually gave in to this.
17     Q.  Anyone other than Mr. Rubenstein and your
18 father making these advances to you to loan this money?
19     A.  Can you repeat that?  I'm sorry.
20     Q.  Let me rephrase it.  Was there anyone other
21 than Mr. Rubenstein and your father that urged you to
22 make this loan of $500,000 in December of 2014?
23     A.  No.
24     Q.  Okay. Right.  And did they know that you had
25 borrowed the money from Mr. Garcia?

1    A.   Yes, they did.
2    Q.   Okay.  Did you ever make it known to Mr. Garcia
3 that you were, in turn, taking his money to loan to Ellis
4 Rubenstein's company?
5    A.   I did not.
6    Q.   Do you know if he knows today?
7    A.   I have no idea.
8    Q.   At that time in December of 2014, do you know
9 whether Mr. Rubenstein knew of Mr. Garcia?
10   A.   I don't know.
11   Q.   Okay.  So this transaction was made, you wired
12 money of $500,000 directly into E Management Consulting's
13 account --
14   A.   Correct.
15   Q.   -- is that right?
16        Okay.  Are there any memorializations of
17 the discussions leading up to this transaction or this
18 transaction itself?
19   A.   No.
20   Q.   No e-mails, nothing like that?
21   A.   No.
22   Q.   So describe to me what happened on December 5th
23 of 2014.  You went over to Mr. Rubenstein's business?
24   A.   No.  I met Mr. Rubenstein at a B of A in
25 Scottsdale and transferred the money to him, to

```
 1   E Management Consultants.
 2        Q.   Within that branch?
 3        A.   Yes.
 4        Q.   That B of A branch --
 5        A.   Uh-huh.
 6        Q.   -- in Scottsdale?
 7             MR. SHULL:  You have to say "yes" or "no."
 8             THE WITNESS:  Oh, yes.  I'm sorry.  Yes.
 9        Q.   BY MR. LAZO:  When was this document signed?
10   Was it signed the same day?
11        A.   Yes.
12        Q.   Did you actually witness the signature here?
13        A.   I did, yes.
14        Q.   You witnessed Mr. Rubenstein signing this
15   document?
16        A.   I did, yes.
17        Q.   Okay.  And he dated it as well?
18        A.   Yes, he provided it to me at the bank.
19        Q.   Okay.  Did you ever think to get collateral for
20   the loan?
21        A.   I did not.
22        Q.   Okay.  Now, at this point in time, you had
23   already signed a promissory note with Mr. Garcia, right?
24        A.   Correct.
25        Q.   And that promissory note is a lot different.
```

1  It looks a lot different, doesn't it?
2       A.   It is.
3       Q.   Did you ever fathom that this note itself
4  should be in a different form or should have been
5  notarized or anything like that?
6       A.   I trusted them.
7       Q.   "Them" being Danny and --
8       A.   I --
9       Q.   -- Ellis?
10      A.   Exactly, on their advisement, and so I went
11 ahead and did what they wanted me to do.
12      Q.   Okay.  Did you actually take the original of
13 this note and keep it?
14      A.   I -- I don't recall.  I don't know where it's
15 at if I did.
16      Q.   Okay.  Did you read the terms of the note prior
17 to Mr. Rubenstein signing it?
18      A.   Yes, I did.
19      Q.   Did you have any discussions with him about
20 those terms?
21      A.   No, I did not.
22      Q.   Okay.  Now, have you come to understand that
23 this $500,000 was not, in fact, used to purchase steel?
24      A.   I don't know what happened to this $500,000.  I
25 can make assumptions of what happened to it, but I don't

1 really know what happened to this.
2    Q.   I understand.  But I'd like you to give me your
3 best understanding of what you believe happened to that
4 money, this first 500,000 that you loaned and -- and the
5 basis of your belief.
6    A.   I believe that a large portion of it went to my
7 dad.
8    Q.   Okay.  And what is the basis of your belief in
9 that regard?
10   A.   When I met with Mr. Rubenstein following that
11 to find out the performance of this, he told me that
12 there was multiple things that he had paid for for my
13 dad.
14   Q.   Okay.  So let's take a step back.  When did
15 that meeting or meetings occur?
16   A.   That was the same meeting following where I
17 discussed -- I was trying to find out the performance of
18 what was going on with this and then the additional loan.
19   Q.   Okay.  So this meeting did not occur until the
20 second loan had been made?
21   A.   Correct.
22   Q.   Okay.  So can you give me a timeframe of when
23 the meeting occurred before we discuss the second loan?
24 For point of reference, I'll represent to you that the
25 second loan appears to have been made in April of the

1  following year.
2     A.   Correct.
3     Q.   Why don't we go ahead and mark as Exhibit 2 the
4  second single principal payment loan dated April 10,
5  2015, of $450,000.
6              THE REPORTER:  One moment, please.
7              MR. LAZO:  You can -- you can mark the one
8  I just --
9              MR. SHULL:  No, you didn't give it to her.
10 That's the problem.
11             THE REPORTER:  Do you want to put the
12 sticker on yourself or do you want to give it to me?
13             MR. LAZO:  No.  I'm fine.
14             Didn't I just hand you it?
15             MR. SHULL:  No.
16             THE REPORTER:  No, sir.
17             MR. LAZO:  Oh.
18             MR. SHULL:  Could I have a copy?
19             MR. LAZO:  Yeah.
20             MR. SHULL:  Thank you.
21             THE REPORTER:  Thank you.
22             (Exhibit No. 2 was marked for
23 identification.)
24             THE WITNESS:  Yes, the discussion I had
25 was following both of these.

1     Q.   BY MR. LAZO:  Okay.  So following April 10th of
2  2015, correct?
3     A.   Correct.
4     Q.   Okay.
5     A.   When I loaned him this additional 450,000 --
6     Q.   Right.
7     A.   -- I was not under the impression that he had
8  given anything to my father.
9     Q.   Okay.  I understand.  So between December of
10 2014 and April of 2015, did you have any discussions with
11 your father, with Mr. Rubenstein, or anyone else about
12 the disposition of the $500,000 you had loaned to
13 E Management Consulting?
14    A.   What do you mean by "disposition"?
15    Q.   How the moneys had been spent?
16    A.   He had told me that he purchased steel.
17    Q.   Okay.  And when did he tell you that?
18    A.   When I spoke to him for status updates
19 following this 500,000 which led to this.  He had
20 additional opportunities, there was a larger steel
21 operator, I believe somewhere out of California, that was
22 looking to sell his business and he had the opportunity
23 to purchase it and it was going to be a huge opportunity
24 and it was going to bring a lot of return and so on and
25 so forth, which is when I gave him the additional

1  450,000.
2     Q.   Okay.  So these discussions that ensued about
3  other opportunities, were they ever memorialized in
4  writings, e-mails, texts between you and Ellis?
5     A.   No, they were not.
6     Q.   You and anyone else?
7     A.   No.
8     Q.   Okay.  So these were verbal conversations?
9     A.   Yes.
10    Q.   Over the phone, in person, all of the above?
11    A.   Certainly on the phone.  I can't recall if I
12 saw Ellis in person.  I don't know.
13    Q.   Okay.
14    A.   I don't remember.
15    Q.   Can you estimate how many conversations you had
16 with Ellis about the $500,000 loan between December of
17 2014 and April of 2015?  Less than ten?
18    A.   Can you repeat that, again?  Between what did
19 you say again?
20         MR. LAZO:  Can you read that back.
21       (The pending question was read.)
22         THE WITNESS:  Yes, less than ten.
23    Q.   BY MR. LAZO:  And he essentially told you there
24 were other opportunities.  Did he tell you that steel had
25 been purchased at any point in time?

1    A.   He did not tell me that.  He told me that it
2  was going really well, that the market was booming, it
3  was very successful, that if he had an additional
4  $450,000, that he could turn it into something that was
5  way larger.
6    Q.   Okay.  During that same period of time,
7  December 2014 through April 2015, did you have
8  conversations with Danny Hendon about the $500,000 loan?
9    A.   I did.
10   Q.   And what was the substance of those
11 conversations?
12   A.   This is going to be great for you.  This is
13 going to be huge.  This is going to yield a bunch of
14 return.  You're not going to regret that you did this.
15   Q.   Okay.
16   A.   Conversations like that.
17   Q.   Did you form a belief that Danny and Ellis had
18 been discussing how to use the $500,000 or that Danny was
19 in any way involved with these other opportunities that
20 Ellis made you known of?
21   A.   I did not, no.
22   Q.   Okay.  And same thing with your father, about
23 less than ten conversations between December and April
24 approximately?
25   A.   Probably.

1     Q.   Okay.  Did you ever have conference calls in
2  that --
3     A.   No.
4     Q.   -- time?
5     A.   Not with the three of us, no.
6     Q.   Did you speak with anyone else in the world
7  about this $500,000 loan between December of 2014 and
8  April of 2015?
9     A.   The only other person that I spoke with about
10 it was my mother.
11    Q.   Okay.  Any -- anything to add there?
12    A.   And she encouraged me not to do it.
13    Q.   Prior to December 2014?
14    A.   Yes.
15    Q.   Okay.  And what -- what were those
16 conversations like?
17    A.   She just told me it was a horrible idea and
18 that I was going to lose the money and that I shouldn't
19 do it.
20    Q.   Okay.
21    A.   Essentially.
22    Q.   Now, Ellis Rubenstein was a family friend, was
23 he not?
24    A.   He was a family friend but not of my mother.
25 He was a family friend of my father.

```
 1      Q.   How long had you known him or of him prior to
 2   December 2014?
 3      A.   Several years.  I knew him prior.  They were
 4   friends originally --
 5      Q.   Ellis and your father?
 6      A.   Yes, correct.
 7      Q.   Okay.
 8      A.   I recall meeting him sometime in, I would say
 9   pre-bankruptcy, pre-raid, pre-all of that.  I met him in
10   Newport Beach.
11      Q.   California?
12      A.   Yes.
13      Q.   On what occasion?
14      A.   Like I said, it was years ago.
15      Q.   Was it a social --
16      A.   It was social, yes.
17      Q.   Okay.
18      A.   Uh-huh.
19      Q.   Did you ever -- were you ever involved with him
20   romantically?
21      A.   No.
22      Q.   Did you come to understand that Ellis and your
23   father had been in business together prior to December of
24   2014?
25               MR. SHULL:  Object to the form
```

1      Q.   BY MR. LAZO:  Go ahead.
2      A.   Okay.  There was a period of time where Ellis
3  worked for the car washes doing customer service.  It was
4  my understanding that his family had also gone through a
5  bankruptcy and they had lost their steel business and in
6  the interim, he needed a place to work.  And so my dad
7  hired him to do, like I said, some customer service
8  stuff.
9      Q.   Okay.  And remind me, to your knowledge, Ellis
10 and Ernie Garcia never met?
11     A.   No, not to my knowledge.
12     Q.   Okay.  So you have these conversations with
13 your father, your mother, and Ellis about the 500,000 and
14 at some point in time you're convinced to give
15 E Management Consulting another loan of $450,000 in April
16 of 2015, right?
17     A.   Correct.
18     Q.   Okay.  And that loan was made under the same
19 circumstances?
20     A.   It was.
21     Q.   Did you understand that there was going to be
22 steel purchased and more opportunities --
23     A.   Yes.
24     Q.   -- bought and sold, that sort of thing?
25     A.   Uh-huh.

1    Q.   Okay.  Okay.  Now, when did you first begin to
2  suspect that any of the money you had loaned to
3  E Management Consulting had not been, in fact, used to
4  purchase steel but inured back to your father's benefit?
5    A.   I didn't have any idea of that until that
6  meeting that I told you about.
7    Q.   Okay.  So let's talk about that meeting.  When
8  did that occur approximately?  Maybe you can put it in
9  terms of how long after you made the second loan did that
10 meeting occur?  Was it --
11   A.   Yeah.
12   Q.   -- the same year?
13   A.   No, it was -- it was quite a while after this.
14   Q.   After April of 2015?
15   A.   Yes.
16   Q.   It was in 2015 or could it have been this year?
17   A.   I do not believe it was this -- it might have
18 been the end -- I'd say the end of last year.
19   Q.   Okay.  The end of 2015.  And I'll represent to
20 you that you were deposed on December 1st --
21   A.   I understand.
22   Q.   -- of 2015.
23   A.   Yes.
24   Q.   Do you recall whether it was prior or after
25 that deposition?

1    A.   I was not aware of this when I had my previous
2  deposition.
3    Q.   So to your best understanding that meeting
4  occurred after December 1st of 2015?
5    A.   Correct.
6    Q.   But before 2016?
7    A.   Somewhere around there, yes.
8    Q.   Okay.  So tell me about that meeting.  Was it
9  over the phone?  In person?
10   A.   No.  Like I said, it was in person.  I went to
11 his place of business.  I wanted --
12   Q.   Ellis's place of business?
13   A.   Correct.
14   Q.   Do you recall where that was?  Was it the same
15 place that you had known of before?
16   A.   Like I said, the west side.
17   Q.   Okay.
18   A.   I think it was off of Grand Avenue.
19   Q.   Okay.
20   A.   He has an office over there attached to a steel
21 yard.  When I met with him, he -- I had asked what was
22 going on with everything? did he lose the money? what had
23 happened to it?  And he said that he had paid a number of
24 things for my dad, that he was trying to be a friend to
25 him, that my dad had convinced him that it was his money

1  and not mine, and that he wanted to essentially help a
2  friend out.
3       Q.   What was your reaction at that time?
4       A.   I was very angry.  I told him that they scammed
5  me and that I had trusted them and I was very angry.
6       Q.   Well, I'm sorry to hear that.
7       A.   Yeah.
8       Q.   What did he, "he" being Ellis -- and, I'm
9  sorry, was it only you and Ellis at that meeting?
10      A.   His son was there also.
11      Q.   What's his son's name?
12      A.   I can't -- I don't -- I don't remember what his
13 name is.
14      Q.   Okay.
15      A.   But --
16      Q.   Had you met his son before?
17      A.   Maybe once in a social gathering at some point
18 but I never had any interaction with him.
19      Q.   Okay.  Did Ellis describe to you with any level
20 of specificity what he had actually paid for Danny and
21 why?
22      A.   He told me that he had paid his trustee fees
23 along with some legal fees, he had fixed his car.
24      Q.   Fixed Danny's car?
25      A.   Yes.

```
 1      Q.   Is this the Ferrari?
 2      A.   No.  His Range Rover.
 3      Q.   Okay.  Sorry.  Didn't mean to confuse the two.
 4      A.   And had given him some, I think, money to
 5 possibly pay his rent.  I can't recall.  But it totaled
 6 up to around $360,000.
 7      Q.   Of the 950,000?
 8      A.   Correct.
 9      Q.   Did he show you receipts or any documents?
10      A.   No, he did not.
11      Q.   Did you ask for that?
12      A.   No, I did not.
13      Q.   Now, you mentioned rent.  Was that payment of
14 rent for a house in California?
15      A.   I don't know.
16      Q.   Okay.  Wasn't your father in prison at the
17 time.
18      A.   Let's see when he went.  No, he went to prison
19 in February.
20      Q.   Of 2016?
21      A.   '15.
22      Q.   Okay.  So we're talking --
23      A.   No, no, no.  Wait.  No.  Wait.  No, he went
24 in -- let's see.  He was sentenced in November of 2014.
25      Q.   Okay.
```

1  A. And then he went, I believe, in February of
2  2015.
3  Q. And he was released when, to your knowledge?
4  A. He was released shortly after that.
5  Q. Shortly after this meeting with Ellis.
6  A. Not shortly after the meeting with Ellis. He
7  wasn't -- he -- when I met with Ellis, that was -- I just
8  want to get my time line straight here.
9  Q. No problem. If there's anything I can show you
10 to help you recollect, let me know.
11  A. So I met with Ellis following -- so that was at
12 the end of 2015.
13  Q. Okay. All right. We're in December of 2015,
14 to your knowledge?
15  A. This was in -- Let's see. December 2015, I
16 wasn't talking to him as much, so I'm kind of having a
17 hard time placing -- he went in February -- it must have
18 been 2015.
19  Q. That your father went to prison?
20  A. Yes.
21  Q. Okay. The genesis of my question was whether
22 to your knowledge your father was in prison at the time
23 of your meeting with Ellis Rubenstein in approximately
24 December of 2015.
25  A. I don't believe that he was.