# EXHIBIT 1

MARC LAZO (SBN 215998)
**WILSON KEADJIAN BROWNDORF LLP**
1900 Main Street, Suite 600
Irvine, CA 92614
Phone No.: (949) 274-7842
Fax No.: (949) 234-6254

Attorneys for Plaintiff

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**03/04/2016** at 12:59:25 PM

Clerk of the Superior Court
By Truemy Vu, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE – CENTRAL JUSTICE CENTER

| | |
|---|---|
| DIVERSIFIED FUNDING GROUP, LLC, an Arizona limited liability company;<br><br>Plaintiff,<br><br>vs.<br><br>NELL HENDON, an individual; HEATHER HENDON, an individual; CHRIS ALVAREZ, an individual; VICTORIA HENDON, an individual; KELLY CARROLL, an individual; ALAN MEDA, an individual; BURCH & CRACCHIOLO, an Arizona corporation; ERNIE GARCIA, an individual; VERDE AUTO SERVICES, LLC a limited liability company; VERDE INVESTMENTS, INC., an Arizona corporation; ELLIS RUBENSTEIN, an individual; PRUDENTIAL METAL AND STEEL SUPPLY, LLC an Arizona limited liability company; E MANAGEMENT CONSULTING, an Arizona limited liability company; ERNIE VASQUEZ, an individual; GIL OLGUIN, an individual; JAY SWART, an individual; MARIA BARKER, an individual; PACWEST ENERGY, LLC, a Delaware limited liability company; JACKSONS FOOD STORES, INC., a Nevada corporation; EQUILON ENTERPRISES, LLC, a Texas limited liability corporation; and DOES 1 through 100, inclusive,<br>Defendants. | Case No. 30-2016-00839008-CU-FR-CJC<br><br>Judge Gregory H. Lewis<br><br>**COMPLAINT FOR:**<br><br>1. **FRAUDULENT TRANSFER**<br>2. **FRAUDULENT CONCEALMENT**<br>3. **CIVIL CONSPIRACY**<br>4. **AIDING AND ABETTING**<br>5. **UNJUST ENRICHMENT**<br>6. **CONSTRUCTIVE TRUST**<br>7. **ACCOUNTING**<br>8. **MONEY HAD AND RECEIVED**<br>9. **UNFAIR BUSINESS PRACTICES (BUS. & PROF. CODE § 17200 ET SEQ.)**<br><br>**DEMAND FOR JURY TRIAL** |

1
COMPLAINT

DIVERSIFIED FUNDING GROUP, LLC, an Arizona limited liability company ("Diversified" or "Plaintiff") hereby alleges against all Defendants as follows:

## PARTIES

**A. Plaintiff**

1. At all times mentioned herein, Plaintiff DIVERSIFIED FUNDING GROUP, LLC was and is an Arizona limited liability company operating as a capital investment company with its principal place of business in Scottsdale, Arizona.

**B. Defendants**

2. Plaintiff is informed and believes and thereon alleges that Defendants consist of HEATHER HENDON and nineteen (19) separate entities and/or individuals, all of whom have participated in a scheme to defraud Plaintiff and the courts.

3. Plaintiff is informed and believes and thereon alleges that Defendant HEATHER HENDON was and is an individual residing in the city of Phoenix, Arizona. Upon information and belief, HEATHER HENDON regularly conducts business in the County of Orange, State of California. HEATHER HENDON is an orchestrator and co-conspirator of the fraudulent scheme against Plaintiff as alleged in this Complaint.

4. CHRIS ALVAREZ is HEATHER HENDON'S spouse. Plaintiff is informed and believes that all acts by HEATHER HENDON complained of herein were taken on behalf of her marital community, and Defendants' marital community is liable to Plaintiff for any amount awarded pursuant to this Complaint.

5. Plaintiff is informed and believes and thereon alleges that Defendant ERNIE GARCIA is a resident in the State of Arizona and conducts business in the state of California. Plaintiff is informed and believes and thereon alleges that Defendant ERNIE GARCIA was a co-conspirator and participated as a strawman in the scheme to defraud Plaintiff. Plaintiff is informed and believes and thereon alleges that Defendant ERNIE GARCIA had a close relationship with HEATHER HENDON and/or her father.

6. Defendant VERDE INVESTMENTS, INC., is an Arizona corporation with its principal place of business in Phoenix, Arizona. Plaintiff is informed and believes and thereon alleges that

**2**

COMPLAINT

1  Defendant VERDE INVESTMENTS, INC. regularly conducts business in the state of California.

2  Defendant ERNIE GARCIA, an individual, is the founder of VERDE INVESTMENTS, INC., and has

3  the power, directly or indirectly, to direct the management and policies of VERDE INVESTMENTS,

4  INC.

5          7.      Defendant VERDE AUTO SERVICES, LLC, is an Arizona limited liability company

6  with its principal place of business in Phoenix, Arizona. Plaintiff is informed and believes and thereon

7  alleges that Defendant VERDE AUTO SERVICES, LLC, regularly conducts business in the state of

8  California. Plaintiff is informed and believes and thereon alleges that Defendant ERNIE GARCIA, an

9  individual, is the founder of VERDE AUTO SERVICES, LLC, and has the power, directly or

10 indirectly, to direct the management and policies of VERDE AUTO SERVICES, LLC.

11         8.      Plaintiff is informed and believes and thereon alleges that Defendant ELLIS

12 RUBENSTEIN is a resident in the State of Arizona. Plaintiff is informed and believes and thereon

13 alleges that Defendant ELLIS RUBENSTEIN conducts business in the state of California. Defendant

14 ELLIS RUBENSTEIN is a family friend and/or former co-worker of HEATHER HENDON.

15         9.      Defendant PRUDENTIAL METAL AND STEEL SUPPLY, LLC, is an Arizona limited

16 liability company with its principal place of business in Scottsdale, Arizona. Plaintiff is informed and

17 believes and thereon alleges that Defendant PRUDENTIAL METAL AND STEEL SUPPLY, LLC,

18 regularly conducts business in the state of California. Defendant ELLIS RUBENSTEIN, an individual,

19 is the founder of PRUDENTIAL METAL AND STEEL SUPPLY, LLC, and has the power, directly or

20 indirectly, to direct the management and policies of PRUDENTIAL METAL AND STEEL SUPPLY,

21 LLC.

22         10.     Defendant E MANAGEMENT CONSULTING, LLC, is an Arizona limited liability

23 company and a shell corporation owned and operated by ELLIS RUBENSTEIN.

24         11.     Plaintiff is informed and believes and thereon alleges that Defendant ALAN MEDA is a

25 resident in the State of Arizona. Upon information and belief, ALAN MEDA conducts business in the

26 state of California. Defendant ALAN MEDA is the attorney for HEATHER HENDON's father and

27 has participated in the conspiracy to defraud Plaintiff.

28 ///

---

**3**

COMPLAINT

12.     Defendant BURCH & CRACCHIOLO, is an Arizona Corporation with its principal place of business at 400 N. Tustin Ave. Suite 370 Santa Ana, California 92705.

13.     Plaintiff is informed and believes and thereon alleges that Defendant MARIA BARKER was and is an individual residing in the city of Corona Del Mar, California. MARIA BARKER is the girlfriend of HEATHER HENDON'S father and participated in the conspiracy against Plaintiff by receiving funds from the fraudulent scheme.

14.     Plaintiff is informed and believes and thereon alleges that Defendant KELLY CAROL was and is an individual residing in the State of Arizona. Upon information and belief, Defendant KELLY CAROL regularly conducts business in the state of California. KELLY CAROL is the ex-wife of HEATHER HENDON's father. Plaintiff is informed and believes and thereon alleges that KELLY CAROL participated in the conspiracy by receiving funds from the unlawful scheme.

15.     Plaintiff is informed and believes and thereon alleges that Defendant NELL HENDON was and is an individual residing in the State of Arizona. Upon information and belief, NELL HENDON regularly conducts business in the state of California. Plaintiff is informed and believes and thereon alleges that Defendant NELL HENDON is HEATHER HENDON's grandmother and participated in the scheme by wrongfully receiving funds and/or hiding assets to hinder, delay, or defraud Plaintiff from collecting on its judgment.

16.     Plaintiff is informed and believes and thereon alleges that Defendant VICTORIA HENDON was and is an individual residing in the State of Arizona. Upon information and belief, VICTORIA HENDON regularly conducts business in the state of California. VICTORIA HENDON is Defendant HEATHER HENDON'S mother and participated in effectuating the conspiracy and scheme alleged in this Complaint.

17.     Plaintiff is informed and believes and thereon alleges that Defendant GIL OLGUIN was and is an individual residing in the State of Nevada. Upon information and belief, GIL OLGUIN regularly conducts business in the state of California.  GIL OLGUIN is, or purports to be, a bond financier and helped facilitate the scheme to defraud Plaintiff.

18.     Plaintiff is informed and believes and thereon alleges that Defendant JAY SWART was and is an individual residing in the State of Arizona. Upon information and belief, JAY SWART

1   regularly conducts business in the state of California. JAY SWART is a longtime family friend of

2   Defendant HEATHER HENDON and participated in the fraudulent conduct alleged in this Complaint.

3        19.    Plaintiff is informed and believes and thereon alleges that Defendant PACWEST

4   ENERGY, LLC is a Delaware limited liability company domesticated as a foreign entity in the State of

5   Arizona with its principal place of business in Phoenix, Arizona. Plaintiff is informed and believes and

6   thereon alleges that Defendant PACWEST ENERGY, LLC, regularly conducts business in the state of

7   California. Upon information and belief, PACWEST ENERGY, LLC, participated in a fraudulent

8   transaction to preclude Plaintiff from recovery.

9        20.    Plaintiff is informed and believes that Defendant JACKSONS FOOD STORES, INC, is

10  a Nevada corporation conducting business in the State of Arizona the managing member of

11  PACWEST ENERGY, LLC. Plaintiff is informed and believes and thereon alleges that Defendant

12  JACKSONS FOOD STORES, INC. regularly conducts business in the state of California.

13       21.    Plaintiff is informed and believes that Defendant EQUILON ENTERPRISES, LLC, is a

14  Texas limited liability company. Moreover, EQUILON ENTERPRISES, LLC is a member of

15  PACWEST ENERGY, LLC. Plaintiff is informed and believes and thereon alleges that Defendant

16  EQUILON ENTERPRISES, LLC regularly conducts business in the state of California.

17       22.    Plaintiff is informed and believes and thereon alleges that Defendant ERNIE

18  VASQUEZ was and is an individual residing in the State of Arizona. Upon information and belief,

19  ERNIE VASQUEZ regularly conducts business in the state of California. ERNIE VASQUEZ is a

20  former co-worker of Defendant HEATHER HENDON and assisted in orchestrating the fraudulent

21  scheme as alleged in this Complaint.

22       23.    All defendants shall collectively be referred to herein as "Defendants".

23  **C. Alter Ego Status**

24       24.    Plaintiff is informed and believes and thereon alleges, that at all times mentioned

25  herein, there was such a unity of interests between each of the individual defendants named herein, that

26  the separate corporate entities should be disregarded, and the corporate entities of the defendants

27  should be treated merely as the alter-ego of the respective individual defendants. Adherence to the

28  fiction of separate existence of the corporate and entity defendants as an entity distinct from the

1 | respective individual defendants would permit an abuse of the corporate provision, would sanction
2 | fraud and injustice in that the individual defendants could evade personal liability for their wrongdoing
3 | alleged in this Complaint and could and would continue in the corporate name to perpetuate the
4 | fraudulent plan, scheme and device alleged in this Complaint. Plaintiff is further informed and believes
5 | that the individual defendants failed to respect the separate identity of the corporate and entity
6 | defendants among other ways, as follows:

a. The corporate defendants were created, and are being continued, pursuant to a fraudulent plan, and devised, conceived and operated by the individual defendants to defraud the plaintiff and the general public;

b. Corporate funds were withdrawn for personal use without treating such withdrawals as salaries or dividends;

c. The individual defendants and some of them acting jointly and individually commingled their funds with those of the corporate defendants and vice versa; and

d. The individual defendants and some of them acting jointly and individually at all times herein mentioned, completely controlled, dominated, managed and operated the corporate defendant.

**D. Doe Defendants**

25. The true names and capacities, whether individual, corporate, associate or otherwise, of defendants named herein as DOES 1 through 100, inclusive, are currently unknown to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff is informed and believes that each of these fictitiously named defendants is in some manner responsible for the events and damages alleged herein and will seek leave of court to amend this Complaint to show the true names and capacities when the same have been ascertained. Each reference in this complaint to "Defendant," "Defendants," or a specifically named defendant refers also to all defendants sued under fictitious names.

26. Plaintiff is informed and believes and thereon alleges that at all times mentioned herein, each of the defendants, as well as DOES 1 through 100, was the principal, agent, representative, partner, joint venture, co-conspirator, alter ego or employee of each of the other defendants, as well as DOES 1 through 100, and in doing the things alleged herein was acting within the course and scope of

///

Case 2:11-bk-21164-SHG    Doc 204-1    Filed 07/20/16    Entered 07/20/16 16:03:07
Desc Exhibit 1    Page 7 of 74

1  such relationship with the full knowledge, consent, authority and/or ratification of each of the other

2  defendants and DOES 1 through 100.

4  **JURISDICTION AND VENUE**

5  27.    Jurisdiction in this state is proper as Plaintiff is informed and believes and thereon

6  alleges that Defendants and each of them have systematic and continuous contacts with the state of

7  California. Further, Defendants, and each of them, have purposefully availed themselves to the benefits

8  and protections of California laws. The exercise of jurisdiction is reasonable when by their acts alleged

9  herein, Defendants assisted a California Resident, Daniel Hendon, commit fraud and other unlawful

10  acts while serving time in a California jail and/or correctional facility. Defendants' contacts include,

11  but are not limited to, phone calls, emails, meetings, conversations, agreements and plans to effectuate

12  the fraudulent scheme perpetrated against Plaintiff as alleged herein.

13  28.    Venue is proper in Orange County, California as Defendants and each of them do

14  business in the county of Orange California. Further, as set forth below, Plaintiff is informed and

15  believes and thereon alleges that all of the evidence relevant to this action is located in Orange County

16  California, where Daniel Hendon resides and acted to co-orchestrate the scheme against Plaintiff.

17  Further, Plaintiff is informed and believes and thereon alleges that Defendants and each of them have

18  hidden assets wrongfully obtained in several business enterprises in the county of orange, including a

19  car wash business owned and/or operated in Santa Ana, California.

20  **FACTUAL ALLEGATIONS**

21  ***A. Relevant History***

22  29.    On or around June of 2007, Daniel Hendon, Defendant HEATHER HENDON's father,

23  personally and by and through an alter ego entity, fraudulently procured a loan of $7.7 million dollars

24  from Plaintiff for the acquisition and development of a commercial property.

25  30.    Upon the maturation of the loan, Daniel Hendon defaulted on the note and engaged in a

26  series of delay tactics to prevent Plaintiff from pursuing its legal recourses. Furthermore, shortly

27  thereafter, Plaintiff learned that Daniel Hendon had engaged in a scheme to defraud Plaintiff and had

28  used the loan proceeds for his personal use, in direct violation of the terms of the loan agreement.

Case 2:11-bk-21164-SHG    Doc 204-1    Filed 07/20/16    Entered 07/20/16 16:03:07
Desc Exhibit 1    Page 8 of 74

1     31.     On or around February of 2010, Plaintiff filed suit against Daniel Hendon in the

2  Arizona Superior Court, for the County of Maricopa (Arizona Superior Court, County of Maricopa,

3  Case No. CV2010-004194) for breach of contract and fraud.

4     32.     On March 31, 2011, a judgment in excess of $17.7 million ("State Court Judgment")

5  was awarded to Plaintiff and issued against Daniel Hendon and other defendants.

6     33.     On or around July 25, 2011, Daniel Hendon petitioned for individual Chapter 11 relief

7  in the United States Bankruptcy Court, District of Arizona, Case No. 2:11-bk-21164 and for relief for

8  all entities under his control, Case No. 2:10-bk-02794.

9     34.     After filing an adversary proceeding, on or around August of 2014, the Court entered a

10  memorandum of decision determining that the debt to Plaintiff was non-dischargeable (Docket 119;

11  Adversary Case No. 2:11-ap-01972).)  A true and correct copy of the non-dischargeable judgment is

12  attached hereto as Exhibit "A".

13     35.     Plaintiff thus became the holder of a non-dischargeable judgment now in excess of

14  $23,916,359.14, with interest to accrue at .11% per annum.

15     36.     Ultimately, Daniel Hendon's business bankruptcy was closed on the basis that a

16  reorganization plan was "substantially consummated." Daniel Hendon's individual bankruptcy case

17  remains open.

18     37.     Plaintiff is informed and believes and thereon alleges that Daniel Hendon is a criminal

19  mastermind who is currently serving time in prison and has for years been involved in criminal

20  conduct including, but not limited to, maintaining more than 100 scam business entities, fraudulently

21  procuring loans, engaging in identity fraud, and bankruptcy fraud.

22     38.     Plaintiff is informed and believes and thereon alleges that while Daniel Hendon is

23  incarcerated, he continues to effectuate his fraudulent schemes to shield his assets from creditors and

24  specifically from Plaintiff with the assistance of Defendants.

25

26    *B. Defendants' Fraudulent Scheme to Fabricate a "Sale" of The Car Wash Business*

27     39.     Defendant HEATHER HENDON was an officer and part owner of several businesses

28  with her father, Daniel Hendon, including a family car wash business.

COMPLAINT

1       40.    Sometime on or around February of 2014, as a result of a federal raid which uncovered

2  that Daniel Hendon orchestrated a scheme to employ over 800 illegal immigrants and provide them

3  with fraudulent identities, Daniel Hendon was required to divest his ownership interests in the car wash

4  businesses.

5       41.    Plaintiff is informed and believes and thereon alleges that Defendants HEATHER

6  HENDON, ERNIE GARCIA, VERDE AUTO SERVICES, LLC, VERDE INVESTMENTS, INC.,

7  ELLIS RUBENSTEIN, PRUDENTIAL MEDAL AND STEEL SUPPLY, LLC AND ALAN MEDA

8  collectively devised an elaborate scheme to fabricate the sale of Daniel Hendon's car wash business

9  and improperly receive such assets, income, and or receivables without paying a reasonably equivalent

10  value and in an attempt to hinder, delay, and defraud Plaintiff in its collection efforts.

11       42.    Further, in order to prevent Plaintiff and/or the bankruptcy court from reaching any of

12  Daniel Hendon's proceeds from the sale of the car wash business, Defendants and each of them

13  participated as buffers and decoys while personally gaining money, assets and/or other benefits from

14  the fraud.

15       43.    Upon information and belief, in order to effectuate the scam, Defendants arranged to

16  have ERNIE GARCIA, by and through his entities VERDE AUTO SERVICES, LLC, and VERDE

17  INVESTMENTS, INC., (collectively referred to hereafter as "VERDE") act as a "straw man" to

18  conceal the sale profits from the courts and Plaintiff and for the benefit of all Defendants.

19       44.    On or around June of 2014, Defendant ERNIE GARCIA and/or VERDE, purchased

20  three mortgage notes secured by the assets of the car wash business for a substantial discount from the

21  creditors prior to the trustee's sale in Daniel Hendon's business bankruptcy case.  Exhibit "B".

22       45.    In turn, on or around August of 2014, ERNIE GARCIA and/or VERDE sold the

23  mortgage loans to PACWEST ENERGY, LLC, a joint venture between EQUILON ENTERPRISES,

24  LLC, and JACKSONS FOOD STORES, INC. for a significant profit.

25       46.    Immediately thereafter on or around December of 2015, ERNIE GARCIA and/or

26  VERDE transferred approximately $600,000 of the proceeds from the sale of the mortgage notes back

27  to the Hendon family and specifically through HEATHER HENDON. Exhibit "C".

28  ///

COMPLAINT

1       47.     On or around April of 2015, Defendant ERNIE GARCIA and/or VERDE transferred an

2 additional $1,000,000 from the proceeds of the sale to Defendant HEATHER HENDON. Exhibit "D".

3       48.     To effectuate the $1,600,000 transfer from the proceeds of the sale of the car wash

4 business to HEATHER HENDON, Defendants ERNIE GARCIA, VERDE, HEATHER HENDON,

5 ELLIS RUBENSTEIN, and PRUDENTIAL conspired to create two fabricated single page loan

6 documents, as a guise.

7       49.     HEATHER HENDON in turn used and continues to use such funds for the benefit of

8 her father Daniel Hendon and has spent thousands of dollars on his behalf to pay his expenses,

9 bankruptcy trustees' fees, and attorney's fees and for her own personal benefit to the detriment of

10 Plaintiff.

11       50.     On or around January of 2015 through December of 2015, Defendant ALAN MEDA,

12 Daniel Hendon's bankruptcy attorney, through his law firm BURCH & CRACCHIOLO, has accepted

13 at least 7 wire transfers of approximately $45,000 from HEATHER HENDON to pay for Daniel

14 Hendon's legal fees, knowing that said funds are the proceeds from the fraudulent sale of the car wash

15 business which was intended to defraud the bankruptcy courts.

16       51.     Plaintiff is informed and believes and thereon alleges that Defendant ALAN MEDA, as

17 Daniel Hendon's attorney, advised and counseled Daniel Hendon and Defendant HEATHER

18 HENDON to effectuate this bankruptcy fraud.

19       52.     At all times mentioned herein, Defendants ERNIE GARCIA, VERDE, HEATHER

20 HENDON, PACWEST ENERGY, LLC, and ALAN MEDA were aware of Daniel Hendon's pending

21 bankruptcy and of Plaintiff's non-dischargeable judgment and therefore conspired to devise this

22 scheme, outside the purview of the bankruptcy court, in order to perpetrate a fraud on the court and

23 specifically to preclude plaintiff from reaching such assets.

24       53.     Plaintiff is informed and believes and thereon alleges that approximately six months

25 prior to the sale of the mortgage notes to ERNIE GARCIA and/or VERDE, HEATHER HENDON met

26 with a representative of PACWEST ENERGY, LLC, and orchestrated this elaborate scheme.

27 ///

28 ///

Case 2:11-bk-21164-SHG    Doc 204-1    Filed 07/20/16    Entered 07/20/16 16:03:07
Desc Exhibit 1    Page 11 of 74

1    54.    After purchasing the three mortgage notes from ERNIE GARCIA, PACWEST

2 ENERGY, LLC, and/or JACKSONS FOOD STORES, subsequently acquired all the remaining assets

3 of the company in lieu of foreclosure of the three mortgage notes.

4    55.    Plaintiff is informed and believes and thereon alleges that agents of PACWEST

5 ENERGY, LLC, and/or JACKSONS FOOD STORES, Inc. were aware of HEATHER HENDON's

6 fraudulent scheme and knowingly participated in such.

7    56.    Upon the consummation of the sale of the car wash business to PACWEST ENERGY,

8 LLC, Defendant HEATHER HENDON was immediately appointed as the vice president of operations

9 and as an agent for certain liquor licenses owned by JACKSON FOOD STORES, Inc.

10    57.    Plaintiff is informed and believes and thereon alleges that Daniel Hendon maintains an

11 ownership interest in the car wash business either directly or indirectly through HEATHER HENDON.

12    58.    Plaintiff is informed and believes and thereon alleges that Defendant HEATHER

13 HENDON continues to act as the alter ego of her father, debtor Daniel Hendon. Further, HEATHER

14 HENDON continues to use the proceeds from the purported sale of the car wash business and/or the

15 continued profits and income from the car wash business to pay for Daniel Hendon's expenses.

16    59.    Plaintiff is informed and believes and thereon alleges that Defendant HEATHER

17 HENDON currently maintains approximately $510,000 from the proceeds of the purported sale of the

18 car wash business in a bank or investment account operated by LPL Financial. Upon information and

19 belief, these funds are being held directly or indirectly for the benefit of Daniel Hendon.

20    *C.  Fraudulently Channeling Funds through ELLIS RUBENSTEIN to Daniel Hendon*

21    60.    Defendant HEATHER HENDON has wired approximately $910,000 of the sale

22 proceeds from the car wash to Defendants PRUDENTIAL METAL AND STEEL SUPPLY, LLC

23 ("PRUDENTIAL") and/or E MANAGEMENT CONSULTING ("E MANAGEMENT"), the alter egos

24 of ELLIS RUBENSTEIN.

25    61.    Plaintiff is informed and believes and thereon alleges that Defendant ELLIS

26 RUBENSTEIN is a friend of Daniel Hendon and/or Defendant HEATHER HENDON's former co-

27 worker and an employee of the car wash business.

28 ///

1    62.    Plaintiff is informed and believes and thereon alleges that Defendant HEATHER

2  HENDON transferred the proceeds from the sale of the car wash to Defendant ELLIS RUBENSTEIN

3  under the guise of an "investment" and/or "loan." Exhibit "E".

4    63.    Upon information and belief, ELLIS RUBENSTEIN, through PRUDENTIAL and E

5  MANAGEMENT, is holding the proceeds from the sale of the car wash for the benefit of Debtor.

6  ***D. Systematic Transfers Made to Conceal Assets***

7    64.    During Plaintiff's pending adversary proceeding against Daniel Hendon, Defendants

8  engaged in a series of transactions to hide and/or obtain Daniel Hendon's assets to the detriment of

9  Plaintiff.

10    65.    Defendant HEATHER HENDON was transferred more than 40% of the membership

11  interests in Daniel Hendon's business entity Danny's Management Services, LLC in order to preclude

12  Plaintiff from collecting on its judgment.

13    66.    Further, Plaintiff is informed and believes and thereon alleges that on or around

14  September of 2014, Daniel Hendon made several transfers to HEATHER HENDON, which were used

15  to pay for HEATHER HENDON'S lavish wedding. Upon information and belief said sums totaled

16  approximately 1 million dollars.

17    67.    Upon information and belief, on or around September of 2014, Defendant HEATHER

18  HENDON immediately began transferring her interests in said funds into her living trust, in order that

19  the funds not be reached by Plaintiff.

20    68.    On or around January of 2014, upon information and belief, Defendant KELLY

21  CARROLL participated in a scam to receive funds from the sale of Daniel Hendon's furniture.

22    69.    In his Chapter 11 voluntary petition, Daniel Hendon fraudulently disclosed that his

23  personal furniture was only worth approximately $40,000. However, on or around January of 2014,

24  Daniel Hendon sold the same furniture in escrow for the sum of $600,000 (the "First Bank Account").

25  Defendant KELLY CARROLL received $200,000 in proceeds from the sale of this furniture. Upon

26  information and belief, KELLY CARROLL used the funds to purchase real property located at 6647 E.

27  Morning Vista Lane, Scottsdale, Arizona.

28  ///

COMPLAINT

1         70.     Upon information and belief, additional transfers to KELLY CARROLL were

2   consummated pursuant to a sham settlement agreement, designed for the purpose of hiding Daniel

3   Hendon's assets from Plaintiff.

4         71.     Furthermore, on or around October of 2013, through its adversary proceeding, Plaintiff

5   learned that Defendant KELLY CARROLL personally received at least $160,000 from the 7.7 million

6   dollar loan that Plaintiff gave to Daniel Hendon, which was only supposed to be used for the

7   development of a commercial property.

8         72.     Upon information and belief, Defendants NELL HENDON and VICTORIA HENDON,

9   participated in the perpetration of the fraud by receiving assets, monies, and/or title to personal and real

10  property from Daniel Hendon.

11        73.     Furthermore, Plaintiff is informed and believes and thereon alleges that Defendant

12  VICTORIA HENDON is holding Daniel Hendon's property and assets in various states under various

13  corporate entities to shield their existence from Plaintiff.

14        74.     Plaintiff is informed and believes and thereon alleges that Defendant ERNIE

15  VASQUEZ, Daniel Hendon's car wash manager and "right-hand man," assisted Daniel Hendon in

16  implementing his fraudulent scheme by concealing evidence of fraudulent transfers, incriminating

17  communications, and committing perjury to protect Daniel Hendon.

18        75.     Plaintiff is informed and believes and thereon alleges that Defendant ERNIE

19  VASQUEZ also received funds from Daniel Hendon, disguised as payments for past-rendered

20  services.

21        76.     Plaintiff is informed and believes and thereon alleges that in a ruse to allow Daniel

22  Hendon to transfer large sums of money out of the country. Defendant GIL OLGUIN made false

23  representations to Plaintiff and claimed that he had procured bond financing for Daniel Hendon which

24  would be used to pay off the 7.7 million dollar loan owed to Plaintiff. Specifically, GIL OLGUIN

25  maintained that the bond financing was a "done deal."

26        77.     Relying on GIL OLGUIN's representations, Plaintiff refrained from filing a lawsuit to

27  enforce its promissory note and provided Daniel Hendon with additional time to pay off the note. Upon

28  ///

1  information and belief, Daniel Hendon used this additional time to wire large sums of money to
2  accounts outside of the United States which were owned and/or operated by Defendant GIL OLGUIN.

3      78.    On or around August of 2014, Defendant MARIA BARKER, Daniel Hendon's
4  girlfriend, received at least $100,000 from Daniel Hendon in order to preclude Plaintiff from
5  recovering such funds. Defendant MARIA BARKER cashed four checks from Daniel Hendon which
6  originated from the First Bank Account.

7      79.    Upon information and belief, in an effort to hide other assets from Plaintiff, Defendant
8  MARIA BARKER received thousands of dollars from Daniel Hendon and used it to prepay rent for a
9  home located in Corona Del Mar, California. Upon information and belief, Daniel Hendon resides at
10 this address. Further, to elude creditors and Plaintiff, MARIA BARKER goes by various names, one
11 such name is Priscila De Leon.

12     80.    Defendant JAY SWART is a longtime friend of Daniel Hendon. Upon information and
13 belief, Defendants KELLY CARROLL and JAY SWART, engaged in a series of secret transactions
14 disguised as loans whereby JAY SWART would appear to be a secured creditor in various assets
15 belonging to Daniel Hendon. Defendants' actions were purposefully designed to keep Daniel Hendon's
16 assets out of reach of creditors in his individual bankruptcy case and specifically Plaintiff.

17     81.    Among other assets, Plaintiff is informed and believes and thereon alleges that Daniel
18 Hendon transferred a Ferrari to Defendant JAY SWART without adequate compensation and in an
19 effort to hide such asset. Upon information and belief, Defendant JAY SWART is holding the Ferrari
20 for the benefit of Daniel Hendon.

21     82.    All of the aforementioned transfers were made without adequate compensation.

22     83.    Plaintiff is informed and believes and thereon alleges that, Defendant ALAN MEDA,
23 Daniel Hendon's counsel, actively assisted Daniel Hendon in providing legal advice to further Daniel
24 Hendon's fraudulent schemes and in violation of the rules of professional conduct.

25 ///
26 ///
27 ///
28 ///

COMPLAINT

**FIRST CAUSE OF ACTION**
**FRAUDULENT TRANSFER**
**(Against All Defendants and DOES 1-100)**

84.　Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

85.　At all times relevant to this lawsuit, Plaintiff was a creditor and had a right of payment from Daniel Hendon for at least $7.7 million dollars.

86.　Plaintiff is informed and believes and thereon alleges that at all times relevant to this lawsuit, Daniel Hendon, working in conjunction with Defendants, systematically transferred his assets, income, and/or receivables to the entity and individual Defendants named herein for the specific purpose of avoiding collection of the debts owed to Plaintiff. Plaintiff is further informed and believes and thereon alleges that as a result of each transfer, Daniel Hendon was insolvent, or became insolvent as a result of the transfers.

87.　Plaintiff is informed and believes and thereon alleges that Daniel Hendon divested himself of the income, assets, and/or property without receiving adequate value by conveying it to friends and family in order to leave the debtor without sufficient assets to repay creditors.

88.　Plaintiff is informed and believes and thereon alleges that Defendants actions were taken willingly, intentionally, and knowingly in violation of Plaintiffs' rights and with the actual intent to hinder, delay and defraud Plaintiff in its attempt to collect on its non-dischargeable judgment.

89.　Plaintiff is informed and believes and thereon alleges that Daniel Hendon's alleged divestiture from the car wash business was a sham and that Daniel Hendon continues to have an ownership interest in the car wash business either directly or indirectly and continues to receive benefits including income and assets.

90.　Plaintiff is informed and believes and thereon alleges that Defendants assisted or participated in Daniel Hendon's scheme to form multiple business entities in order to hide assets and/or shift funds between different entities and/or persons, thereby avoiding mounting judgments and the debt owed to Plaintiff.

///

---

COMPLAINT

Case 2:11-bk-21164-SHG    Doc 204-1    Filed 07/20/16    Entered 07/20/16 16:03:07
Desc Exhibit 1    Page 16 of 74

1        91.    Plaintiff is informed and believes and thereon alleges that Defendants intentional acts

2  were designed to disrupt and frustrate Plaintiff's ability to receive performance of Daniel Hendon's

3  obligations in his individual Chapter 11 bankruptcy.

4        92.    As a direct, legal, and proximate result of Defendants' fraudulent transfers, Plaintiff has

5  suffered, and will continue to suffer, substantial general and special damages in an amount according

6  to proof.

7        93.    The aforementioned conduct was willful, wanton, malicious and oppressive and was

8  undertaken with the intent to defraud Plaintiff and justifies an award of exemplary and punitive

9  damages.

10       94.    As a direct and proximate result of the foregoing unlawful, unfair or fraudulent acts and

11  practices by Defendants and DOES 1 through 100, inclusive, and each of them, Plaintiff is entitled to

12  injunctive relief prohibiting such acts or practices from hereinafter continuing.

13       95.    Plaintiff is moreover entitled to an order of restitution, requiring Defendants and DOES

14  1 through 100, inclusive, and each of them, to disgorge any and all funds they received or derived,

15  directly or indirectly, as a result of such unlawful, unfair or fraudulent business acts and practices.

16

17
### SECOND CAUSE OF ACTION
### FRAUDULENT CONCEALMENT
### (Against All Defendants and DOES 1-100)
18

19       96.    Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby

20  incorporates them by reference as though fully set forth herein.

21       97.    Plaintiff is informed and believes and thereon alleges that Defendants concealed

22  essential and material information and facts, including but not limited to, facts pertaining the

23  fraudulent divestiture of the car wash business and systematic transfers of Daniel Hendon's income,

24  assets, and/or property in an effort to defraud Plaintiff and to maintain their deceptive scheme.

25       98.    Plaintiff is informed and believes and thereon alleges that had Plaintiff been aware of

26  the existence of the facts not disclosed by Defendants, Plaintiff would have made collection efforts on

27  its judgment prior to the transfer of Daniel Hendon's assets out of the reach of Plaintiff.

28  ///

1   99.   Plaintiff is informed and believes and thereon alleges that Defendants' concealment of

2   the fraudulent transfers and fraudulent sale of the car wash business, was a substantial factor in causing

3   Plaintiff's harm, including loss of millions of dollars in assets either transferred or hidden by Daniel

4   Hendon in order to preclude Plaintiff from collecting on its judgment, additional losses from any

5   income or interest derived from those assets, and losses to pursue this legal action.

6   100.   The aforementioned conduct was an intentional concealment and suppression of

7   material facts known to Defendants with the intention on the part of Defendants of thereby depriving

8   Plaintiff of property or legal rights or otherwise causing injury, and was conduct that was willful,

9   wanton, malicious and oppressive and undertaken with the intent to defraud Plaintiff and thus justifies

10   an award of exemplary and punitive damages.

11   101.   As a direct, legal, and proximate result of Defendants' fraudulent transfers, Plaintiff has

12   suffered, and will continue to suffer, substantial general and special damages in an amount according

13   to proof.

14   102.   As a direct and proximate result of the foregoing unlawful, unfair or fraudulent acts and

15   practices by Defendants and DOES 1 through 100, inclusive, and each of them, Plaintiff is entitled to

16   injunctive relief prohibiting such acts or practices from hereinafter continuing.

17   103.   Plaintiff is moreover entitled to an order of restitution, requiring Defendants and DOES

18   1 through 100, inclusive, and each of them, to disgorge any and all funds they received or derived,

19   directly or indirectly, as a result of such unlawful, unfair or fraudulent business acts and practices.

20
21   **THIRD CAUSE OF ACTION**
     **CIVIL CONSPIRACY**
22   **(Against All Defendants and DOES 1-100)**

23   104.   Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby

24   incorporates them by reference as though fully set forth herein.

25   105.   Plaintiff is informed and believes and thereon alleges that Defendants and DOES 1

26   through 100, inclusive, knowingly and willfully conspired between themselves to hinder, delay and

27   defraud Plaintiff by cooperatively engaging in fraudulent transfers of Daniel Hendon's assets and the

28   fraudulent divestiture of the car wash business.

Further, to conceal Daniel Hendon's funds from Plaintiff, Defendants and DOES 1 through 100, inclusive, and each of them, created single-purpose bank accounts, committed wire frauds, and/or created layers of corporate entities to shield their wrongful actions.

106. Plaintiff is informed and believes and thereon alleges, that Defendants were untruthful when testifying under penalty of perjury regarding wire transfers related to Daniel Hendon to hide voidable transfers from creditors.

107. Plaintiff is informed and believes and thereon alleges, that under this conspiracy, Defendants agreed to and actually performed the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and agreement alleged in this Complaint.

108. Plaintiff is informed and believes, and thereon alleges, that Defendants equally profited from the wrongful acts complained of herein and are jointly and severally liable for each of the wrongs.

109. The aforementioned conduct by Defendants was a substantial factor in causing harm to Plaintiff.

110. As a direct, legal, and proximate result of the aforementioned conduct, Plaintiff has suffered, and will continue to suffer, substantial general and special damages in an amount according to proof.

111. The aforementioned conduct was willful, wanton, malicious and oppressive and was undertaken with the intent to defraud Plaintiff and justifies an award of exemplary and punitive damages.

112. Plaintiff is further informed and believes, and thereon alleges, that if Defendants and DOES 1 through 100 inclusive, and each of them, are permitted to further engage in such unlawful, unfair or fraudulent business acts and practices, they will even more grievously injure Plaintiff.

113. As a direct and proximate result of the foregoing unlawful, unfair or fraudulent acts and practices by Defendants and DOES 1 through 100, inclusive, and each of them, Plaintiff is entitled to injunctive relief prohibiting such acts or practices from hereinafter continuing.

///

///

1    114.    Plaintiff is moreover entitled to an order of restitution, requiring Defendants and DOES

2  1 through 100, inclusive, and each of them, to disgorge any and all funds they received or derived,

3  directly or indirectly, as a result of such unlawful, unfair or fraudulent business acts and practices.

4

5                              **FOURTH CAUSE OF ACTION**
                                  **AIDING AND ABETTING**
6                          **(Against All Defendants and DOES 1-100)**

7       115.    Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby

8  incorporates them by reference as though fully set forth herein.

9       116.    Plaintiff is informed and believes and thereon alleges, that Defendants had full

10  knowledge or should have reasonably known of the true nature of the wrongful conduct of Defendant

11  HEATHER HENDON, Daniel Hendon, and each other named Defendant, and aided and abetted in

12  such wrongful conduct, including interference with Plaintiff's collection efforts, by providing

13  substantial assistance and/or encouraging others to act in wrongful conduct.

14      117.    Specifically, Plaintiff is informed and believes and thereon alleges that Defendants and

15  DOES 1 through 100, inclusive, knowingly and willfully provided substantial assistance or

16  encouragement to Defendant HEATHER HENDON and her father Daniel Hendon to hinder, delay and

17  defraud Plaintiff by engaging in fraudulent transfers of Daniel Hendon's assets and the fraudulent

18  divestiture of the car wash business.

19      118.    Further, to assist in committing fraud, Defendants and DOES 1 through 100, inclusive,

20  and each of them, created single-purpose bank accounts, committed wire frauds, concealed assets,

21  and/or created layers of corporate entities to shield their wrongful actions.

22      119.    Plaintiff is informed and believes, and thereon alleges, that Defendants were untruthful

23  when testifying under penalty of perjury regarding wire transfers related to Daniel Hendon to hide

24  voidable transfers from creditors.

25      120.    As a direct, legal, and proximate result of the aforementioned conduct, Plaintiff has

26  suffered, and will continue to suffer, substantial general and special damages in an amount according

27  to proof.

28  ///

Case 2:11-bk-21164-SHG    Doc 204-1    Filed 07/20/16    Entered 07/20/16 16:03:07
                    Desc Exhibit 1    Page 20 of 74

1    121.   The aforementioned conduct was a substantial factor in causing harm to Plaintiff and

2    was conduct that was oppressive, fraudulent, and malicious, and subjected Plaintiff to cruel and unjust

3    hardship in a willful and conscious disregard of their rights. As such, Plaintiff is entitled to an award of

4    punitive damages at trial.

5    122.   As a direct and proximate result of the foregoing unlawful, unfair or fraudulent acts and

6    practices by Defendants and DOES 1 through 100, inclusive, and each of them, Plaintiff is entitled to

7    injunctive relief prohibiting such acts or practices from hereinafter continuing.

8    123.   Plaintiff is moreover entitled to an order of restitution, requiring Defendants and DOES

9    1 through 100, inclusive, and each of them, to disgorge any and all funds they received or derived,

10   directly or indirectly, as a result of such unlawful, unfair or fraudulent business acts and practices.

11

12   **FIFTH CAUSE OF ACTION**
     **UNJUST ENRICHMENT**
13   **(Against All Defendants and DOES 1-100)**

14   124.   Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby

15   incorporates them by reference as though fully set forth herein.

16   125.   Defendants' willful and conscious disregard for Plaintiff's rights and remedies and the

17   harm caused to Plaintiff based on the egregious conduct alleged herein created an unjust hardship for

18   Plaintiff. Plaintiff has been forced to expend substantial time, resources, and money in order to recover

19   damages caused to it by the allegations contained herein.

20   126.   Defendants have been unjustly enriched as a result of the unlawful conduct alleged in

21   this Complaint.

22   127.   As a direct, legal, and proximate result of the aforementioned conduct, Plaintiff has

23   suffered, and will continue to suffer, substantial general and special damages in an amount according

24   to proof.

25   128.   The aforementioned conduct was oppressive, fraudulent, and malicious, and subjected

26   Plaintiff to cruel and unjust hardship in a willful and conscious disregard of their rights. As such,

27   Plaintiff is entitled to an award of punitive damages at trial.

28   ///

Case 2:11-bk-21164-SHG    Doc 204-1    Filed 07/20/16    Entered 07/20/16 16:03:07
Desc Exhibit 1    Page 21 of 74

1    129.    Plaintiff is further informed and believes, and thereon alleges, that if Defendants and
2    DOES 1 through 100 inclusive, and each of them, are permitted to further engage in such unlawful,
3    unfair or fraudulent business acts and practices, they will even more grievously injure Plaintiff.

4    130.    As a direct and proximate result of the foregoing unlawful, unfair or fraudulent acts and
5    practices by Defendants and DOES 1 through 100, inclusive, and each of them, Plaintiff is entitled to
6    injunctive relief prohibiting such acts or practices from hereinafter continuing.

7    131.    Plaintiff is moreover entitled to an order of restitution, requiring Defendants and DOES
8    1 through 100, inclusive, and each of them, to disgorge any and all funds they received or derived,
9    directly or indirectly, as a result of such unlawful, unfair or fraudulent business acts and practices.

10
11                                **SIXTH CAUSE OF ACTION**
                                 **CONSTRUCTIVE TRUST**
12                          **(Against All Defendants and DOES 1-100)**

13    132.    Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby
14    incorporates them by reference as though fully set forth herein.

15    133.    This is an action seeking equitable redress for Defendants' illegal and wrongful course
16    of conduct in taking the income, profits, proceeds, assets and monies from sale of properties and other
17    transfers.

18    134.    Plaintiff is informed and believes, and thereon alleges, that Defendant's have gained an
19    unconscionable advantage in the retention of wrongfully withheld monies and assets belonging to
20    Plaintiff.

21    135.    Plaintiff is further informed and believes, and thereon alleges, that Defendants'
22    wrongfully transferred, acquired and/or hold property and monies that were deprived from the
23    bankruptcy estate, including, but not limited to the fraudulent sale of the car wash business and all
24    proceeds generated therefrom.

25    136.    As a direct, legal, and proximate result of the aforementioned conduct, Plaintiff has
26    suffered, and will continue to suffer, substantial general and special damages in an amount according
27    to proof.

28    ///

137.     The aforementioned conduct was oppressive, fraudulent, and malicious, and subjected Plaintiff to cruel and unjust hardship in a willful and conscious disregard of their rights. As such, Plaintiff is entitled to an award of punitive damages at trial.

138.     Plaintiff is further informed and believes, and thereon alleges, that if Defendants and DOES 1 through 100 inclusive, and each of them, are permitted to further engage in such unlawful, unfair or fraudulent business acts and practices, they will even more grievously injure Plaintiff.

139.     As a direct and proximate result of the foregoing unlawful, unfair or fraudulent acts and practices by Defendants and DOES 1 through 100, inclusive, and each of them, Plaintiff is entitled to injunctive relief prohibiting such acts or practices from hereinafter continuing.

140.     Plaintiff is moreover entitled to an order of restitution, requiring Defendants and DOES 1 through 100, inclusive, and each of them, to disgorge any and all funds they received or derived, directly or indirectly, as a result of such unlawful, unfair or fraudulent business acts and practices.

141.     Based upon the facts alleged, Defendant's are holding properties and proceeds, or any portion thereof, in constructive trust for the benefit of Plaintiff.

### SEVENTH CAUSE OF ACTION
### ACCOUNTING
**(Against All Defendants and DOES 1-100)**

142.     Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

143.     In the course of perpetrating the fraud, Defendants and DOES 1 through 100, inclusive, and each of them, fraudulently, intentionally and wrongfully received, redistributed, or misplaced monies due to Plaintiff, wherein a portion may be due to Plaintiff.

144.     Plaintiff is informed and believes, and thereon alleges, that Defendant's received monies and properties as a result of their misconduct, at Plaintiff's expense, and that some or all of such monies and properties and profits derived therefrom is rightfully due to Plaintiff.

145.     The amount of money due from Defendants to Plaintiff is unknown to Plaintiff and cannot be ascertained without an accounting of the receipts and disbursements of the income and gross profits Defendant's have obtained through their wrongful and unlawful conduct.

COMPLAINT

1    146.    Plaintiff is therefore entitled to and demands a full accounting from all Defendants.

2    147.    As a direct, legal, and proximate result of the aforementioned conduct, Plaintiff has

3    suffered, and will continue to suffer, substantial general and special damages in an amount according

4    to proof.

5    148.    Plaintiff is further informed and believes, and thereon alleges, that if Defendants and

6    DOES 1 through 100 inclusive, and each of them, are permitted to further engage in such unlawful,

7    unfair or fraudulent business acts and practices, they will even more grievously injure Plaintiff.

8    149.    As a direct and proximate result of the foregoing unlawful, unfair or fraudulent acts and

9    practices by Defendants and DOES 1 through 100, inclusive, and each of them, Plaintiff is entitled to

10   injunctive relief prohibiting such acts or practices from hereinafter continuing.

11   150.    Plaintiff is moreover entitled to an order of restitution, requiring Defendants and DOES

12   1 through 100, inclusive, and each of them, to disgorge any and all funds they received or derived,

13   directly or indirectly, as a result of such unlawful, unfair or fraudulent business acts and practices.

14

15   **EIGHT CAUSE OF ACTION**
     **MONEY HAD AND RECEIVED**
16   **(Against All Defendants and DOES 1-100)**

17   151.    Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby

18   incorporates them by reference as though fully set forth herein.

19   152.    Defendants received substantial benefits at the expense of Plaintiff and took advantage

20   of Plaintiff's situation whereby money was exacted to which Defendant had no legal right.

21   153.    Defendants' willful and conscious disregard for Plaintiff's rights and the harm caused to

22   Plaintiff based on their egregious conduct created an unjust hardship for Plaintiff.

23   154.    Defendants have been unjustly enriched as a result of the conduct described in this

24   Complaint and other inequitable conduct.

25   155.    Plaintiff is further informed and believes, and thereon alleges, that Defendant's

26   wrongfully transferred, acquired and/or hold property and monies that were deprived from the

27   bankruptcy estate, including, but not limited to the fraudulent sale of the car wash business and all

28   proceeds and profits generated therefrom.

1    156.    As a direct, legal, and proximate result of the aforementioned conduct, Plaintiff has

2    suffered, and will continue to suffer, substantial general and special damages in an amount according

3    to proof.

4    157.    The aforementioned conduct was oppressive, fraudulent, and malicious, and subjected

5    Plaintiff to cruel and unjust hardship in a willful and conscious disregard of their rights. As such,

6    Plaintiff is entitled to an award of punitive damages at trial.

7    158.    Plaintiff is further informed and believes, and thereon alleges, that if Defendants and

8    DOES 1 through 100 inclusive, and each of them, are permitted to further engage in such unlawful,

9    unfair or fraudulent business acts and practices, they will even more grievously injure Plaintiff.

10   159.    As a direct and proximate result of the foregoing unlawful, unfair or fraudulent acts and

11   practices by Defendants and DOES 1 through 100, inclusive, and each of them, Plaintiff is entitled to

12   injunctive relief prohibiting such acts or practices from hereinafter continuing.

13   160.    Plaintiff is moreover entitled to an order of restitution, requiring Defendants and DOES

14   1 through 100, inclusive, and each of them, to disgorge any and all funds they received or derived,

15   directly or indirectly, as a result of such unlawful, unfair or fraudulent business acts and practices

16

17   **NINTH CAUSE OF ACTION**
     **UNFAIR BUSINESS PRACTICES (BUS. & PROF. CODE § 17200 ET SEQ**
18   **(Against All Defendants and DOES 1-100)**

19   161.    Plaintiff refers to each of the foregoing paragraphs in their entirety and hereby

20   incorporate them by reference as though fully set forth herein.

21   162.    Plaintiff is informed and believes, and thereon alleges, that the wrongful conduct of

22   Defendants and DOES 1 through 100 inclusive, as described above constitutes unlawful, unfair or

23   fraudulent business acts or practices proscribed by California's Unfair Business Practices Act, or

24   Business and Professions Code section 17200, *et seq,* including but not limited to the regular

25   occurrences of fraud, including but not limited to, creation of fraudulent business enterprises for the

26   purpose of laundering money and defrauding Plaintiff and the courts, engaging in a conspiracy to

27   willfully and intentionally obtain and/or hide funds rightfully belonging to Plaintiff, fraudulent

28   statements made to Plaintiff, fraudulent wire transfers and bank deposits, and mail fraud.

163.     Plaintiff is informed and believes, and thereon alleges, that Defendants have committed the aforementioned acts on a more widespread basis, and that Defendants, acting together, constitute a criminal enterprise who have harmed similarly situated banks, lenders, consumer, and/or members of the public at large.

164.     Plaintiff is further informed and believes, and thereon alleges, that if Defendants and DOES 1 through 100 inclusive, and each of them, are permitted to further engage in such unlawful, unfair or fraudulent business acts and practices, they will even more grievously injure Plaintiff and other potential victims of Defendants' fraudulent scams.

165.     As a direct and proximate result of the foregoing unlawful, unfair or fraudulent business acts and practices by Defendants and DOES 1 through 100, inclusive, and each of them, Plaintiff is entitled to injunctive relief prohibiting such acts or practices from hereinafter continuing.

166.     Plaintiff is moreover entitled to an order of restitution, requiring Defendants and DOES 1 through 100, inclusive, and each of them, to disgorge any and all funds they received or derived, directly or indirectly, as a result of such unlawful, unfair or fraudulent business acts and practices.

167.     Defendants' unfair business practices were the direct cause of Plaintiff's harm. As a direct and proximate result of Defendants' business practices, Defendants have received and continue to benefit by continuing to receive profits and returns realized from the funds that have been improperly withheld from Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against all Defendants and DOES 1-100, and each of them, as follows:

### **ON THE FIRST, SECOND, THIRD, FOURTH AND FIFTH CAUSES OF ACTION**

1.     For general, special and consequential damages according to proof;

2.     For all costs of the proceedings herein;

3.     For attorney's fees and costs;

4.     For punitive damages;

5.     For pre and post-judgment interest; and

1      6.      For any such other relief the Court deems proper.

2      **ON THE SIXTH, SEVENTH, EIGHTH, AND NINTH CAUSES OF ACTION**

3      1.      For an order of restitution, requiring Defendants and DOES 1 through 100, inclusive, to

4            disgorge any and all funds they received or derived, directly or indirectly, as a result of

5            their unlawful, unfair or fraudulent business acts and practices;

6      2.      For a permanent injunction enjoining defendants from engaging in the conduct alleged;

7      3.      For attorney's fees and costs;

8      4.      For general, special and consequential damages according to proof;

9      5.      For all costs of the proceedings herein;

10      6.      For punitive damages;

11      7.      For pre and post-judgment interest; and

12      8.      For any such other relief the Court deems proper.

13

14 Dated: March 4, 2016                  **WILSON KEADJIAN BROWNDORF, LLP**

15

16                           _____

17                           Marc Lazo
                          Attorney for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# EXHIBIT A



Eileen W. Hollowell, Bankruptcy Judge

1
2
3
4
5
6
7
8
9

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

10  In re:

11  DANIEL L. HENDON,

12                              Debtor.

13

14  DIVERSIFIED FUNDING GROUP, LLC, an
    Arizona limited liability company, et al,

15                              Plaintiffs,

16  v.

17  DANIEL L. HENDON,

18                              Defendant.

19

Chapter 11 Proceeding

Case No. 2:11-bk-21164-EWH

Adversary No. 2:11-ap-01972-EWH

**MEMORANDUM DECISION**

20

21                  **I.  INTRODUCTION**

22      Debtor personally guaranteed a loan made by Plaintiff to an LLC he controlled. That

23  entity defaulted, and the loan was never repaid. Plaintiff seeks a determination that Debtor's

24  obligation under his guarantee is nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (B).

25  For the reasons explained in the balance of this decision, Plaintiffs are entitled to a judgment

26  on one of their § 523(a)(2)(A) claims.

27

28

## II.  JURISDICTIONAL STATEMENT

Jurisdiction is proper under 28 U.S.C. §§ 1334 and 157(b)(2)(J).[1]

## III.  FACTS

### A.    Debtors' Entities

In 2007, Daniel L. Hendon ("Debtor" or "Hendon") and two partners, Richard Burton ("Burton") and Robert Banovac, Sr. ("Banovac"), through entities they each controlled were members of Rightpath Holdings, LLC ("Rightpath"). Hendon, through his entity, MLB Development, LLC, was the managing member of Rightpath.

In 2007, Hendon operated over twenty (20) car washes ("Car Washes") in the greater Phoenix area. Most of the Car Washes were owned by separate LLC's controlled by Hendon. Hendon also owned a number of real properties, including property in Glendale, Arizona, which he hoped to develop in conjunction with that city's plans to build a baseball stadium. While not completely clear from the record, Danny's Family Companies III, LLC ("DFC III") was an entity which Hendon used to manage most, if not all, of the entities in which he held a controlling interest ("the Danny's Companies"). It was Hendon's business practice to maintain in DCF III's bank account all "excess money" from the Danny's Companies, with the understanding that the excess would be put back into the companies when needed in the form of a capital investment or intercompany transfer. (Tr. 6/27/14, 99:5-15). As a result, the DFC III account was an account where funds, including loan funds related to the various Danny's Companies were comingled.

---

[1]   Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. § 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure Rules 1001-9037.

As discussed infra, Rightpath transferred money to DFC III. Rightpath also deposited into a single account loan proceeds from all of its lenders. (Ex. 130, Interrogatory Answer #5).

**B.    Rightpath's and Diversified Funding Group's Business**

Rightpath hoped to act as the developer of a number of parcels of real property under a proposed development agreement with the cities of Phoenix and Glendale. The specific properties which Rightpath hoped to develop included: a 77 Acre Parcel ("77 Acre Parcel"), Mainstreet Glendale Property ("Mainstreet"), and the Airpark Property ("Airpark") (collectively, the "Specified Properties").

Beginning in March 2007, as part of its efforts to develop the Specified Properties, Rightpath sought a loan from Diversified Funding ("DF"). At about the same time, it was negotiating a development agreement for the Specified Properties. The proposed development agreement included the 77 Acre Parcel, which had been zoned for high density. Rightpath had entered into a purchase agreement to acquire the 77 Acre Parcel from Ferrantino Enterprises LLC ("Ferrantino"). Rightpath had received a letter of intent ("LOI") from Fairfield Enterprises ("Fairfield") for half of the 77 Acre Parcel for approximately $850,000 an acre. Rightpath planned to sell one-half of the 77 Acre Parcel as soon as the purchase from Ferrantino closed.

DF was formed in 2003 as a capital investment company. In 2007, it made short-term, six-months to three year loans to borrowers, including real estate developers. It was DF's business practice to raise money for its loans from investors who executed a standard form of loan participation agreement ("LPA") to purchase an undivided interest in a DF loan. Under Section 3 of the LPA, Diversified was the Administrator and Servicer of the loan, including pursuing collection by instituting an action to collect any amounts owed by the borrower or to enforce the loan documents.

## C.   Loan

### (a) Due Diligence Period

Rightpath began negotiations with DF for a $7.7 million loan ("Loan") in June 2007. As part of those negotiations, DF requested financial statements from Hendon, Burton and Banovac because each of them would be required to guarantee the Loan. DF was especially interested in Hendon's financial condition because he was the only principal of Rightpath who had a cash flowing business – the Car Washes. As a result, and because the only other security for the Loan was contingent on Rightpath closing the purchase on the 77 Acre Parcel,[2] DF considered Hendon's guarantee as critical to its ability to collect on the Loan in the event of a default.

DF conducted due diligence for the Loan from June through the end of August 2007. Part of that due diligence included a review of Hendon's June 30, 2007 personal financial statement which included the assets of "Danny's Family LTD etc" ("Financial Statement"). Paragraph (7) of the guaranty ("Guaranty") that Hendon signed included a representation that the Financial Statement was prepared according to GAAP principles.[3] Despite that representation, the Financial Statement was not prepared using GAAP principles. Instead, Kent Despain ("Despain"), the Chief Financial Officer for the Danny's Companies, and Hendon went through a different process to determine the value of the assets listed on the Financial Statement.

---

[2] The Loan provided that upon closing of the 77 Acre Parcel purchase, Rightpath would provide DF with a subordinate deed of trust to secure the Loan. Rightpath also agreed to pledge to DF its membership interest in Rightpath MLB 77, LLC, which was the entity that owned the purchase contract for the 77 Acre Parcel. Finally, the Loan provided that DF could succeed to Rightpath's rights as developer of the 77 Acre Parcel under a to-be-executed development agreement between Rightpath and the City of Glendale. See Ex. 41 (Loan Agreement), at Article 1.5(j), 2.1, 3.1(l).

[3] As part of the initial communications between Rightpath and DF, DF indicated that an audited financial statement of Hendon would be required, but DF ultimately accepted the unaudited Financial Statement. (Ex. 19)

Despain testified that in valuing the Car Washes (listed as Fair Market Value of Securities on the Financial Statement), Despain and Hendon would consider whether a car wash was located on leased or owned land, sales, cash flow and EBITDA. They also used appraisals on the real property as part of their valuation analysis, but those appraisals were from 2004 and 2005. Ceasar Perez ("Perez"), who was primarily responsible for DF's due diligence, and DF's trial expert, Morris Aaron ("Aaron"), testified that under GAAP principles, the appraisals should be no more than a year old. Perez was aware of the age of the appraisals because Despain sent some of them to him. Perez did not, however, demand updated appraisals.

With respect to the real estate assets listed on the Financial Statement, Hendon and Despain considered the acquisition cost, but also possible offers to acquire the real property. For example, with respect to the 77 Acre Parcel, a major factor considered by Despain and Hendon was the letter of intent issued by Fairfield for 35 acres at a price of $29,808,000. ("Fairfield LOI"). Perez and Aaron both testified that letters of intent should not be used to determine real property value. Nevertheless, DF was sent the Fairfield LOI during the due diligence period. Therefore, DF was aware that in June 2007 there was not yet a formal offer to purchase the 77 Acre Parcel.

Two of the assets listed on the Financial Statement were derived from Hendon's one-third interest in another LLC, Desert Ridge Holding LLC ("Desert Ridge"). Desert Ridge owned 269 acres of partially developed property ("Property"). The Desert Ridge Property was acquired from the State of Arizona in February 2014 for $149.45 million.

On the Financial Statement under the hearing "Cash and Short term Investments," Hendon listed a note receivable from Desert Ridge for $6.5 million. The $6.5 million note receivable was based on a loan Hendon made to Desert Ridge from money he obtained by placing a second mortgage on his residence. Hendon's $6.5 million obligation on that

second mortgage is listed under the heading "Mortgages on Real Estate" as being due to "Oxford Investments (Newport)."

Under the heading "Real Estate Owned," Hendon listed $36,932,667 as the value of his one-third interest in the Desert Ridge Property. That value was based on a $273 million value for the entire Desert Ridge Property. At trial, Banovec testified that the increase in the value of the Desert Ridge Property from its $149.45 million acquisition cost was based on the Property being titled, split into fifteen (15) parcels, and partially sold, with approximately five (5) contracts with deposits in escrow and numerous LOIs. (Tr. 6/27/14, 7:11-8:24, 75:10-76:9). During the due diligence period, some of the LOIs were provided to DF. (Tr. 6/25/14, 133:13-18).

(b) Loan History From Date of Execution to Default

On August 31, 2007, Hendon signed a promissory note ("Note") and loan agreement ("Loan Agreement") on behalf of Rightpath for $7,760,000. On that same date, he executed the Guaranty. All of the money for the Loan came from ten participating investors ("Investors"). The Loan was for an initial one-year term, payable interest only at the rate of 10% with two possible 30-day extensions, provided the Loan was not in default and an extension fee was paid. The Loan provided for an interest reserve of $776,000, so no payments were due during the initial one-year term. As a result of the interest reserve and other costs, the amount received by Rightpath was $6,857,049.10 ("Loan Proceeds"). The Loan, including exit fees, had an effective interest rate of over 30%. DF's fees for making the Loan exceeded $170,000.

The Loan Agreement in Section 1.5 "Key Loan Provisions" at subparagraph (j) states that it is for commercial not residential or personal use and that borrower (Rightpath) was entering into the Loan in order to provide financing or refinancing with respect to the acquisition and development of the Specified Properties.

Section 3.1(j) states that the Loan Proceeds will be used "solely for commercial purposes."

Section 5.2.2 prohibits any equity distributions to the members of Rightpath from the proceeds of a sale of any portion of the Specified Properties including the 77 Acre Parcel unless the Loan has been paid in full.[4]

The Guaranty at paragraph (e) states that Hendon was fully familiar with all of the covenants and conditions of the Loan Documents, i.e. the Loan Agreement. Hendon testified at trial that he was aware when he executed the Loan Agreement that the Loan Proceeds were to be used for commercial purposes related to the Specified Properties. (Tr. 7/9/14, 26:16-27:10)

On August 31, 2008, the Loan matured. Rightpath paid the extension fee and obtained a one-month extension until September 30, 2008. On October 6, 2008, DF sent Rightpath a notice of default. Thereafter, Rightpath and DF engaged in a series of negotiations which resulted in further extensions of the Loan. Under one of those agreements, Rightpath was required to record a second deed of trust and subordination agreement on Air Park. It never did so. In 2009, while negotiations were going on for extensions of the Loan, Hendon transferred $225,000 from Rightpath's to his personal bank account at Wells Fargo (Ex. 69). Also, during the negotiations for extensions, Hendon and/or his employees told DF's representatives that bond financing would be obtained to pay off the Loan and that such financing would be imperiled if DF filed suit to collect, but the bond financing never materialized and communications between DF and Hendon or his employees eventually ceased.

---

[4] None of the Specified Property were ever sold, so Section 5.2.2 was never triggered.

(c) <u>Dispersal of the Loan Proceeds from August 31, 2007 to September 11, 2007</u>

On August 31, 2007, DF transferred $6,765,000 into Rightpath's account. On that

date, the balance in the Rightpath account was $586.18. (Ex. C). The chart below

summarizes transfers made in August and September 2007 from Rightpath to its members

or entitles controlled by its members ("Member Transfers").

### MEMBER TRANSFERS OF LOAN PROCEEDS

| Summary of Distributions to Members August – September 2007 | | |
|---|---|---|
| Member/Entity | Date | Amount |
| Hendon – personal | 8/31/2007 | $ 530,330.72 |
| DFC III – Hendon entity | 8/31/2007 | $ 1,000,000.00 |
| DFC III – Hendon entity | 9/06/2007 | $ 1,529,000.00 |
| **Total Hendon** | | **$ 3,059,330.72** |
| Banovac Properties | 9/04/2007 | $ 1,000,000.00 |
| | 9/06/2007 | $ 1,625,000.00 |
| **Total Banovac** | | **$ 2,625,000.00** |
| Rightpath Limited Corp. (controlled by Burton) | 9/04/2007 | $ 1,000,000.00 |
| | 9/06/2007 | $ 1,425,535.00 |
| **Total Burton** | | **$ 2,425,535.00** |
| Desert Ridge Holdings | 9/11/2007 | $ 103,000.00 |
| **Total Transfers** | | **$ 8,212,865.72** |

The $530,330.72 is listed in Rightpath's ledger (Ex. C) as a payment to Nell Hendon

(Hendon's mother) as reimbursement for advances she made in conjunction with a loan

from Mortgages Limited, which Rightpath used to acquire some of the Specified Properties.

However, that money was not transferred to Nell Hendon, but to Hendon's personal

account. Right after that transfer, Hendon wrote personal checks to his then wife for

$160,000 and to himself for $2,000. Prior to the $530,330 transfer, there were insufficient

funds in Hendon's personal account to cover those checks. Hendon testified that he repaid

his mother, but no documentation was provided to substantiate his testimony. Hendon did

not present any evidence that the checks issued to his ex-wife and to himself were used for the development of the Specified Properties.

Exhibit C also shows that on September 11, 2007, Rightpath transferred $103,000 to Desert Ridge Holdings LLC to cover a negative balance of $102,000 in Desert Ridge Holding's account. (Tr. 7/9/14, 67:16-24).

Hendon admitted in his testimony that the Member Transfers came from the Loan Proceeds. He denied, however, that the Member Transfers were used for any purpose other than Rightpath related expenses. (Tr. 7/9/14, 27:7-12). In support of his assertion that the Member Transfers were used for the Specified Properties, Hendon testified that over $854,000 paid on September 6, 2007in legal fees to a law firm for work on the Specified Properties came from the Loan Proceeds, as did appraisal fees and other costs related to the Specified Properties. (Ex. C). Hendon testified that ultimately Rightpath spent over $10 million in its efforts to develop the Specified Properties. However, no documentation, such as billing statements, was provided to substantiate Hendon's claim that all of the expenses paid by Rightpath were for work on the Specified Properties.

The only document submitted by Hendon to support his claim that all the Member Transfers were eventually used for the Loan purposes was Exhibit C. However, nothing in Exhibit C demonstrates that there were large deposits equal to or approximately the amount of the Member Transfers made into the Rightpath account after August 31, 2007. Hendon only submitted Exhibit C as documentary evidence.

On February 16, 2010, DF sued Rightpath and Hendon, among others, in Arizona state court for breach of contract and fraud. On March 31, 2011, a judgment in excess of $17.7 million ("State Court Judgment") was issued against Hendon and other defendants on its contract claims.

## IV. **BANKRUPTCY CASE**

On July 25, 2011, Hendon filed for Chapter 11 relief. On October 27, 2011, DF filed this adversary proceeding. DF alleged that Hendon incurred the debt through a materially false personal financial statement, promised to use the Loan Proceeds for specific purposes but failed to disclose his true intent to use the proceeds for unrelated and unauthorized purposes, and fraudulently obtained extensions of debt. On July 25, 2013, Hendon filed a motion for summary judgment arguing that DF was not the real party in interest and that only the Investors had standing to pursue a nondischargeability action. The merits of that motion were not decided. Instead, DF amended the complaint to add the Investors as plaintiffs.

On June 25, 26, 27 and July 9, 2014, trial was held. The matter was taken under advisement and is now ready for decision.

## V. **ISSUES**

1.      Did Hendon make materially false representations in his Personal Financial Statement on which DF reasonably relied?

2.      Did Hendon fraudulently obtain extensions of the Loan which caused DF to lose valuable collection remedies?

3.      Did Hendon fraudulently fail to disclose that Rightpath would use the Loan Proceeds for purposes other than those specified in the Loan Agreement?

## VI. **DISCUSSION**

DF has alleged that its judgment on Hendon's Guaranty should be exempt from discharge pursuant to § 523(a)(2) as a result of Hendon's alleged fraudulent statements and conduct related to (1) the Financial Statement, (2) Rightpath's requests for extension of the Loan, and (3) Rightpath's alleged misuse of the Loan Proceeds.

Section 523(a)(2) states that:

(a) A discharge under section 727, 1141, 1228(a), or 1328(b) of this
title does not discharge an individual debtor from any debt—
...
(2) for money, property, services, or an extension, renewal, or
refinancing of credit, to the extent obtained by—

    (A) false pretenses, a false representation, or actual fraud,
    other than a statement respecting the debtor's or an
    insider's financial condition;

    (B) use of a statement in writing—
        (i) that is materially false;
        (ii) respecting the debtor's or an insider's financial
        condition;
        (iii) on which the creditor to whom the debtor is liable for
        such money, property, services, or credit reasonably
        relied; and
        (iv) that the debtor caused to be made or published with
        intent to deceive

## A.    § 523(a)(2)(B) – Financial Statement

The Ninth Circuit has reworded the elements of § 523(a)(2)(B) to require the Plaintiff

to prove:

(1) a representation of fact by the debtor,

(2) that was material,

(3) that the debtor knew at the time to be false,

(4) that the debtor made with the intention of deceiving the creditor,

(5) upon which the creditor relied,

(6) that the creditor's reliance was reasonable,

(7) that damage proximately resulted from the misrepresentation.

Candland v. Ins. Co. of North Am. (In re Candland), 90 F.3d 1466, 1469 (9th Cir. 1996). The

Plaintiff must prove these elements by a preponderance of the evidence. Grogan v. Garner,

498 U.S. 279 (1991).

It is undisputed that Hendon made representations of his personal financial condition

through the written Financial Statement and that DF relied on those representations in deciding to extend the Loan. (Tr. 6/25/14 26:10-20). However, DF failed to carry its burden of proving that the Financial Statement was materially false, or that DF's reliance was reasonable.

### 1. Materially False

A statement is materially false if it includes information which is substantially inaccurate and is of the type that would generally affect a creditor's decision making process. In re Candland, 90 F.3d at 1470. The creditor must show not only that a personal financial statement was inaccurate, but that it contained "important and substantial untruths." First Interstate Bank of Nevada v. Greene (In re Greene), 96 B.R. 279 (9th Cir. BAP 1989) (quoting Afsharnia v. Roland (In re Roland), 65 B.R. 1003, 1006 (Bankr. D. Conn. 1986)).

The evidence produced by DF regarding the falsity of the Financial Statement was in the form of the expert report and testimony of Morris Aaron. Aaron opined that (1) the cash and short term investments, listed as $9,900,000, were overstated because they included two notes receivable which had no value, and they included cash held by the Car Washes, (2) the unlisted securities, listed as $105,530,203, were overstated because the values were based on a combination of outdated appraisals and on cash flow analyses instead of recent sales comparables or business appraisals, and (3) the net real estate values were overstated because they were based on LOIs and not on expert appraisals or recent sales comparables. (Ex.136, pp. 14-20). According to Aaron, the method that Hendon used to value his real estate holdings was not in accordance with accounting standards governing the preparation of personal financial statements.

Aaron did not obtain appraisals of any of the properties or assets listed in the Financial Statement as of June, 2007. On cross-examination, Aaron testified that he did not calculate the fair market value of the securities listed on the Financial Statement and did not

obtain or review any appraisals of the real property. Aaron did review appraisals of 15 of the car wash entities and found that, on average, the values reported on the Financial Statement were 22% higher than the appraisals. However, Aaron opined that because the appraisals were from 2004 and 2005, they "would not be considered timely for fair market value reporting purposes" and would be "considered stale and inappropriate to use." (Ex. 136, p.17).

Essentially, Aaron's opinion that the Financial Statement was materially false is based on Hendon's valuation methodology and the fact that the reported values were higher than previous appraisals or auction prices. DF provided no evidence of the fair market value of Hendon's assets at the time of the Financial Statement.

Although the Financial Statement was not prepared in accordance with GAAP as represented in the Guaranty, the evidence demonstrates that there was a reasonable basis for the valuation of the assets. The real property values were based on contracts with deposits in escrow, LOIs, including the Fairfield LOI, and pending development agreements and memorandums of understanding with the cities of Glendale and Phoenix. (Tr. 6/27/14, 8:3-14; 16:7-17:15). Similarly, Hendon and Despain employed a method for valuing the Car Washes which included adjusting previous appraisals to account for current cash flows and determining whether the entity owned or leased the real estate. Finally, the Financial Statement stated that it included Danny's Family LTD, etc., which held entity cash, and there is no evidence that the notes receivable listed in the "cash and short term investments" section of the Financial Statement were uncollectable at the time Hendon provided the Financial Statement to DF.

DF has shown that Hendon's valuation methods did not meet GAAP standards, but it has not proven that those methods yielded values that were materially false. DF has therefore not carried its burden of proving that the Financial Statement was materially false.

### 2. Reasonable Reliance

DF has also failed to show that its reliance on the Financial Statement was reasonable. Reasonable reliance is not defined in the bankruptcy code, but "is a term courts can apply without additional help." Candland v. Ins. Co. of North Am. (In re Candland), 90 F.3d 1466, 1471 (9th Cir. 1996). Reasonable reliance is judged on a case by case basis in light of the totality of the circumstances. Cashco Fin. Servs., Inc. v. McGee (In re McGee), 359 B.R. 764, 774 (9th Cir. BAP 2006). A creditor's reliance may be reasonable with little investigation where there is evidence of a materially fraudulent financial statement. Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch), 237 B.R. 160, (9th Cir. BAP 1999); See also, La Trattoria, Inc. v. Lansford (In re Lansford), 822 F.2d 902 (9th Cir. 1987). This does not mean that a creditor can ignore "red flags" that bear directly on the truth of the statement the creditor claims to have relied upon. Heritage Pac. Fin., LLC v. Machuca (In re Machuca), 483 B.R. 726, 737 (9th Cir. BAP 2012). In such a case, the creditor must produce evidence explaining why it was reasonable to rely on the statement notwithstanding the red flags. Id. (citing In re McGee, 359 B.R. 764).

In the present case, DF argues that the Financial Statement was inaccurate because it was not prepared in accordance with GAAP and the values were not supported by current appraisals or comparable sales. However, DF was aware that the Financial Statement was not prepared according to GAAP when it received appraisals for the Car Washes that were two or three years old. DF was also aware that Hendon had not provided current appraisals for the real property. Instead, Hendon provided a draft development agreement, the Fairfield LOI, and sales contracts for lots in Desert Ridge to support his valuations.

The evidence demonstrates that during initial due diligence, DF requested that Hendon provide an audited financial statement, but DF ultimately did not require it prior to making the Loan. DF knew that the valuation methods used by Hendon were not in

accordance with GAAP, but has not produced any evidence explaining why its reliance was reasonable in spite of that knowledge. Therefore, DF's reliance on the Financial Statement was not reasonable and DF has not carried its burden of proving the elements of nondischargeability under § 523(a)(2)(B).

**B. Extensions of the Loan**

At the close of Plaintiff's case, Defendant moved for a directed verdict on Plaintiff's claim for fraudulent misrepresentations related to the extensions of the Loan. The motion, more properly considered as a motion for judgment on partial findings pursuant to Rule 7052(c), was granted.

Rule 7052(c) permits the Court to enter judgment on a claim against a party if the Court finds against that party on an issue which is essential to the claim and the party has been fully heard on the issue.

To prevail on a nondischargeability claim, the Plaintiff must prove the five elements of § 523(a)(2)(A), that:

> (1) the debtor made ... representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; [and] (5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

Ghomesh v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010).

In the context of an extension of a loan, the element of proximate cause is satisfied if the Plaintiff proves that "it had valuable collection remedies at the time of the extension or renewal, that it did not exercise in reliance on the debtor's misrepresentation and that those remedies lost value during the renewal or extension period." Cho Hung Bank v. Kim (In re Kim), 163 B.R. 157, 161 (9th Cir. BAP 1994); See Siriani v. Northwestern Nat'l. Ins. Co. of Milwaukee, Wisc. (In re Siriani), 967 F.2d 302, 306 (9th Cir. 1992).

At the close of Plaintiff's case, DF had not produced any evidence that it had valuable collection remedies at the time of the extensions which lost value during the extension period. DF argued that it had produced evidence that Rightpath had dissipated assets during the time of the extension in the form of two payments made to Hendon personally, and that this dissipation resulted in a loss of value in its collection remedies. However, the nondischargeability claim is against Hendon personally, and DF did not produce evidence to establish by preponderance that its collection remedies against Hendon lost value during the extension period.

C.    § 523(a)(2)(A) – Representations Related to Use of Funds

To except a debt from discharge under § 523(a)(2)(A), a creditor must prove by a preponderance of the evidence, the following elements:

(1)    misrepresentation, fraudulent omission or deceptive conduct by the debtor;

(2)    knowledge of the falsity or deceptiveness of his statement or conduct;

(3)    an intent to deceive;

(4)    justifiable reliance by the creditor on the debtor's statement or conduct; and

(5)    damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000).

1. Fraudulent Omission

A debtor's failure to disclose material facts constitutes fraudulent omission if the debtor was under a duty to disclose and the omission was motivated by an intent to deceive. Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1246 n.4 (9th Cir. 2001). To determine whether the debtor has a duty to disclose in a business transaction, the Ninth Circuit looks to the Restatement (Second) of Torts ("Restatement"). See Apte v. Romesh Japra, M.D.,

F.A.C.C., Inc. (In re Apte), 96 F.3d 1319, 1324 (9th Cir. 1996). Section 551 of the

Restatement provides:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
>
> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
> ....
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551 (1977).

Comment j. further states:

> A basic fact is a fact that is assumed by the parties as a basis for the transaction itself. It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with. Other facts may serve as important and persuasive inducements to enter into the transaction, but not go to its essence. These facts may be material, but they are not basic. If the parties expressly or impliedly place the risk as to the existence of a fact on one party or if the law places it there by custom or otherwise the other party has no duty of disclosure.

Id. at cmt. j.

Under Restatement § 551(2)(e), Hendon owed DF a duty to disclose his intention to immediately make the Member Transfers instead of using the Loan Proceeds for the purposes stated in the Loan Agreement. Rightpath's use of the Loan Proceeds for the "acquisition, development and/or construction" of the Specified Properties was basic to the transaction and Hendon knew that DF was mistaken about his true intent. Hendon also

knew that DF was relying upon his good faith and would not be able to easily discover his true intent absent disclosure.

Hendon does not dispute that the Loan Proceeds were used to fund the Member Transfers. Instead, Hendon argues that the Member Transfers were used to pay Rightpath-related expenses and that there was no intent to use the Loan Proceeds for anything other than the purposes stated in the Loan Agreement. Therefore, the issue is whether the evidence shows that Hendon intended to use the Loan Proceeds for purposes other than those stated in the Loan Agreement at the time of execution of the Loan Agreement.

Direct evidence of intent is rarely present, but intent can be inferred from surrounding circumstances. Cowen v. Kennedy (In re Kennedy), 108 F.3d 1015, 1018 (9th Cir. 1997). In this case, the circumstantial evidence establishes a prima facie showing of Hendon's intent to use the Loan Proceeds for other purposes.

The net Loan Proceeds in the amount of $6,765,000 were deposited into Rightpath's account on August 31, 2007. Within one week of the deposit, Rightpath had transferred $3,059,331 to DFCIII and Hendon personally, $2,625,000 to Banovac Properties and Banovac personally, and $2,452,535 to Burton's Rightpath Limited Corporation. Approximately eleven days after DF funded the Loan, Rightpath transferred $103,000 to Desert Ridge Holdings LLC to cover a negative balance of $102,000 in Desert Ridge Holding's account. (Tr. 7/9/14, 67:16-24).

Hendon acknowledged that only he and Despain had signatory authority on the Rightpath bank account and that no payments from the Rightpath account would have been made in August or September of 2007 without his approval. (Tr. 7/9/14, 55:2-56-1). Hendon testified that $530,330 was transferred from Rightpath into his personal bank account as repayment of a note payable to Nell Hendon. Hendon used part of the $530,330 deposit to make a $160,000 payment to his wife. (Tr. 7/9/14, 56:22-58-14). Hendon's personal bank

account ledger shows that he had insufficient funds to pay his wife until the $530,330 deposit was made. (See Ex. 27).

Although the burden of proof always remains with the creditor, once DF has made a prima facie case by a fair preponderance of the evidence, the burden of going forward shifts to Hendon to refute the evidence. See, e.g., Hussain v. Malik (In re Hussain), 508 B.R. 417 (9th Cir. BAP 2014); Matter of Stratton, 140 B.R. 720 (Bankr. N.D. Ill., 1992). Hendon has produced no credible evidence to refute the evidence that Hendon intended to use the Loan Proceeds for purposes other than those specified in the Loan Agreement.

Hendon testified that all of the Loan Proceeds were eventually used to develop the Specified Properties, but provided no documentary evidence to show that the entities which received the Member Transfers made any payments for the development of the Specified Properties. Banovac testified that he wired $1,500,000 into an account designated by Hendon, and put an additional $1,150,000 into the Specified Properties, but was unable to produce any documentary evidence of such transfers or any proof that the wired funds were used for the Specified Properties. (Tr. 6/27/14, 26:5-15; 63:9-64:21). Exhibit C does not show whether the Member entities, Hendon, Banovac or Burton ever repaid the distributions to the Rightpath account.

Hendon asserts that while he may not have initially used the Loan Proceeds for their intended purposes, he ultimately did so. In support of that claim, Hendon produced a summary of payments made for expenses related to the Specified Properties in Exhibit C. As discussed above, Exhibit C does not demonstrate that the Member Transfers were ever transferred back into any of Rightpath's bank accounts. Furthermore, no back up documentation was presented to verify that the amounts listed on the Exhibit C summary were used for the Loan purposes.

The Court concludes that Hendon intended at the time of the Loan to distribute the Loan Proceeds to members and other entities for purposes other than those specified in the Loan Agreement. Hendon had a duty of reasonable care to disclose this intention to DF because it was a fact basic to the transaction, Hendon knew that DF was mistaken about the fact, and Hendon knew that under the circumstances DF would reasonably expect disclosure.

**2. Intent to Deceive**

To support a finding of fraudulent omission, DF must prove not only that Hendon had a duty to disclose his intent, but that his omission was motivated by an intent to deceive. Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1246 n.4 (9th Cir. 2001).

The evidence shows that Hendon knew that by not disclosing his intent to make the Member Transfers and not to distribute the Loan Proceeds for the purposes set out in the Loan Agreement, he gave DF the impression that Rightpath would use the Loan Proceeds for the Specified Properties. Hendon testified that he understood that the Loan Agreement required the Loan Proceeds be spent on the Specified Properties. (Tr. 7/9/14, 26:16-27:10; 44:16-19). Section 1.5(j) of the Loan Agreement states that the Loan was for "commercial use, not residential or personal or household use," and that Rightpath was "entering into it in order to provide financing or refinancing in conjunction with the acquisition, development and/or construction" of the Specified Properties. (Ex. 41, p.4)

Hendon was aware of the provisions in the Loan Agreement and of the importance to DF that the Specified Properties be developed. For example, Hendon knew that the 77 Acre Parcel was of particular importance to DF. Rightpath had contracted to purchase the 77 Acre Parcel and had negotiated the Fairfield LOI for approximately half of the 77 acres. Once the Ferrnatino purchase contract was accomplished, DF would be provided with security for the Loan.

Section 1.5(j) of the Loan Agreement also allowed DF to succeed to the position of developer with respect to the 77 Acre Parcel if Rightpath defaulted, and Section 2.1 required Rightpath to provide DF with a pledge of membership interest in Rightpath MLB 77 LLC, the entity which held the Ferrantino purchase contract. Furthermore, the Loan Agreement required Rightpath to take all actions necessary to preserve the Ferrantino purchase contract, and upon closing, provide DF with a deed of trust lien on the property to secure the Loan. (Ex. 41, p.9). It is clear from the Loan Agreement, that DF expected Rightpath to use the Loan Proceeds for the Specified Properties in order to provide additional security for, and repayment of, the Loan.

Hendon knew that not disclosing his true intent would give DF the impression that Rightpath intended to use the Loan Proceeds to develop the Specified Properties as stated in the Loan Agreement. This is sufficient to establish Hendon's intent to deceive and to establish a fraudulent omission under <u>Harmon v. Kobrin (In re Harmon)</u>, 250 F.3d 1240, 1246 n.4 (9th Cir. 2001).

### 3. Reliance and Proximate Cause

In determining reliance under § 523(a)(2)(A), courts apply a "justifiable" reliance standard, which turns on the Defendant's knowledge under the circumstances. <u>Citibank, N.A. v. Eashai (In re Eashai)</u>, 87 F.3d 1082, 1090 (9th Cir.1996). "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." <u>Field v. Mans</u>, 516 U.S. 59, 70 (1995) (quoting Restatement (Second) of Torts § 545A (1977)).

In the Ninth Circuit, non disclosure of a material fact despite a duty to disclose has been held to establish the requisite reliance and causation for actual fraud. <u>Apte v. Romesh Japra, M.D., F.A.C.C., Inc. (In re Apte)</u>, 96 F.3d 1319, 1323 (9th Cir.1996). Reliance on a

fraudulent omission can also be presumed when the case is characterized as one that primarily alleges omissions. Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir. 1999). When a debtor has committed a fraudulent omission, it may be impossible to demonstrate reliance, "since to do so requires proof of a speculative state of facts, i.e. how one would have behaved if omitted material information had been disclosed." Rainier Title Co. v. Demarest (In re Demarest), 176 B.R. 917, 921 (Bankr.W.D.Wash.1995). Therefore, justifiable reliance is established when a party having a duty to disclose a material fact fails to do so. Tallant v. Kaufman (In re Tallant), 218 B.R. 58, 68 (9th Cir. BAP 1998) (citing In re Apte, 96 F.3d at 1323).

In the present case, the evidence demonstrates that Hendon fraudulently withheld his intention to distribute the Loan Proceeds to members. This nondisclosure is sufficient to establish the requisite elements of reliance and causation.

**4. Damages**

Finally, DF must prove the amount of its damage that was proximately caused by Hendon's fraudulent omission. DF asserts that it was damaged when Rightpath and Hendon failed to repay the Loan and the proper measure of damage is the amount of the State Court Judgment.

Hendon argues that the State Court Judgment has no preclusive effect because it was a judgment on a contract claim, not a claim for fraud as alleged in this adversary. Hendon also argues that the measure of DF's damage on a finding of nondischargeability should be limited to only that portion of the State Court Judgment that DF would be entitled to recover under the Loan Participation Agreements, which Hendon asserts is $1,656,439.

The Supreme Court has interpreted § 523(a)(2)(A) to encompass "any debt...for money, property, services, or...credit, to the extent [that the money, property, services, or...credit is] obtained by...false pretenses, false representation, or actual fraud." Cohen v.

De la Cruz, 523 U.S. 213, 218 (1998). Once a plaintiff has established that "specific money or property has been obtained by fraud...'any debt' arising therefrom is excepted from discharge." Id. at 218.

In this case, the "specific money or property" obtained by Hendon's fraud was the Loan that DF extended to Rightpath supported by Hendon's Guaranty. Any debt arising from the Loan is therefore nondischargeable. The damages arising from the Loan have been determined in the state court action. The liquidated State Court Judgment amount is the proper measure of damages under § 523(a)(2)(A).

Hendon's argument that DF was only damaged in the amount of $1,656,439 because of the Loan Participation Agreements fails for two reasons. First, Hendon's obligation on the Guaranty was to DF, not to the Investors. Hendon dealt with DF, and his fraudulent omission arose because of a duty owed to DF. Second, the claim that DF asserts is nondischargeable is its allowed claim for the amount of the State Court Judgment. The judgment establishes the amount of Hendon's obligation to DF and was entered in favor of DF only. DF assigned interests in the Loan to Investors through the Loan Participation Agreements, but retained the right to administer and enforce the Loan on behalf of itself and the Investors.

The Court finds that the amount of damages excepted from discharge pursuant to § 523(a)(2)(A) is the entire amount of the State Court Judgment. However, because the nondischargeability judgment is a federal judgment for fraud pursuant to § 523(a)(2)(A) and not a breach of contract, it will accrue interest, post-entry, at the federal rate.

## VII. CONCLUSION

DF has demonstrated by a preponderance of the evidence that Hendon made a fraudulent omission regarding his intent to use the Loan Proceeds for purposes other than those specified in the Loan Agreement, and is therefore entitled to a nondischargeability judgment on its claim under § 523(a)(2)(A). DF has not proven that Hendon fraudulently

obtained the debt through a materially false personal financial statement or that Hendon

fraudulently obtained extensions of the debt. The foregoing constitutes the Court's findings

of law as required under Rule 7054.


DATED AND SIGNED ABOVE.

To be NOTICED by the BNC
("Bankruptcy Noticing Center") to:

Michael W. Carmel
Michael W. Carmel, Ltd.
80 East Columbus Avenue
Phoenix, AZ 85012-2334
*Attorney for Defendant/Debtor*

John R. Clemency
Michael R. Ross
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, AZ 85016-9225
*Attorneys for Plaintiffs*

United States Trustee
230 North First Ave., Suite 204
Phoenix, AZ 85003-1706

District/Off: 0970-2                    User: brennerc                    Date Created: 8/13/2014
Case: 2:11-ap-01972-EWH          Form ID: pdf08a                  Total: 5

**Recipients of Notice of Electronic Filing:**
aty      JOHN R. CLEMENCY        john.clemency@gknet.com
aty      MICHAEL W. CARMEL       michael@mcarmellaw.com
                                                                    TOTAL: 2

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
ust      U.S. TRUSTEE       OFFICE OF THE U.S. TRUSTEE        230 NORTH FIRST AVENUE        SUITE
         204       PHOENIX, AZ 85003
         MICHAEL W CARMEL, LTD        80 EAST COLUMBUS AVENUE        PHOENIX, AZ 85012-2334
         MICHAEL R ROSS        GALLAGHER &KENNEDY, PA        2575 EAST CAMELBACK
         ROAD       PHOENIX, AZ 85016-9225
                                                                    TOTAL: 3

# EXHIBIT B

February 7, 2014


Daniel Hendon
Heather Hendon
Danny's Family Companies
15880 N. Greenway Hayden Loop Suite 160
Scottsdale, AZ 85260

Letter of Intent

RE:     PURCHASE OF DANNY'S FAMILY COMPANIES

Per our meetings and discussions, (EG), is interested in acquiring Danny's Family Companies, including: Danny's Management Services, LLC; CW Management, LLC; Danny's Family Limited Partnership, Danny's Car Services: Danny's Glass, LLC,; Danny's Family Companies, LLC: Twentieth & Highland, LLC, 84th & Bell, LLC, Danny's Scottsdale & TB, LLC, 3rd & Bell, LLC, Danny's Tatum, LLC, 83rd & Union Hills, LLC, Danny's Crossroads, LLC, Danny's San Tan, LLC, Danny's Tempe, LLC, Danny's Family Companies II, LLC, Danny's Happy Valley, LLC, Danny's Raintree & Northsight, LLC; Danny's Family Carousel, Inc.; Paradise Village Car Care Center, Inc., National Car Care Development, Corp.

It is understood that (EG), will be given consent to negotiate to purchase The Notes and Deeds of Trust, with the following secured lenders: Atalaya Capital, Hudson Americas and Sorenson Capital. This purchase is subject to (EG), negotiating satisfactory terms of purchase for the secured debt and the unsecured debt. It is the intent to immediately release Danny's Family Companies from Bankruptcy once the debt has been acquired.


Sincerely,


_____          _____
Ernie Garcia                                              Date
Acknowledged and Consent Granted


_____          _____
Daniel Hendon                                         Date


_____          _____
Heather Hendon                                       Date



## Danny's Family Companies, LLC
### 01/01/2014 Entities

| Store # | Named Insured | Ownership |
|---|---|---|
| | Danny's Family Companies, LLC | 90% DFLP - 10% CW Management, LLC |
| | Danny's Family Limited Partnership | 1% Danny's Management Services, LLC - 99% Danny's Family Trust |
| | Danny's Management Services, LLC | 50% Heather A Hendon Dynasty Trust 50% Hendon Family Trust (DLH as trustee) |
| | CW Management, LLC | 90% DFLP, 10% Daniel Hendon |
| | Danny's Car Services, LLC | 90% DFLP - 10% CW Management, LLC |
| | Danny's Family Companies II, LLC | 90% DFLP - 10% CW Management, LLC |
| | Danny's Family Carousel, Inc. | 90% DFLP - 10% CW Management, LLC |
| | Danny's Family Companies III, LLC | 90% DFLP - 10% CW Management, LLC |
| | Danny's Glass, LLC | 100% Danny's Car Services, LLC |
| 18 | 84th & Bell, LLC | 100% Danny's Family Companies |
| 12 | Twentieth & Highland, LLC | 100% Danny's Family Companies |
| 41 | Danny's Raintree & Northsight, LLC | 100% Danny's Family Companies II, LLC |
| 40 | Danny's Happy Valley, LLC | 100% Danny's Family Companies II, LLC |
| 8 | Paradise Village Car Care Centre, Inc. | 100% Danny's Family Carousel, Inc. |
| 16 | National Car Care Development Corp. | 100% Danny's Family Carousel, Inc. |
| | Danny's Fuel, LLC | 100% Danny's Car Services, LLC |
| 15/32 | Danny's Scottsdale & TB, LLC | 100% Danny's Family Companies |
| 31 | Danny's Tatum, LLC | 100% Danny's Family Companies |
| | DH Tinting, LLC | 50% Danny's Car Services, LLC, 50% Hugh, LLC |
| 26 | 3rd & Bell, LLC | 100% Danny's Family Companies |
| 35 | 83rd & Union Hills, LLC | 100% Danny's Family Companies |
| 46 | Danny's San Tan, LLC | 100% Danny's Family Companies |
| 48 | Danny's Tempe, LLC | 100% Danny's Family Companies |
| 44 | Danny's Crossroads, LLC | 100% Danny's Family Companies |
| | Southern Carousel, LLC | 100% Danny's Family Companies |

Entities in Which Interests Are
Retained

**Danny's Family Limited Partnership**
Danny's Management Services, LLC
CW Management, LLC

**Danny's Family Companies, L.L.C.**
Twentieth & Highland, L.L.C.
Danny's Scottsdale & TB, LLC (fka DH Optics, L.L.C.)
84th & Bell, LLC (fka 75th Carousel, L.L.C.)
3rd & Bell, L.L.C.
Danny's Tatum, L.L.C.
83rd & Union Hills, LLC (fka 59th Carousel, L.L.C.)
Mayo & Scottsdale Family Car Wash, L.L.C.
Danny's Crossroads, L.L.C.
Danny's San Tan, LLC
Danny's Tempe, L.L.C.

**Danny's Family Companies II, L.L.C.**
Danny's Happy Valley, L.L.C.
Danny's Raintree & Northsight, L.L.C.

**Danny's Family Carousel, Inc.**
Paradise Village Car Care Centre, Inc.
National Car Care Development Corporation

**Danny's Car Services, L.L.C.**
Danny's Glass, L.L.C.
Danny's Fuel, L.L.C.
DH Tinting, L.L.C.

25th & Camelback, Inc.
Danny's Family Companies III, L.L.C.

**Confidentiality Agreement**

January 8, 2014

<u>Via Email</u>
Ernest (Ernie) Garcia II
egarcia@drivetime.com

**PRIVATE AND CONFIDENTIAL**

Dear Mr. Garcia:

In connection with the consideration by you, including all affiliated persons and companies ("Recipient") of a possible transaction (the "Transaction") with Danny's Family Companies, LLC, including all affiliated persons and companies ("Discloser"), Recipient has requested access to certain information, properties and personnel of Discloser. This Confidentiality Agreement shall be effective as of January 8, 2014 ("Effective Date")

In consideration for and as a condition to Discloser's furnishing access to such information, properties and personnel of Discloser as Discloser, in its sole discretion, agrees to deliver or otherwise make available ("disclose") to Recipient, Recipient agrees to the terms and conditions set forth in this letter agreement:

## 1. CONFIDENTIAL AND PROPRIETARY NATURE OF THE INFORMATION

Recipient acknowledges the confidential and proprietary nature of the Confidential Information (as defined below), agrees to hold and keep the Confidential Information as provided in this letter agreement and otherwise agrees to each and every restriction and obligation in this letter agreement.

## 2. CONFIDENTIAL INFORMATION

As used in this letter agreement, the term "Confidential Information" means and includes any and all of the items described in paragraphs (a) and (b) below that has been or may hereafter be disclosed to Recipient by Discloser or by the directors, officers, employees, agents, consultants, advisors or other representatives, including legal counsel, accountants and financial advisors ("Representatives") of Discloser:

(a)     trade secrets concerning the business and affairs of Discloser, product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current, and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, supplier lists, market studies, business plans, computer software and programs (including object code and source code), computer software and database technologies, systems, structures and architectures (and related processes, formulae, composition, improvements, devices, know-how, inventions, discoveries, concepts, ideas, designs, methods and information), debt

1

and debt structure of Discloser, organizational structure of Discloser and any other information, however documented, that is a trade secret within the meaning of A.R.S. §§ 44-401 et. seq. (the "Trade Secret Act"); and

(b)     information concerning the business and affairs of Discloser (which includes historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, the names and backgrounds of key personnel, personnel training techniques and materials and the potential purchase or restructure of the exiting debt of Discloser), however documented, or is otherwise obtained from review of Discloser's documents or property or discussions with Discloser's Representatives or by Recipient's Representatives (including current or prospective financing sources) or Representatives of Recipient's Representatives irrespective of the form of the communication, and also includes all notes, analyses, compilations, studies, summaries and other material prepared by Recipient or Recipient's Representatives containing or based, in whole or in part, upon any information included in the foregoing.

Any trade secrets of Discloser will also be entitled to all of the protections and benefits the Trade Secret Act and any other applicable law. If any information that Discloser deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret for purposes of this letter agreement, such information will in any event still be considered Confidential Information for purposes of this letter agreement. In the case of trade secrets, Recipient hereby waives any requirement that Discloser submit proof of the economic value of any trade secret or post a bond or other security.

To the extent that any Confidential Information may include materials subject to the attorney-client privilege, the Discloser is not waiving and will not be deemed to have waived or diminished its attorney work-product protections, attorney-client privileges or similar protections and privileges as a result of disclosing any Confidential Information (including Confidential Information related to pending or threatened litigation) to Recipient, regardless of whether Discloser has asserted or is or may be entitled to assert such privileges and protections. The parties (a) share a common legal and commercial interest in all such Confidential Information that is subject to such privileges and protections; (b) are or may become joint defendants in proceedings to which such Confidential Information covered by such protections and privileges relates; and (c) intend that such privileges and protections remain intact should either party become subject to any actual or threatened proceeding to which such Confidential Information covered by such protections and privileges relates. In furtherance of the foregoing, Recipient shall not claim or contend, in proceedings involving either party, that Discloser waived its attorney work-product protections, attorney-client privileges or similar protections and privileges with respect to any information, documents or other material not disclosed to Recipient due to Discloser disclosing Confidential Information (including Confidential Information related to pending or threatened litigation) to Recipient.


3. RESTRICTED USE OF CONFIDENTIAL INFORMATION

Recipient agrees that the Confidential Information (a) will be kept confidential by Recipient and Recipient's Representatives and (b) without limiting the foregoing, will not be disclosed by Recipient or Recipient's Representatives to any person (including current or prospective financing sources) except with the specific prior written consent of Kent Despain of Discloser or except as expressly otherwise permitted by this letter agreement. It is understood that Recipient may disclose Confidential Information to only those of Recipient's Representatives who (a) require such material for the purpose

2

of evaluating the Transaction and (b) are informed by Recipient of the confidential nature of the Confidential Material and the obligations of this letter agreement. Recipient further agrees that Recipient and Recipient's Representatives will not use any of the Confidential Information either for any reason or purpose other than to evaluate and to negotiate the Transaction. Recipient also agrees to be responsible for enforcing this letter agreement as to Recipient's Representatives and to take such action, legal or otherwise, to the extent necessary to cause them to comply with this letter agreement and thereby prevent any disclosure of the Confidential Information by any of Recipient's Representatives (including all actions that Recipient would take to protect its own trade secrets and confidential information) except as permitted by this letter agreement.

## 4. NONDISCLOSURE OF TRANSACTION

Except as expressly permitted by Section 3 and except as expressly permitted by a definitive agreement with respect to the Transaction, if any, entered into between the parties, neither Recipient, Discloser nor their Representatives will disclose to any person the fact that the Confidential Information has been disclosed to Recipient or Recipient's Representatives or that Recipient or Recipient's Representatives have inspected any portion of the Confidential Information or that any discussions or negotiations are taking place concerning the Transaction, provided, however, Recipient and its Representatives may make such a disclosure if, and solely to the extent that, Discloser has already done so or Recipient has received the written opinion of its outside counsel that such a disclosure must be made by Recipient in order that it not commit a violation of law, and further provided, Recipient and its representatives shall consult with Discloser, to the extent reasonably practicable, before making any such disclosure, and any such permitted disclosure shall not affect or impair Recipient's obligations of confidentiality with respect to the Confidential Information. Without limiting the generality of the foregoing, Recipient further agrees that, without the prior written consent of Discloser, Recipient will not, directly or indirectly, enter into any agreement, arrangement or understanding, or any discussions that might lead to such an agreement, arrangement or understanding, with any person regarding a possible transaction involving Discloser.

## 5. DISCLOSER CONTACT

All requests by Recipient or Recipient's Representatives for Confidential Information, meetings with Discloser's personnel or Representatives or inspection of Discloser's properties must be made to the Discloser Contact.

## 6. EXCEPTIONS

All of the foregoing obligations and restrictions do not apply to that part of the Confidential Information that Recipient demonstrates (a) was or becomes generally available to the public prior to, and other than as a result of, a disclosure by Recipient or Recipient's Representatives or (b) was available, or becomes available, to Recipient on a non confidential basis prior to its disclosure to Recipient by Discloser or a Discloser's Representative, but only if (i) the source of such information is not bound by a confidentiality agreement with Discloser or is not otherwise prohibited from

3

transmitting the information to Recipient or Recipient's Representatives by a contractual, legal, fiduciary or other obligation and (ii) Recipient provides Discloser with written notice of such prior possession either (A) prior to the execution and delivery of this letter agreement or (B) if Recipient later becomes aware of (through disclosure to Recipient or otherwise through Recipient's work on the Transaction) any aspect of the Confidential Information of which Recipient had prior possession, promptly upon Recipient becoming aware of such aspect.

## 7. LEGAL PROCEEDINGS

If Recipient or any of Recipient's Representatives becomes legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigative demand or similar process) to make any disclosure that is prohibited or otherwise constrained by this letter agreement, Recipient or such Representative, as the case may be, will provide Discloser with prompt notice of such legal proceedings so that it may seek an appropriate protective order or other appropriate relief or waive compliance with the provisions of this letter agreement. In the absence of a protective order or Recipient's receiving such a waiver from Discloser, Recipient or its Representative is permitted (with Discloser's cooperation but at Recipient's expense) to disclose that portion (and only that portion) of the Confidential Information that Recipient or the Representative is legally compelled to disclose, provided, however, that Recipient and Recipient's Representatives must use reasonable efforts to obtain reliable assurance that confidential treatment will be accorded by any person to whom any Confidential Information is so disclosed.

## 8. CONTACT WITH EMPLOYEES

Without the prior written consent of the Discloser Contact, neither Recipient nor any of Recipient's Representatives will (a) initiate or cause to be initiated (other than through the Discloser Contact) any communication with any employee of Discloser concerning the Confidential Information or the Transaction or (b) for a period of two years after the Effective Date of this letter agreement, solicit or cause to be solicited the employment of any person who is now employed by Discloser.

## 9. RETURN OR DESTRUCTION OF CONFIDENTIAL INFORMATION

If Recipient determines that it does not wish to proceed with the Transaction or if Discloser notifies Recipient that it does not wish Recipient to consider the Transaction any further, then (a) Recipient (i) shall promptly deliver to Discloser Contact all documents or other materials disclosed by Discloser or any Discloser's Representative to Recipient or Recipient's Representatives constituting Confidential Information, together with all copies and summaries thereof in the possession or under the control of Recipient or Recipient's Representatives and (ii) will destroy materials generated by Recipient or Recipient's Representatives that include or refer to any part of the Confidential Information, without retaining a copy of any such material or (b) alternatively, if the Discloser Contact requests or gives his prior written consent to Recipient's request, Recipient will destroy all documents or other matters constituting Confidential Information in the possession or under the control of Recipient or Recipient's Representatives. Any such destruction pursuant to the foregoing must be certified by an authorized officer of Recipient in writing to Discloser (and such certification shall include a list of the destroyed materials).

4

## 10. NO OBLIGATION TO NEGOTIATE OR ENTER A TRANSACTION

Discloser reserves the right, in its sole discretion, to reject any and all proposals made by Recipient or Recipient's Representatives with regard to a Transaction and to terminate discussions and negotiations with Recipient and Recipient's Representatives at any time. Neither Recipient nor Discloser shall have rights or obligations of any kind whatsoever with respect to the Transaction by virtue of this letter agreement other than for the matters specifically agreed to herein. Without limiting the preceding sentences, nothing in this letter agreement requires either Recipient or Discloser to enter into a Transaction or to negotiate such transaction for any specified period of time.

## 11. NO REPRESENTATIONS OR WARRANTIES

Discloser retains the right to determine, in its sole discretion, what information, properties and personnel it wishes to make available to Recipient, and neither Discloser nor its Representatives make any representation or warranty (express or implied) concerning the completeness or accuracy of the Confidential Information, except pursuant to representations and warranties that may be made in a definitive agreement for the Transaction, if any, between the parties.

## 12. REMEDIES

Recipient agrees to indemnify and hold Discloser and its owners, and Discloser's Representatives,] harmless from any damages, loss, cost or liability (including legal fees and the cost of enforcing this indemnity) arising out of or resulting from any disclosure by Recipient or Recipient's Representatives of the Confidential Information other than as expressly permitted by this letter agreement. In addition, because an award of money damages (whether pursuant to the foregoing sentence or otherwise) would be inadequate for any breach of this letter agreement by Recipient or Recipient's Representatives, and any such breach would cause Discloser irreparable harm, Recipient also agrees that, in the event of any breach or threatened breach of this letter agreement, Discloser will also be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance. Such remedies will not be the exclusive remedies for any breach of this letter agreement but will be in addition to all other remedies available at law or equity to Discloser.

## 13. MISCELLANEOUS

(a)     Modification. This letter agreement and the agreements set forth in this letter agreement may be modified or waived only by a separate writing signed by Discloser and Recipient expressly modifying or waiving this letter agreement or such agreements.

(b)     Waiver. Neither the failure nor any delay by any party in exercising any right, power or privilege under this letter agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

5

(c)     Person. The term "person" means any individual, corporation (including any nonprofit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or other entity or governmental body.

(d)     Severability. The invalidity or unenforceability of any provision of this letter agreement shall not affect the validity or enforceability of any other provisions of this letter agreement, which shall remain in full force and effect. If any of the covenants or provisions of this letter agreement are determined to be unenforceable by reason of its extent, duration, scope or otherwise, then the parties contemplate that the court making such determination shall reduce such extent, duration, scope or other provision and enforce them in their reduced form for all purposes contemplated by this letter agreement.

(e)     Costs. Recipient agrees that if it is held by any court of competent jurisdiction to be in violation, breach or nonperformance of any of the terms of this letter agreement, then it will promptly pay to Discloser all costs of such action or suit, including reasonable attorneys' fees.

(f)     Section Headings, Construction. The headings of Sections in this letter agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this letter agreement unless otherwise specified. All words used in this letter agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

(g)     Jurisdiction; Service of Process. Any action or proceeding seeking to enforce any provision of, or based upon any right arising out of, this letter agreement may be brought against either of the parties in the courts of the State of Arizona, County of Maricopa, or, if it has or can acquire jurisdiction, in the United States District Court of Arizona, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

(h)     Governing Law. This letter agreement will be governed by the laws of the State of Arizona without regard to conflicts-of-laws principles.

(i)     Execution of Agreement. This letter agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this letter agreement, and all of which, when taken together, shall be deemed to constitute one and the same agreement. The exchange of copies of this letter agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this letter agreement as to the parties and may be used in lieu of the original letter agreement for all purposes. Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for any purpose whatsoever.

(j)     Construction. The parties have participated jointly in the negotiation and drafting of this letter agreement. If an ambiguity or question of intent or interpretation arises, this letter agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this letter agreement.

If you are in agreement with the foregoing, please sign and return one copy of this letter agreement, which thereupon will constitute our agreement with respect to its subject matter.

Very truly yours,

DANNY'S FAMILY COMPANIES, LLC

By: _____
     Daniel H. Hendon, Manager

6

DULY EXECUTED and agreed to on January __, 2014.

By: _____
      Ernest C. Garcia II

# EXHIBIT C

# PROMISSORY NOTE

**$600,000.00**

**Phoenix, Arizona**
**December 5, 2014**

FOR VALUE RECEIVED, **Heather A. Hendon**, a married woman and resident of Phoenix, Arizona ("Borrower") promises to pay to the order of **Verde Investments, Inc.** ("Lender"), the principal sum of **Six Hundred Thousand Dollars** ($600,000.00) ("Principal"), and interest thereon at the rate of Five Percent (5.0%) per annum ("Interest") all in lawful money of the United States of America payable at 4020 E. Indian School Road, Suite A, Phoenix, Arizona 85018, or at such other address as Lender may designate in writing from time to time. The outstanding Principal and all accrued and unpaid Interest, if not previously paid, shall be due and paid in full on or before **December 5, 2015** (the "Maturity Date"). This Promissory Note may be prepaid in whole or in part at any time and without penalty.

If any payment becoming due hereunder is not made in full within ten (10) days after the date due, then without any notice from Lender that such payment is late and without prejudice to any other remedy available to the Lender, a charge of 5.0% of the amount due and not paid shall automatically accrue and be due and payable immediately to compensate Lender for the delay and inconvenience caused by the late payment (the "Late Charge"). The Late Charge shall not be applied to but shall be in addition to Principal and Interest. If Borrower fails to pay any amount when due or breaches any covenant, representation or warranty of Borrower under this Promissory Note and such failure or breach is not cured within ten (10) days after delivery to Borrower of written notice of the failure or breach, Borrower shall be in default under this Promissory Note. In such event, Lender may accelerate payment of this Promissory Note and exercise all rights and remedies. In the event Lender utilizes the services of an attorney in collecting the amounts due hereunder or enforcing the terms hereof or of agreements related to this indebtedness, or if Lender becomes a party in any legal proceedings for the recovery or protection of the indebtedness evidenced hereby, then Borrower shall pay to Lender on demand, all costs and expenses so incurred, including reasonable attorneys' fees.

Except as otherwise provided herein, Borrower and all sureties, endorsers and guarantors of this Promissory Note waive (i) demand, presentment of repayment, notice of non-payment, protest, notice of protest and all other notice, (ii) filing of suit, and (iii) diligence in collecting this Promissory Note and agree that the Lender may setoff at any time any sums or property owed to the Borrower. Borrower and all sureties, endorsers and guarantors of this Promissory Note consent to any extension or postponement of time of payment of this Promissory Note or any other indulgence with respect hereto including, but not limited to, the release of any party primarily or secondarily liable hereon or the taking or release of security, without notice thereof to any of them. This Note shall be governed by Arizona law and all judicial proceedings shall be prosecuted exclusively in the courts of Maricopa County, Arizona. Borrower, and Lender by acceptance of this Promissory Note, mutually and voluntarily waive trial by jury in all judicial proceedings relating to this Promissory Note. Time is of the essence with respect to this Promissory Note and each and every term and provision hereof.

Borrower represents and warrants that the address of Borrower stated below is the address of Borrower's residence or place of business in Arizona; that all notices to Borrower made pursuant to this Promissory Note delivered to such address shall be accepted by Borrower; and that service of process on Borrower may be made to Borrower at such address.

By the signature below, Borrower acknowledges receipt of the funds loaned to Borrower pursuant to this Promissory Note, Borrower's voluntary acceptance of all terms and conditions of the loan evidenced by this Promissory Note and that this Promissory Note is the complete and entire statement of all terms and conditions of the loan evidenced by this Promissory Note and supersedes all prior and contemporaneous statements, representations, understandings or other communications relating to the loan.

_____
Borrower Signature
3732 E. Hazelwood Street, Phoenix, Arizona 85018


STATE OF ARIZONA    )
                    ) ss
COUNTY OF MARICOPA  )

The foregoing instrument was acknowledged before me this December 5, 2014, by Heather A. Hendon.

My Commission Expires:
_July 14, 2018_

_____
Notary Public

STEVEN P. JOHNSON
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
July 14, 2018

# EXHIBIT D

# PROMISSORY NOTE

**$1,000,000.00**

**Phoenix, Arizona**
**April 6, 2015**

FOR VALUE RECEIVED, **Heather A. Hendon**, a married woman and resident of Phoenix, Arizona ("Borrower") promises to pay to the order of **Verde Investments, Inc.** ("Lender"), the principal sum of **One Million and 00/100 Dollars** ($1,000,000.00) ("Principal"), and interest thereon at the rate of Five Percent (5.0%) per annum ("Interest") all in lawful money of the United States of America payable at 4020 E. Indian School Road, Suite A, Phoenix, Arizona 85018, or at such other address as Lender may designate in writing from time to time. The outstanding Principal and all accrued and unpaid Interest, if not previously paid, shall be due and paid in full on or before **April 5, 2016** (the "Maturity Date"). This Promissory Note may be prepaid in whole or in part at any time and without penalty.

If any payment becoming due hereunder is not made in full within ten (10) days after the date due, then without any notice from Lender that such payment is late and without prejudice to any other remedy available to the Lender, a charge of 5.0% of the amount due and not paid shall automatically accrue and be due and payable immediately to compensate Lender for the delay and inconvenience caused by the late payment (the "Late Charge"). The Late Charge shall not be applied to but shall be in addition to Principal and Interest. If Borrower fails to pay any amount when due or breaches any covenant, representation or warranty of Borrower under this Promissory Note and such failure or breach is not cured within ten (10) days after delivery to Borrower of written notice of the failure or breach, Borrower shall be in default under this Promissory Note. In such event, Lender any accelerate payment of this Promissory Note and exercise all rights and remedies. In the event Lender utilizes the services of an attorney in collecting the amounts due hereunder or enforcing the terms hereof or of agreements related to this indebtedness, or if Lender becomes a party in any legal proceedings for the recovery or protection of the indebtedness evidenced hereby, then Borrower shall pay to Lender on demand, all costs and expenses so incurred, including reasonable attorneys' fees.

Except as otherwise provided herein, Borrower and all sureties, endorsers and guarantors of this Promissory Note waive (i) demand, presentment of repayment, notice of non-payment, protest, notice of protest and all other notice, (ii) filing of suit, and (iii) diligence in collecting this Promissory Note and agree that the Lender may setoff at any time any sums or property owed to the Borrower. Borrower and all sureties, endorsers and guarantors of this Promissory Note consent to any extension or postponement of time of payment of this Promissory Note or any other indulgence with respect hereto including, but not limited to, the release of any party primarily or secondarily liable hereon or the taking or release of security, without notice thereof to any of them. This Note shall be governed by Arizona law and all judicial proceedings shall be prosecuted exclusively in the courts of Maricopa County, Arizona. Borrower, and Lender by acceptance of this Promissory Note, mutually and voluntarily waive trial by jury in all judicial proceedings relating to this Promissory Note. Time is of the essence with respect to this Promissory Note and each and every term and provision hereof.

Borrower represents and warrants that the address of Borrower stated below is the address of Borrower's residence or place of business in Arizona; that all notices to Borrower made pursuant to this Promissory Note delivered to such address shall be accepted by Borrower; and that service of process on Borrower may be made to Borrower at such address.

By the signature below, Borrower acknowledges receipt of the funds loaned to Borrower pursuant to this Promissory Note, Borrower's voluntary acceptance of all terms and conditions of the loan evidenced by this Promissory Note and that this Promissory Note is the complete and entire statement of all terms and conditions of the loan evidenced by this Promissory Note and supersedes all prior and contemporaneous statements, representations, understandings or other communications relating to the loan.


Heather A. Hendon
3732 E. Hazelwood Street
Phoenix, Arizona 85018


STATE OF ARIZONA      )
                      ) ss
COUNTY OF MARICOPA    )

The foregoing instrument was acknowledged before me this April 6, 2015, by Heather A. Hendon.


My Commission Expires:
July 14, 2015

Notary Public

STEVEN P. JOHNSON
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires:
July 14, 2015

# EXHIBIT E

# SINGLE PRINCIPAL
# PAYMENT LOAN

December 5, 2014                                        PHOENIX, ARIZONA
$500,000

E MANAGEMENT CONSULTING, LLC, referred to herein as "MAKER", agrees to pay to the order of HEATHER HENDON, referred to herein as "HOLDER", or order, the sum of the amount borrowed of FIVE HUNDRED THOUSAND DOLLARS ($500,000) under the terms and conditions stated hereinbelow of this Single Principal Payment Loan, referred to herein as "LOAN" at 111 W. MISSOURI AVE UNIT C, PHOENIX, AZ 85013 with interest thereon at the simple interest rate of TEN PERCENT (10.0%) per annum.

This LOAN shall be due in full, including interest on December 55, 2015 (the MATURITY DATE). Interest shall be due annually and calculated at 10.0% for a total amount of FIFTY THOUSAND DOLLARS ($50,000) due on January 31, 2016 and FIFTY THOUSAND DOLLARS ($50,000) due on January 31, 2016.

CONTINGENT INTEREST at the rate of FIVE PERCENT (5.0%) in the amount of TWENTY FIVE THOUSAND ($25,000) shall be paid by MAKER on or before June 15, 2016, six months after the Maturity Date. Contingent Interest shall be paid at the sole discretion of MAKER.

This note is payable in U.S. Dollars. At any time the maximum rate of interest applicable to this transaction shall not exceed the legal maximum rate of interest for a note of this type. Any sums paid in excess of any lawful limitation shall be applied to principal.

After default herein, should default occur, this LOAN shall bear interest at the highest legal rate for this type of note until paid in full. Upon any default, MAKER agrees to pay a reasonable attorney's fees for any and all services of an attorney, whether in or out of court, and for appeal and post-judgment collection legal services.

Dated: _____

_____
MAKER

# SINGLE PRINCIPAL
# PAYMENT LOAN

April 10, 2015                                        PHOENIX, ARIZONA
$450,000

E MANAGEMENT CONSULTING, LLC, referred to herein as "MAKER", agrees to pay to the order of HEATHER HENDON, referred to herein as "HOLDER", or order, the sum of the amount borrowed of FOUR HUNDRED FIFTY THOUSAND DOLLARS ($450,000) under the terms and conditions stated hereinbelow of this Single Principal Payment Loan, referred to herein as "LOAN" at 111 W. MISSOURI AVE UNIT C, PHOENIX, AZ 85013 with interest thereon at the simple interest rate of TEN PERCENT (10.0%) per annum.

This LOAN shall be due in full, including interest on April 10, 2016 (the MATURITY DATE). Interest shall be due annually and calculated at 10.0% for a total amount of FORTY FIVE THOUSAND DOLLARS ($45,000) due on April 30, 2016 and FORTY FIVE THOUSAND FIVE DOLLARS ($45,000) due on April 30, 2016.

CONTINGENT INTEREST at the rate of FIVE PERCENT (5.0%) in the amount of TWENTY TWO THOUSAND FIVE HUNDRED DOLLARS ($22,500) shall be paid by MAKER on or before October 10, 2016, or six months after the Maturity Date. Contingent Interest shall be paid at the sole discretion of MAKER.

This note is payable in U.S. Dollars. At any time the maximum rate of interest applicable to this transaction shall not exceed the legal maximum rate of interest for a note of this type. Any sums paid in excess of any lawful limitation shall be applied to principal.

After default herein, should default occur, this LOAN shall bear interest at the highest legal rate for this type of note until paid in full. Upon any default, MAKER agrees to pay a reasonable attorney's fees for any and all services of an attorney, whether in or out of court, and for appeal and post-judgment collection legal services.

Dated: 4/10/2015

_____
MAKER