MARC LAZO (Ca. Bar. No. 215998)
PHILIP EIKER (Az Bar. No. 025913)
**WILSON KEADJIAN BROWNDORF LLP**
62 Rail X Ranch Estates Place
Patagonia, Arizona 85624
Phone No.:　　(888) 690-5557
Fax No.:　　　(949) 234-6254
mlazo@wkbllp.com

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| Daniel Lewis Hendon, | Case No. 2:11-bk-21164-SHG |
| | Adversary No. 2:11-ap-01972-SHG |
| Debtor. | |
| DIVERSIFIED FUNDING GROUP, LLC, an Arizona limited liability company; REYNALDO GUTIERREZ, an individual; THE FARADJOLLAH FRED DJAHANDIDEH TRUST, an Arizona Trust; FRED DJAHANDIDEH as Trustee of The Faradjollah Fred Djahandideh Trust; HCM RETIREMENT TRUST, a California Trust; DREW SHERLINE as Trustee of HCM RETIREMENT TRUST; RIGHTPATH INVESTORS, LLC, a limited liability company; SIROTKA HOLDINGS, LLC, a limited liability company; iDEA SERVICES, LLC, a limited liability company; VAN BUREN DEVELOPMENT, LLC, a limited liability company; SOUTHWEST DEVELOPMENT PARTNERS, LLC, a limited liability company; FORTUNA ASSET MANAGEMENT, LLC, a limited liability company, | **DIVERSIFIED FUNDING GROUP'S SUPPLEMENTAL BRIEF RE TRUSTEE'S MOTION TO SELL CERTAIN LIQUIDATING TRUST ASSETS** |
| | |
| | **Hearing Date** |
| | Date: July 25, 2016 |
| | Time: 11:00 AM |
| | Place: 230 N. First Ave. Courtroom 301 Phoenix AZ |
| Plaintiff, | |
| v. | |
| DANIEL L. HENDON, | |
| Defendant. | |

**1**

Case 2:11-bk-21164-SHG    Doc 206    Filed 07/20/16    Entered 07/20/16 19:38:59    Desc
Main Document    Page 1 of 16

1    Diversified Funding Group, LLC ("DFG"), Reynaldo Gutierrez, The Faradjollah Fred

2 Djahnadideh Trust, Fred Djahandideh as Trustee of the Faradjollah Fred Djahandideh Trust; HCM

3 Retirment Trust, Drew Sherline as Trustee of HCM Retirement Trust, Rightpath Investors LLC,

4 Sirotka Holdings LLC, iDEA Services, LLC, Van Buren Development LLC, Southwest Development

5 Partners, LLC and Fortuna Asset Management, LLC (collectively referred to herein as "DFG")

6 respectfully submits the following supplemental memorandum of points and authorities in support of

7 the Trustee's Motion to Sell Certain Liquidating Trust Assets to DFG.

8    ## I.    **PRELIMINARY MATTER**

9    DFG has discovered that Verde's counsel Lewis Roca Rothgerber Christie LLP ("Lewis Roca"),

10 has had access to certain confidential information pertaining to DFG, which would make their

11 representation in this mater unfair and detrimental to DFG.  In July of 2006, DFG had several meetings

12 with Lewis Roca pertaining to engaging Lewis and Roca to represent DFG in its desire to securitize its

13 lending transactions. (See Declaration of Cesar Perez attached hereto as **Exhibit 1**). Specifically,

14 Lewis Roca received information pertaining to DFG's lending practices, loan structures, underwriting

15 procedures, collection methodology, non-performing loan workouts and structuring compliance to

16 various securitization requirements. *Id*. Pursuant to Arizona's Rules of Professional Conduct, "a

17 lawyer who has formerly represented a client in a matter shall not thereafter, (a) represent another

18 person in the same or a substantially related matter in which that person's interests are materially

19 adverse to the interests of the former client, unless the former client consents after consultation." See

20 Arizona Rules of Professional Conduct, 1.9. Here, Lewis Roca's interests are directly adverse to the

21 rights of DFG, pertaining to a substantially related matter, namely, DFG's "collection methodology."

22 Lewis Roca, however, has not obtained approval from DFG to represent a client directly adverse to

23 DFG in a case pertaining to the collection of 26M judgment.  Accordingly, it should be recused from

24 any further representative efforts in this matter, and Verde should be ordered to retain new counsel

25 forthwith.

26 ///

27 ///

28 ///

## II. INTRODUCTION

On July 1, 2016, Thomas H Allen, Plan Agent and Trustee ("Trustee") of the Liquidating Trust Agreement and Declaration of Trust dated November 12, 2012 ("Trust") filed a Motion to Approve the the Sale of Certain Liquidated Trust Assets Free and Clear of Liens, Claims, Encumbrances, and Interest to sell any and all litigation claims, rights, standing, and interest that the Trustee and the Trust hold against any of the defendants currently listed in: DFG's pending Adversary Proceeding No. 2:16-ap-00127; DFG's pending US District Court Complaint, for the Central District of California Case No. 8:16-cv-00823-JVS-JCG ("California Complaint"); as well as two of the Trustee's pending Adversary Proceedings, Case No. 2:15-ap-00739 against Kelly Carroll and Adversary Proceeding 2:15-ap-00740 against Heather Hendon; along with any future lawsuits, claims, or other proceedings initiated in law or equity for which the Trustee and the Trust would hold litigation claims, rights standing, and any interest ("Trustee's Motion").

On July 14, 2016, one day before the Court's hearing, Ernie Garcia, Verde Auto Services, LLC, and Verde Investments, Inc. (collectively "Verde"), a party with **no standing** and who is a Defendant in DFG's pending Adversary Proceeding and California Complaint, objected to the Trustee's motion raising meritless objections in an effort to preclude DFG from gaining the rights to further seek avoidance actions on behalf of the bankruptcy estate. Shortly, thereafter creditor Kelly Carroll, ("Carroll") who is also a named Defendant in DFG's pending actions and a co-conspirator, joined Verde's Objection to the Trustee's Motion. Not surprisingly, Debtor Daniel Hendon, who is the orchestrator of the fraud perpetrated against DFG, in collusion with Verde and Carroll, joined Verde's objection to the Trustee's Motion. Mr. Hendon's objection is intended solely to shield him from liability and further permit him to effectuate and conceal his illegal, fraudulent, and deceitful conduct.

On Friday July 15, 2016, before the honorable Judge Gan presiding, the Bankruptcy Court heard the Trustee's Motion and the objections of Verde and Carroll and appropriately instructed the parties to provide a supplemental brief to address whether the Trustee has legal authority to sell his avoidance claims.

For the reasons set forth below, the Court should make the following findings:

///

- Upon the Debtors' confirmation of the reorganization plan, all property of the estate revested in the Debtors;

- Neither the Bankruptcy Code nor the Debtors' Reorganization Plan confers upon the Trustee any rights, standing, or interest to claims that belong to DFG and arise post-confirmation of the Debtors' reorganization Plan;

- While the Trustee may sell avoidance actions that belong to the estate, it may not sell such claims to a party without standing and who faces liability to the estate, as does Verde.

## III. DFG'S CLAIMS FOR DEBTORS' POST-CONFIRMATION CONDUCT DOES NOT BELONG TO THE BANKRUPTCY ESTATE AND CANNOT BE SOLD BY THE TRUSTEE.

DFG's post-confirmation claims against the Debtor and his cohorts including Verde and Carroll, do not belong to the bankruptcy estate. Therefore, the Trustee has no authority, statutory or otherwise, to sell such claims. The authority of a trustee to avoid fraudulent transfers is set forth in sections 548[1] and 549 of the Bankruptcy Code ("Code") and pursuant to section 544(b) of the Code, which vests the trustee with strong-arm powers. A trustee may also avoid preferential transfers under section 547[2] of the Code. However, while a trustee's powers under the Bankruptcy Code are undoubtedly broad, they are not unlimited. *Caplin v. Marine Midland Grace Trust Co. of N.Y.,* 406 U.S. 416, 92 (1972). It is well settled that a trustee has no standing generally to sue third parties on behalf of the estate's creditors but can only assert claims held by the *debtor estate itself*. *In re Kenny G. Enterprises, LLC*, 512 B.R. 628, 633 (C.D. Cal. 2014).

---

[1] Section 548 of the Bankruptcy Code provides in relevant part that the trustee may avoid any transfer of an interest of the debtor or an obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition and made with intent to hinder, delay, or defraud any entity to which the debtor was or became indebted. 11 U.S.C. §548. This section is inapplicable to the fraudulent post-petition, post-confirmation transfers relevant to this motion and is therefore not discussed herein.

[2] Section 547 of the Bankruptcy Code is also inapplicable to the circumstances of this case and is not discussed herein. The section provides, in relevant part, that the trustee may avoid any transfer of an interest of the debtor in property-
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent; (4) made (A) on or within 90 days before the filing of the petition; or (B) between 90 days and one year before the date of the filing of the petition. 11 U.S.C. §548.

Case 2:11-bk-21164-SHG    Doc 206    Filed 07/20/16    Entered 07/20/16 19:38:59    Desc
Main Document    Page 4 of 16

1   The Ninth Circuit has recognized that courts "should not allow expansion of the trustee's statutory

2   powers beyond their statutory scope, particularly where courts have historically limited the Trustee's

3   reach." *Id*. Thus, while a single creditor, such as DFG, may sue to avoid a post confirmation

4   transaction under state law (in this case, Arizona's Revised Statute § 44-1004 and Cal. Civ. Code §

5   3439 et seq.), this does not necessarily mean the trustee can likewise assert standing to challenge the

6   transfer. *Id*; See e.g, *In re Kenny G. Enterprises, supra* at 633. ("a trustee is not authorized to pursue

7   every action a creditor may pursue."). "The trustee represents the bankruptcy estate—not its creditors."

8   *Id.*

9       Here, on July 25, 2011, Debtor Daniel Hendon petitioned for individual Chapter 11 relief in the

10  United States Bankruptcy Court, District of Arizona, Case No. 2:11-bk-21164 and simultaneously

11  petitioned for relief for all car wash entities under his control, Case No. 2:10-bk-02794. On December

12  12, 2011, the Car Wash Entities and Mr. Hendon filed as joint proponents their Amended and Restated

13  Joint Plan of Reorganization dated December 12, 2011 (the "Plan") (**Exhibit 2**). The Plan was

14  confirmed by the Bankruptcy Court on December 16, 2011 (the "Confirmation Order") (**Exhibit 3**),

15  which became effective on December 31, 2011 (the "Effective Date"). The Liquidated Trust

16  Agreement and Declaration of Trust ("Trust") was approved by the Court on December 11, 2012

17  (**Exhibit 4**). Pursuant to the Plan, a Liquidating Trust was created to administer the Plan. Upon the

18  Effective Date of the Confirmation Plan on December 31, 2011, all property of the bankruptcy estate

19  revested in the Debtors and the Trustee's statutory powers to avoid subsequent fraudulent transfers

20  were cutoff, as further discussed below.

21  **1. DFG's Post-Confirmation Claims Fall Outside The Purview Of The Trustee's §549**

22  **Avoidance Powers And Cannot Be Sold By The Trustee.**

23      Section 549 of the Bankruptcy Code does not vest the Trustee with the unlimited power to avoid

24  transfers that occur post confirmation of a debtor's reorganization plan. Although section 549 provides,

25  in relevant part, that a trustee may avoid a transfer of ***property of the estate*** that occurs after the

26  commencement of the case and which is not authorized by the court,[3] the section does not apply,

27  whereas here, the claims arise post-confirmation. Crucial to this point is the long-standing and well-

28

---

[3] 11 U.S. Code § 549.

**5**

1  settled law that upon confirming a reorganization plan, the property of the estate revests in the debtor.

2  11 U.S.C. § 1141(b)[4]. The term "vests" means absolute ownership, not mere possession. *In re Jones*,

3  420 B.R. 506, 515 (B.A.P. 9th Cir. 2009).

4     In sum, the Bankruptcy Code provides that the filing of a petition creates an estate consisting of

5  "all legal or equitable interests of the debtor in property as of the commencement of the case." 11

6  U.S.C. § 541(a)(1). Post-petition, all property that used to be the debtor's property then transmutes into

7  "property of the estate." ***But after a bankruptcy court <u>confirms</u> a reorganization plan, the property of***

8  ***the estate revests in the debtor, thereby making the property again property of the debtor.*** *In re*

9  *Kenny G. Enterprises, supra* at 633; *See also Sw. Marine Inc. v. Danzig*, 217 F.3d 1128, 1140 (9th Cir.

10  2000) (although the assets were once part of the debtor's estate, after the Court confirmed the Chapter

11  11 plan, all property of the estate vested in the reorganized debtor both under the terms of § 1141(b)

12  and under plan of reorganization); *Shure v. State of Vermont,* 983 F.2d 1015 (11th Cir.1993) (debtor

13  not protected from post-confirmation creditor for debt arising from voluntary post-confirmation

14  activity related to asset that was formerly part of estate); *Sw. Marine Inc. v. Danzig*, 217 F.3d 1128,

15  1140 (9th Cir. 2000) ("a firm that has emerged from bankruptcy is just like any other defendant in a

16  tort case: it must protect its interests in the way provided by the applicable non-bankruptcy law....");

17  *Norwest Equipment Finance, Inc. v. Nath,* 91 F.3d 1072, 1074 (8th Cir.1996) (generally, once the plan

18  has been confirmed, the estate of the debtor and the bankruptcy court's jurisdiction ceases to exists).

19     Here, although the car washes and their assets were once part of the bankruptcy estate, when the

20  Court confirmed the Chapter 11 reorganization, all property of the estate vested in the reorganized

21  Debtors under § 1141(b). The car washes and their assets, and Mr. Hendon's interest in the carwashes,

22  therefore, were no longer property of the estate in 2014; they belonged to the reorganized Debtors. The

23  scheme devised by Mr. Hendon for Verde to acquire the mortgage notes and transfer the assets of the

24  car washes to PacWest through a deed-in-lieu transaction occurred post confirmation. In fact, in

25  contemplation of committing fraud, Verde purposely orchestrated the conspiracy to fall outside of the

26  purview of the bankruptcy court. Verde paid all of the administrative fees and all other fees required to

27  close the car wash entities bankruptcy proceeding.

28
---
[4] Pursuant to § 1141(b) "except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." 11 U.S.C. § 1141(b).

DIVERSIFIED FUNDING GROUP'S SUPPLEMENTAL BRIEF RE TRUSTEE'S MOTION TO SELL CERTAIN LIQUIDATING TRUST ASSETS

1   Furthermore, various other fraudulent transactions occurred post-confirmation. In 2014, Heather

2   Hendon established a living trust to conceal assets belonging to Mr. Hendon in her own name, in

3   which DFG believes at least 1 million dollars in assets and/or property was transferred to Ms. Hendon.

4   In or around January of 2014, Debtor and defendant Kelly Carroll participated in a scam to receive

5   funds from the sale of Mr. Hendon's furniture. While disclosing to the Bankruptcy Court that the

6   furniture was only worth approximately $30,000, Mr. Hendon sold the same furniture in escrow for the

7   sum of $600,000 and transferred $200,000 to defendant Kelly Carroll in 2014. Maria Barker, Mr.

8   Hendon's girlfriend received at least $100,000 from the fraudulent sale of assets. These are only a few

9   examples of the ongoing conspiracy between the defendants and their attempts to defraud DFG.

10   The Trustee, however, may not employ § 549 to avoid transfers made in 2014. The Trustee has no

11   claim that could constitute property of the estate and may not sell claims he has no standing to pursue.

12   DFG on the other hand, as the judgment creditor, who has continuously been defrauded and prevented

13   from collecting on its $26M judgment, has the appropriate standing to bring avoidance actions and to

14   pursue the numerous defendants, including Verde and Ms. Hendon, who have taken elaborate

15   measures to conceal assets within Mr. Hendon's possession, custody, or control.

16   **2. DFG's Claims Fall Outside The Purview Of The Trustee's §544 Avoidance Powers**

17   Likewise, section 544 of the Bankruptcy Code[5] does not confer upon a trustee the right to pursue

18   claims that it has no standing to pursue. Section 544(b) generally allows the trustee to assert certain

19   state-law fraudulent transfer actions for the benefit of the estate. *In re Weisman*, 5 F.3d 417, 420 (9th

20   Cir. 1993). Outside of bankruptcy, this claim belongs to the creditors; and once the bankruptcy petition

21

22

---

23   [5] 11 U.S.C. 544 provides: a)The trustee shall have, as of the commencement of the case, and without regard to any
     knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or

24   any obligation incurred by the debtor that is voidable by—a creditor that extends credit to the debtor at the time of the
     commencement of the case, and (1) that obtains, at such time and with respect to such credit, a judicial lien on all property

25   on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; (2)
     an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

26   (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such
     transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the

27   commencement of the case, whether or not such a purchaser exists.
     (b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any

28   obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim.

DIVERSIFIED FUNDING GROUP'S SUPPLEMENTAL BRIEF RE TRUSTEE'S MOTION TO SELL CERTAIN
LIQUIDATING TRUST ASSETS

1    is filed, the creditors' prepetition rights to prosecute §544 claims are expressly transferred to the

2    trustee. *Id.*

3        However, Courts have abundantly made clear that § 544(b) only applies to rights that belong to a

4    creditor ***before a Debtor files for bankruptcy***. *In re Kenny G. Enterprises, LLC,* 512 B.R. 628, 635

5    (C.D. Cal. 2014) (since the strong-arm powers exist at the commencement of the case, and since §

6    544(a) is limited to "any transfer of property of the debtor," these powers could only ever apply to

7    prepetition transfers); *In re Leonard,* 454 B.R. 444, 459 (Bankr.E.D.Mich.2011) ("The Trustee's claims

8    based on [state] fraudulent transfer statutes are made through Bankruptcy Code § 544(b)(1), and the

9    Trustee's avoidance powers under that section are also limited to pre-petition transfers."); *In re*

10   *Sattler's, Inc.,* 73 B.R. 780, 790–91 (Bankr.S.D.N.Y.1987) (finding § 544(b) does not apply to post-

11   petition transfers, because Congress did not include a statute of limitations keyed to the transaction

12   date like it did in § 549). In fact, the Ninth Circuit, in the case of *In re Kenny G.,* has conclusively

13   established that a trustee's avoidance powers under § 544(b) applies only to pre-petition transfers and

14   therefore necessarily cannot apply to post-confirmation transfers. 512 B.R. 628, 639 (C.D. Cal. 2014)

15   (finding "§ 544 is an inch too short" to reach a post-confirmation transaction).

16       Therefore, the Trustee neither has standing to pursue a post-confirmation avoidance action under

17   section 544(b) of the Bankruptcy Code, nor can it sell a claim to which it has no rights. As discussed

18   more fully above, a majority of the claims asserted by DFG are as a result of actions taken in 2014.

19       Furthermore, in *In re Viola,* the Court held that the trustee lacked standing under § 544(b) to bring

20   an avoidance action against a bank for aiding and abetting fraudulent transfers, where trustee had no

21   independent claim against the bank. 469 BR 1, 7-9 (9th Cir. BAP 2012); *See also In re Agape World,*

22   *Inc.,* 2012 WL 566303 (Bankr. E.D. N.Y. 2012)(while the strong-arm provision authorizes a trustee to

23   avoid transfers that the creditor of the debtor could avoid under applicable law, this provision is limited

24   to avoidance claims, and does not permit the trustee to assert personal, direct claims of creditors for the

25   benefit of bankruptcy estate or of a particular class of creditors.)

26       Thus, while DFG as a judgment creditor may pursue its claims, including avoidance claims under

27   state statutory remedies, against Daniel Hendon and may pursue additional claims against the other

28   named defendants in its adversary and state complaints, the Trustee has no standing to assert these

1  claims directly. The Trustee therefore cannot sell the claims that DFG independently has as a judgment

2  creditor who has been defrauded from its rights to collect upon its $26M judgment.

3      **3.  Debtors' Confirmation Plan Does Not Vest The Trustee With Unfettered Power To Avoid**

4          **Fraudulent Post-Confirmation Transactions**

5      Neither does the Debtors' Confirmation Plan vest the Trustee with the right to bring an avoidance

6  action for post-confirmation conduct. Contrary to Verde's contentions, the Confirmation Plan does not

7  vest the Trustee with unfettered power to avoid post-confirmation transactions that occur indefinitely

8  into the future. Such interpretation of the Confirmation Plan would be improper. While a confirmation

9  may bind corporate and individual debtors with respect to claims that arose *before confirmation*, it

10 cannot bind creditors with respect to claims that arise post confirmation. *In re Kenny G. Enterprises,*

11 *supra* at 633. As fully discussed above, once a plan has been confirmed, the property of the estate

12 revests to the debtor and is no longer property of the estate. *Id.*

13     In this regard, in order to avoid having the property revest to the debtor after reorganization, the

14 *Plan or Confirmation Order must specifically provide that the property will remain property of the*

15 *estate. In re Jones,* 420 B.R. 506, 515 (B.A.P. 9th Cir. 2009) (collection of a post-petition debt can

16 occur against a debtor who "does not otherwise provide in the plan or confirmation order that all

17 property remains property of the estate"); 11 U.S.C. § 1123(b)(3)(a debtor (or trustee) may retain

18 causes of action possessed by the bankruptcy estate by providing for the retention of such claims in its

19 reorganization plan. The Trustee, therefore, has limited powers to bring claims and may only assert

20 those claims that have been explicitly preserved for the trustee pursuant to the Plan or Confirmation.

21 *McFarland, supra* at 1335.

22     Here, while both the Plan and Trust undeniably vest the power to assert *__estate__* causes of action,

23 including avoidance actions, with the Trustee[6], nothing in the Plan or Trust could justify the notion that

24

25 ───────────────
   [6] The Plan provides that the Trustee has the duty and power to "perform the duties, exercise the powers, and assert the
26 rights of a trustee under Sections 704 and 1106 of the Bankruptcy Code, including, without limitation, objecting to Claims
   and Disputed Claims; commencing, prosecuting or settling Causes of Action and Avoidance Actions . . ." (Trust, Exhibit B
27 at p. 6.). Pursuant to the Plan, Causes of Action are defined "as with regard to Hendon and the Hendon Trust, any right,
   claim, tort, lien, liability, obligation, action, cause of action, avoiding power, proceeding, debt, contract, judgment, offset,
28 damage, and demand, whatsoever in law or equity, whether known or unknown, contingent or otherwise, that the Debtor
   and its Bankruptcy Estate may have against any Person…" (Exhibit B to Plan, pp. 2-3).

DIVERSIFIED FUNDING GROUP'S SUPPLEMENTAL BRIEF RE TRUSTEE'S MOTION TO SELL CERTAIN
Case 2:11-bk-21164-SHG    Doc 206    Filed 07/20/16    Entered 07/20/16 19:38:59    Desc
LIQUIDATING TRUST ASSETS
                        Main Document    Page 9 of 16

the Trustee could pursue claims and avoid transfers that do not belong to the estate. In fact, the Plan explicitly defines an Avoidance Action as a ***"claim or cause of action of an <u>Estate</u> of a Proponent[7] to avoid transfers made by the Proponent to the extent such claims arise under §§ 544-551 of the Bankruptcy Code."*** (Exhibit B to Plan, p.1.) As fully discussed above, because the transactions at issue occurred in 2014, the Trustee cannot invoke the avoidance powers of sections 544-551 of the Bankruptcy Code. After the Plan was confirmed in 2011, the property became property of the debtor, and not of the estate. The Debtors' culpable conduct therefore was conducted outside the purview of the bankruptcy court and outside the reach of the Trustee. *In re Kenny G. Enterprises, supra* at 633.

Further, the Plan and Trust both verify that upon the Effective Date of the Plan on December 31, 2011, the estate property reverted to the Debtors. The Plan provides that [o]n the Effective Date, the Hendon Trust shall revert to Hendon, as Trustor." (Confirmation Order, p. 17). The Trust further clarifies that "[p]ursuant to the Plan and Confirmation Order, the Daniel Hendon Trust was revoked and the assets of the Daniel L. Hendon Trust reverted to the Debtor. Accordingly, any reference herein to "Debtor" shall be deemed to include the Daniel L. Hendon Trust, and the 'Bankruptcy Estate' shall be deemed to include the Bankruptcy Estates of both Daniel L. Hendon and the Daniel L. Hendon Trust." (Trust, p.1 Exhibit C). This language is indicative of the Plan's contemplation that upon the Effective Date, all property reverted back to the Debtors. Thus, neither the Plan nor Confirmation Order confers the Trustee with the right to pursue DFG'S claims.

## IV. <u>ALTHOUGH THE TRUSTEE MAY SELL AVOIDANCE CLAIMS BELONGING TO THE BANKRUPTCY ESTATE, IT COULD NEVER SELL TO VERDE, A BAD FAITH PURCHASER WITH NO STANDING.</u>

While the Trustee cannot sell claims that occur post confirmation and outside the purview of the bankruptcy court, the Trustee may sell avoidance claims belonging to the bankruptcy estate. Although some courts have adopted differing views, the case of *In Re Lahijani* establishes the controlling law in the Ninth Circuit, that a "trustee's causes of action are intangible items of property of the estate that may be sold." *In re Lahijani*, 325 B.R. 282, 288 (B.A.P. 9th Cir. 2005)[8] (citing *Duckor Spradling &*

---

[7] "Proponent" is defined in the Plan as collectively referring to debtors Daniel L. Hendon, Daniel L. Hendon Family Trust, and the car wash entities.

[8] *Lahijani* involved facts almost identical to this case. The debtor filed for Chapter 7 relief. Nine months after the bankruptcy case was closed, plaintiffs sued the debtor and others in state court in an effort to recover about $10 million that

1  *Metzger v. Baum Trust* (*In re P.R.T.C., Inc.*), 177 F.3d 774, 781 (9th Cir.1999); *Briggs v. Kent* (*In re*

2  *Prof'l Inv. Props. of Am.*), 955 F.2d 623, 625-26 (9th Cir.1992)); *with Official Comm. of Unsecured*

3  *Creditors of Cybergenics Corp. v. Chinery* (*In re Cybergenics Corp.*), 226 F.3d 237, 242 (3d

4  Cir.2000).

5      The sale of a trustee's avoidance claims is done pursuant to section 363(b) of the Code, which

6  governs the trustee's use, or sale of estate property. *In Re Lahijani*, 325 B.R. at 288 (avoidance causes

7  of action may be sold by a bankruptcy trustee under § 363(b).) Pursuant to section 363(b), the sale of

8  estate assets "must be supported by an articulated business justification, good business judgment, or

9  sound business reasons." *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010). Under this standard, "the

10 trustee must demonstrate that the proposed sale price is the highest and best offer though a bankruptcy

11 court may accept a lower bid in the presence of sound business reasons." *Id*. at 263.  Courts generally

12 defer to the trustee's business judgment. *In Re Lahijani*, *supra* at 289.

13     Therefore, the Trustee may sell its avoidance actions to the extent such claims arise under the

14 Bankruptcy Code.  This includes claims to avoid all fraudulent pre-petition transfers pursuant to §§

15 547 and 548 and post-petition transfers pursuant to §549 and that are expressly reserved to the Trustee

16 by a plan of reorganization. Here, a sale of the Trustee's avoidance powers would be limited to the

17 Trustee's existing claims against Heather Hendon and Kelly Carroll and any other claim reserved for

18 the Trustee, which is limited to pre-confirmation fraudulent transfers. Through its diligent and ongoing

19 investigation, DFG learned of potential transfers that could be avoided by the Trustee pursuant to the

20 Bankruptcy Code. DFG included such allegations in its pending Adversary and California Complaints.

21 The claims involve the Debtor's numerous transactions to his family members and friends. Including,

22 among others, the transfer of assets to his daughter Heather Hendon, mother Nell Hendon, and

23 potentially millions of dollars in transfers to defendant Gil Olguin. The Debtors' are also in violation

24 of the terms of the bankruptcy Plan and the $1m equity note due under the Plan. The Trustee, however,

25

26 they alleged was embezzled before the bankruptcy filing. *Id*. The action alleged misrepresentation, concealment, rescission,
27 conspiracy, breach of fiduciary duty, constructive trust, and conversion. While the state court action was pending, the
   bankruptcy case was reopened and a Chapter 7 Trustee was appointed. After losing in state court, plaintiffs' only remaining
   avenue for recovery was to maximize the value of the bankruptcy estate by purchasing the trustee's avoidance actions. *Id*.
28 The Ninth Circuit held that the trustee was authorized to sell the causes of action to the plaintiffs. *Id*.

**11**

DIVERSIFIED FUNDING GROUP'S SUPPLEMENTAL BRIEF RE TRUSTEE'S MOTION TO SELL CERTAIN
LIQUIDATING TRUST ASSETS

Case 2:11-bk-21164-SHG   Doc 206   Filed 07/20/16   Entered 07/20/16 19:38:59   Desc
Main Document    Page 11 of 16

1 | neither has the means nor capability to investigate or pursue such claims. Thus, upon the purchase of
2 | these claims, DFG has agreed to diligently pursue these potential claims for the benefit of the estate.

### 1. Verde Is Not A Good Faith Purchaser

However, even where the Trustee may sell its avoidance actions, it may not to do so to a party acting in bad faith or with the intent to defraud. When considering whether the trustee has established a good business reason for the sale, courts must consider all salient factors pertaining to the proceeding including the purchasers "good faith". *In re Thomas*, 287 B.R. 782 (B.A.P. 9th Cir. 2002) ("'Good faith' of the purchaser of estate property…can be defeated by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"). Because "good faith" is not defined in the Bankruptcy Code, in analyzing good faith, courts have "followed traditional equitable principles." *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1992) ("although the Bankruptcy Code and rules do not define good faith, courts have indicated that a lack of good faith is shown where there is evidence of misconduct, and unclean hands on the part of the purchaser"); *In re Nicole Energy Servs., Inc.,* 385 B.R. 201, 235 (Bankr. S.D. Ohio 2008) ("no bankruptcy judge is likely to approve a sale that does not appear to be in 'good faith'); *In re Ellis*, 441 B.R. 656,664 (Bankr. D. Idaho 2010) (Black's Law Dictionary defines "good faith" as, among other things, "[a] state of mind consisting of honesty in belief or purpose ...or absence of intent to defraud or to seek unconscionable advantage.")

Verde is not a good faith purchaser and its nominal $200,000 offer to purchase the Trustee's claims was made for the sole purpose to further hinder, delay, and defraud the Bankruptcy Court, bankruptcy creditors, and specifically judgment creditor DFG whose pending Adversary Complaints implicate Verde's instrumental role in the subject conspiracy.

Specifically, Verde is liable for its role as a straw buyer of the notes securing the car washes. Between April and June of 2014, Verde purchased three mortgage notes secured by the assets of the car wash businesses for substantial discounts from the creditors. In an attempt to conceal the transactions, which were structured to ultimately inure to the benefit of Daniel Hendon, Verde paid for all of the Car Wash Debtors' remaining administrative fees and ensured that the bankruptcy case

DIVERSIFIED FUNDING GROUP'S SUPPLEMENTAL BRIEF RE TRUSTEE'S MOTION TO SELL CERTAIN LIQUIDATING TRUST ASSETS

1  would be closed. Thus, Mr. Hendon's business bankruptcy case was closed on the basis that a

2  reorganization plan was "substantially consummated."

3  Within two months of the purchase of the mortgage notes and the closing of the bankruptcy case, in

4  August of 2014, Verde sold the mortgage loans to PacWest Energy, LLC for a multi-million dollar

5  profit, in conjunction with which PacWest Energy LLC also acquired the assets of the car washes

6  through deeds in lieu of foreclosure. These "deeds-in-lieu" exonerated the Debtor from any further

7  liability under the notes or security instruments.

8  Immediately thereafter, Verde transferred $600,000 of the proceeds from the sale of the mortgage

9  notes to Debtor's daughter Ms. Hendon.  Upon receipt of that money, Ms. Hendon made arrangements

10  to meet with Ellis Rubenstein ("Mr. Rubenstein"), a family friend, who was given $500,000 of that

11  money, which Rubenstein then channeled back to the Debtor over time. In fact, through deposition

12  testimony, DFG has established that Debtor arranged for Mr. Rubenstein to meet his daughter at a local

13  bank and instructed that a transfer be made immediately, i.e., the same day Verde "loaned" her the

14  money. **[Exhibit 5, H. Hendon Deposition Transcript Vol. 2, 268-285].**

15  In turn, Mr. Rubenstein paid out the funds and provided the Debtor with large sums of cash (in

16  small cash deposits under $10,000 to avoid reporting requirements); paid for various expenses of the

17  Debtor, including Debtor's attorney's fees; provided Debtor with a debit card under the alias "Daniel

18  Lewis" to use at his leisure; placed funds into the accounts of Debtor's mother, girlfriend Maria

19  Barker, and others; and committed numerous other misappropriations to defraud the Bankruptcy Court,

20  Trustee and DFG.

21  **Essentially, while Debtor had agreed, in exchange for a lighter sentence and other**

22  **concessions, to completely divest himself of his interest in the car washes, and while at the same**

23  **time Ernie Garcia wrote a letter that was presented to Debtor's sentencing judge to plead for a**

24  **lesser sentence based on Garcia's representation that Debtor was completely destitute and had**

25  **"lost his family business," Debtor, Heather Hendon and Mr. Garcia were secretly plotting to**

26  **siphon assets back to Debtor through the proceeds from the sale to PacWest, and recruited the**

27  **easily manipulated Rubenstein to help effectuate their fraudulent conspiracy.**

28

1    In furtherance of this conspiracy, in April of 2015, Verde transferred an additional $1,000,000

2   from the proceeds of the sale to Ms. Hendon, which found their way back to Debtor. Again, the funds

3   were transferred into Mr. Rubenstein's account, and ultimately sent to Debtor or used for the benefit of

4   the Debtor to pay for his personal expenses and to make plan payments to keep his Chapter 11

5   proceeding alive. **[Exhibit 6, H. Hendon Deposition Transcript Vol. 2, 389-392]**.

6    Thus, Verde transferred a total of $1.6M to Ms. Hendon under the guise of two promissory notes,

7   without any evidence of a security instrument, without any method of repayment, and without any

8   showing of collateralization. **[Exhibit 7].** These monies irrefutably ended up in Debtor's hands,

9   scattered through numerous bank accounts held by Debtor's family members and Debtor himself. The

10  transfer of the $1.6M to the Debtor was purposely orchestrated by Debtor, Ms. Hendon, Verde and

11  other defendants in order to conceal, from the bankruptcy court, Trustee and creditors, the proceeds

12  Debtor received from the sale the car wash entities, **in which he had purported to divest his interests**

13  **as part of his plea bargain**. Verde is therefore liable for conspiracy and bankruptcy fraud for aiding in

14  the concealment of Debtor's scheme to defraud the Bankruptcy Court and Trustee, and for making

15  fraudulent representations to the Court – including Debtor's sentencing judge - in addition to taking

16  overt actions to promote and facilitate fraudulent transfers.

17     Therefore, to evade liability Verde, Carroll and the Debtor, have colluded and conspired to

18  prevent DFG from purchasing the Trustee's assets for the sole purpose of ensuring that no avoidance

19  actions are brought against them. <u>Verde is trying to buy its innocence</u>.  These Creditors seek to avoid

20  liability and further conceal their fraudulent schemes without interruption or interference by DFG.

21    Moreover, because Verde has an ongoing relationship and loyalty to the Hendon family, and is also

22  seeking to avoid further liability for its own conduct, Verde will not pursue avoidance claims which

23  will benefit the estate. Verde has no reason to investigate or pursue avoidance causes of actions and

24  has every reason to ensure that such claims are never brought to light. In fact, Verde's sole motivation

25  for offering to purchase the Trustee's claims is to ensure that Debtors' fraudulent transfers are

26  concealed. Verde will undoubtedly forfeit the millions of dollars in avoidance actions as is evidenced

27  by the unsubstantiated, self-serving, and frankly absurd contention it makes in its objection that "it is in

28  the estate's best interest to either settle or not pursue the claims at all."

1     Verde's offer is therefore made in bad faith and based on established law the Court should not

2 authorize the sale of estate assets in the absence of good faith. In the interest of justice, the Court

3 should not allow the Creditors to use the Bankruptcy Court as a mechanism to further unlawful

4 conduct, engage in gamesmanship, and evade liability for their conduct.

5

6         **2.**    **Verde Has No Standing To Object To The Trustee's Sale of Claims To DFG or To**

7                **Purchase The Trustee's Claims**

8     Further, the Trustee may not sell estate assets to a party who has no standing to purchase the

9 claims. Entities or individuals that may have an economic stake in the outcome of a debtor's case but

10 that hold no claims directly against a debtor have no standing. See, e.g., *Sentinel Trust Co. v. Newcare*

11 *Health Corp. (In re Newcare Health Corp.),* 244 B.R. 167 (B.A.P. 1st Cir. 2000) (a secured creditor of

12 a debtor's affiliates is not a party with standing to file a motion seeking the appointment of an

13 examiner); *Masonic Hall & Asylum Fund v. Official Comm. of Unsecured Creditors (In re Refco, Inc.),*

14 2006 U.S. Dist. LEXIS 85691 (S.D.N.Y. Nov. 26, 2006) (***investors in a fund that is a party to an***

15 ***adversary proceeding do not have standing to oppose a settlement***)(emphasis added).

16     Verde neither has standing to oppose DFG's offer to purchase the Trustee's claims, nor can Verde

17 purchase the claims itself. Verde is not a creditor in Debtor's bankruptcy estate and has no interest in

18 the Trustee's Sale or any justification for filing an objection, other than its own interest in obtaining a

19 "get out of jail free card." In order to interfere with DFG's purchase of the Trustee's claims, two days

20 prior to this Court's hearing on the Sale, Verde purports to have acquired two nominal creditor claims

21 in order to assert rights it would never have standing to assert in the first place. Verde's transfer of

22 claims is a ruse to feign standing to bring meritless objections and hinder DFG's diligent efforts to

23 recover assets for the benefit of the bankruptcy estate.

24     As such, Verde's objections to the Trustee's proffered sale and attempt to exculpate its liability to

25 the estate by purchasing the very claims that would be advanced against it must summarily be

26 disregarded.

27   *///*

28   *///*

## V. **CONCLUSION**

For the foregoing reasons, the Court should find that the bankruptcy estate has no rights or interests in DFG's claims occurring post –confirmation and therefore the Trustee may not sell such claims. The Court should further find that to the extent the Trustee may sell avoidance actions belonging to the bankruptcy estate, it may not sell such claims to a third party with no standing and who is acting in bad faith.

Dated: July 20, 2016                                          WILSON KEADJIAN BROWNDORF, LLP

By: _____

Marc Y. Lazo

Attorney for Plaintiffs and Creditors