Warnicke Law PLC
Robert C. Warnicke
Arizona Bar No. 015345
777 East Thomas Road Suite 210
Phoenix, Arizona 85014
E-mail: Robert@WarnickeLaw.net
Telephone (602) 738-7382

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

In Re:

DANIEL LEWIS HENDON,

            Debtor.

Chapter 11

Case No. 2:11-bk-21164-SHG

**DECLARATION OF ROBERT C. WARNICKE IN SUPPORT OF MOTION TO REVOKE *PRO HAC VICE* ADMISSION OF MARC Y. LAZO**

I, ROBERT C. WARNICKE, being first duly sworn upon my oath, declare as follows:

1. I am an attorney for the Estate of Nell Hendon in two adversaries pending in Arizona Bankruptcy Court brought against her, and a large number of other parties, by Daniel Hendon's judgment creditor in this matter, "Diversified".

2. I represented Nell Hendon for several weeks briefly before her death in two matters brought by Diversified.

3. I have never met Daniel Hendon. I talked to him twice on the telephone in November of 2016, after his mother's death in September. The first time I spoke with

1

him to request that he sign a waiver of his right to be the personal representative of Nell Hendon's Estate. Nell Hendon's will designated him with priority to be the personal representative of her estate. The second time I spoke with him was on November 9, 2016, when he called me just to confirm that he had executed and mailed the waiver. I believe he was on one other call that I had with his attorney since November 2016.

4. Prior to being employed on behalf of Nell Hendon, as the result of my own bankruptcy practice, I was generally aware of the Danny's Car Wash Bankruptcy case, and that its principal had filed his own Bankruptcy case. I also was aware of what I read in the paper about the criminal case involving the use of undocumented workers at the car washes.

**Rule 11 and the Complaints**

5. Mr. Lazo signed the four complaints that are the basis for the two pending adversaries, 2:16-ap-127-SGH and 2:16-518-SHG.

6. With respect to Nell Hendon, all four complaints rely almost exclusively on making conclusory allegations about her supposed conduct, and almost no specific allegations of fact. The complaints sound in fraud and Mr. Lazo had heightened pleading requirements. I have been trying to find out more about the substance of the claims against Nell Hendon since I became involved in the case. In a phone call in September 2016, Mr. Lazo told me that his associate would send me specific information supporting the claim. No such information has ever been provided.

7.  All four complaints broadly allege that each individual defendant is the alter ego of each entity defendant.[1]  Mr. Lazo also did not include any specific allegations of fact to support alter ego for any defendant with respect to any entity, it is all conclusory and general allegations.  The alter ego allegations appear to have been added as a matter of course.  They are absurd, as Nell Hendon is cannot possibly be the alter ego of any of the entity defendants, particularly the law firms.

**Settlement Agreement**

8.  After I first became involved, I was also told by Diversified's attorneys that I would be provided drafts of a settlement agreement between Diversified and some of the other defendants.   At the time, I was hoping my client could become part of a settlement agreement that was being negotiated by the other parties.   I followed up with Diversified about the settlement agreement and my client's possible participation, but I was told that the document would instead be sent to me once it was finalized.

9.  Nell Hendon died on September 29, 2016.   I did not find out she had passed until October.

10. On October 10, 2016 while I was out of town, Diversified and the settling defendants filed a motion for good faith settlement approval and sought an accelerated hearing.  *See* 2:16-ap-127-SHG Doc 80.     The filing of the motion with the executed

---

[1] Nell Hendon is not, after any reasonable inquiry, the alter ego of Burch & Cracchiolo, Dickinson Wright PLLC, Verde Auto Services, LLC; Verde Investments, Inc., Prudential Metal and Steel Supply, LLC, E Management Consulting, LLC, Pacwest Energy, LLC, Food Stores, Inc., Equilon Enterprises, LLC or KOCS Capital Group.

3

settlement agreement attached was the first time I was provided with any specific information about the settlement agreement.

11. After the motion has been filed, Diversified reached out to me to get my client's consent to the settlement agreement. I told Diversified about the death of my client and raised my concerns that that settlement agreement would bar discovery from the settling defendants. I was assured that revised documents addressed my concerns about discovery in an Email. A true and correct copy of the email is attached as Exhibit 1 (Karbassi email 2016-10-18).

12. The revised documents did not address my concerns about the discovery bar.

**Hearing on October 20, 2016.**

13. At this accelerated hearing on good faith approval of Diversified's settlement with some defendants, I was bereft of a decision maker because Nell Hendon had recently died and there was no personal representative for the Estate.

14. At the hearing, I objected that the settlement agreement operated to cut-off the right to conduct discovery from the Verde Parties, and this was a problem because Nell Hendon was alleged to have joint and several liability with the Verde Parties as well as being the *alter ego* of the Verde Parties' that were entities. During the course of the hearing, Mr. Lazo agreed that if there needed to be future discovery from the Verde Parties, Diversified would have to dismiss those claims, however, there were no proposed changes to the order, and the agreement to dismiss put a burden on the Estate to establish that the needed discovery was barred.

4

15. I then requested that the order contain language to reflect this change and clarify the burden. I described the proposed order as a bar to discovery. Mr. Lazo stated "There is no bar in the order." Exhibit 2 (10/20/16 Transcript, at p. 44-46).

16. The proposed Order was later entered, and it states:

9. The Settling Defendants are not required to participate any further in the Actions, and the **Verde Parties** (as Settlement Agreement funders that already provided testimony under oath in the Sale Proceedings) and Victoria Hendon (as a party whose only alleged wrongdoing was receiving unidentified property from Daniel Hendon, a claim being settled **are not obliged to participate in any discovery by any party to the Actions or party in interest in the Bankruptcy Case.**

See 2:11-bk-21164-SHG Doc 257 (Emphasis added)

17. The Court then determined:

I think that the record is clear that there will not be any further discovery as a result of the settlement with regard to the Verde Defendants.

Exhibit 2 (10/20/16 Transcript, at p. 46).

18. In the hallway after the hearing, Lazo and his client representative berated Warnicke for making the objection, as Warnicke walked away from them, Lazo threw his shoulder into Warnicke in an attempt to physically intimidate him. Warnicke and Lazo later rode the elevator down together and shook hands, however, the incident should never have occurred. I briefly referred to the incident in an email a few days later when it became clear that Lazo always engages in bullying behavior. A true and correct copy of my email is Exhibit 3 (Warnicke email 10-24-2016, at p. 2)

**Email of October 24: False Statements and Threats to have Me Sanctioned**

19. By Monday, October 24th, Mr. Lazo realized that my objection had preserved the Estate's right to appeal the order approving the settlement. Mr. Lazo's associate sent an

5

email on Monday October 24th at **2:42 p.m.** inquiring as to the status of my attempt to get a personal representative. A true and correct copy is attached as Exhibit 4 (Karbassi Email 10/20/16 2:42).

20. When I failed to respond that same day by **4:54 p.m.** Mr. Lazo sent an email with a false description of circumstances leading up to the time, threatened the Estate with having the litigation transferred back to California, and promised to seek sanctions against me if any appeal was filed. Mr. Lazo demanded a response by the next day, Tuesday at 9:30 a.m., or the bad things would begin. A true and correct copy is attached as Exhibit 5 (Lazo Email 10-24-16).

21. While I was addressing the nonsense in Mr. Lazo's email, another of Mr. Lazo's associates emailed at Monday at **9:34 p.m**. to follow through on his threat to litigate in California, by informing me that I had to appear at a hearing already set in California or they would seek sanctions. A true and correct copy is attached as Exhibit 6 (Wilhoit Email 10-24-2016).

22. As the entire California case had already been transferred to this Court, this was just more inane bullying. *See* 2:17-ap-518-SGH (Docket).

23. I responded to all of Mr. Lazo's false statements in an email. *See* Exhibit 3 (Warnicke email 10-24-2016, at p. 1-2).[2]

**Lazo's Misconduct at the Deposition of Gil Ogluin: Starting Prematurely, Editing The Record, Terminating the Telephonic Appearances**

---

[2] Looking back, I drafted my email thinking it was already Tuesday, but went ahead and sent it late night on Monday, this means that in my email I miscounted the days that Mr. Lazo falsely claimed that he had been attempting to reach me, thinking it had been one more than it had actually been.

6

24. The deposition of Gil Ogluin was set by Mr. Lazo for 10:00 a.m. in Las Vegas on November 17, 2016. *See* 2:16-ap-127-SGH Doc. 117.

25. I let Diversified know I intended to participate in the deposition by email. Diversified inquired as to whether a personal representative had been appointed, and I told them that all of the paperwork for a personal representative had been filed that day. Mr. Lazo responded: "So the answer is no as of this moment. I will note the record accordingly if you chime in at any point during the depo." A true and correct copy of these emails is attached as Exhibit 7 (2016-11-14/15 emails, at p. 1).

26. On the day of the deposition, the start time was moved by email to **11:00 a.m.** so Mr. Lazo could make an appearance in some other matter. A true and correct copy of this email is attached as Exhibit 8 (2016-11-17 Karbassi Email, at p. 1).

27. Lazo started the deposition prior to the newly announced time of **11:00 a.m.**, beginning it even before all counsel he knew were going to appear telephonically had appeared. The deposition was started at "**10:56 a.m.**" *See* Exhibit 9 (Deposition of Gil Olguin, at p. 1) (emphasis added). A true and correct copy of the deposition of Gil Olguin is Exhibit 9.

28. I called into the deposition and I was surprised Mr. Lazo had started without me, and I assumed I was late and mistaken about the time. I was not late, the deposition had improperly been started early.

29. When I announced my presence, Mr. Lazo objected as he said he would in his email, and again conceded I could appear:

For the record, Diversified Funding objects to Mr. Warnicke's appearance. **While we can't stop it**, he has not been retained by the Estate, as far as we know, and he has no right to voice any objections or commentary during this deposition.

*See* Exhibit 9 (Deposition of Gil Olguin, at p. 10) (Emphasis added).[3]

30. After Mr. Lazo and Mr. Vitagliano had completed their questioning of the witness, and I knew that making an objection could not in any way be characterized as interfering with the testimony, I began trying to make an objection on the record about the improper start of the deposition. Exhibit 9 (Deposition of Gil Olguin at p. 248-249).

31. During my objection, Mr. Lazo interrupted me and falsely asserted that he had told me I could not appear: this is contrary to his email about making an objection and his statement in the same transcript when I first appeared: "we can't stop it". Exhibit 7 (2016-11- 17 Emails, at p. 1) & Exhibit 9 (Deposition of Gil Olguin, at p. 10 & 248-249).

32. Contrary to his prior statement that "we can't stop" me from participating, Mr. Lazo and his client *did* stop me. I was repeatedly interrupted by Mr. Lazo while trying to record the objection. *See also*, Exhibit 9 (Deposition of Gil Ogluin at ¶ 248-249).

33. Someone began shouting at me when I was attempting to make my objection, and that person has been identified as Mr. Lazo's client representative. Exhibit 10 (Declaration of Gil Ogluin at ¶ 9).

34. I am told that Mr. Lazo unilaterally directed the court reporter to stop transcribing my objection while his client was shouting at me. Exhibit 10 (Declaration of Gil Ogluin at ¶ 11).

---

3

8

35. Shockingly, the Court Reporter followed Mr. Lazo's direction, but she did not transcribe that statement. Instead, the court reporter transcribed only Mr. Lazo's interference with my objection, shouting, and then the termination of the call. Exhibit 9 (Deposition of Gil Olguin, at 248-249).

36. The official record of the deposition is inconsistent with what I heard and what Mr. Olguin has testified in his declaration. The Court Reporter has an audio recording of the deposition, and she will turn over the audio file only upon receiving an order to do so from the Court.

37. What actually happened after the Court reporter quit transcribing, is that Mr. Lazo said something like that he paid for the court reporter and that if I wanted a court reporter I could arrange for one.

38. Mr. Vitagliano stated that I should be allowed to make my objection, and that the deposition could not be edited.

39. I went on to continue to make my objection about how the deposition was started early and prior to the attorneys that Mr. Lazo knew were appearing telephonically being able to appear. Mr. Lazo interrupted me to announce that the Court reporter was not taking down any of my words. Appearing telephonically, I assumed that Mr. Lazo was mistaken and kept attempting to articulate my objection despite the interference.

40. Lazo then announced that he was picking up the phone, it sounded like he did, and then stated that he was hanging up on me. While Mr. Lazo did hang up on me, he also apparently hung up on everyone making a telephonic appearance.

41. Mr. Lazo's office immediately sent an email about the deposition, characterized the call as having been "disconnected" and claimed to have made a number of attempts to get only Mr. Vitagliano back on that line. *See* Exhibit 11 (2016-11-17 Karbassi email, at p. 1). Notably, no attempts were described as having been made to get me back on the line, which is consistent with what actually happened, Mr. Lazo was preventing me from participating in the deposition. A true and correct copy of the email is Exhibit 11.

42. Diversified never substituted the Estate in for Nell Hendon as a party. I am and have been counsel of record for Nell Hendon since August 29, 2016. This Court had overruled Mr. Lazo's identical objection at the October hearing as to whether the Estate has standing in this case. Prior to the deposition, I had actually filled the papers to have the Personal Representative appointed. Under Arizona law, actions by the Personal Representative relate back to the date of death. *See* A.R.S. §14-3701. The Superior Court appointed the Personal Representative, Peggy Jackson, the same person I had previously been working with under Nell Hendon's power of attorney, on November 22, 2016, after having misplaced documents I filed for several days.

43. Prior to the deposition, Mr. Lazo did not request an order from the Court preventing me from participating in the deposition, even though he knew I planned to appear. I was not being disruptive during the deposition and I did not interfere with the witness's testimony. All I wanted was to make a record of the fact that Mr. Lazo intentionally started the deposition early and without me. The record shows it was started without not only me, but other defense counsel being on the line either. His utter lack of

10

professionalism lead to all defense counsel being terminated from the call before the deposition was complete.

**Hearing of January 23, 2017**

44. At the hearing on January 23, 2017, Mr. Lazo urged that the many pending motions to dismiss should simply be denied as the result of his false statements about those motions. He stated:

> MR. LAZO: Thank you, Your Honor. The only issue we have is **all of the parties who are before you in the courtroom merely filed joinders to the Verde entities' motion to dismiss**. And then parties followed to file joinders to those joinders. **So none of the parties before you really filed a motion to dismiss.** The only parties that did were the Verde parties which as Your Honor may know were dismissed when we reached a settlement with those parties that included an assignment of all of the trustee's claims against any and all of the parties that are here before you today.
>     **So for the most part, the Verde parties' motion was based on a lack of standing by my clients to prosecute claims owned by the trustee**. That issue has now been mooted because we entered into a settlement with the Verde parties that included an assignment of the trustee's rights. **So all of the parties there really have joined a motion that was based on an issue that has now been mooted.**

Exhibit 12 (2017-01-12 transcript, at p. 6-7) (Emphasis added). A true and correct copy of the transcript is Exhibit 12.

45. Mr. Lazo's attempt to simply dispose of the motions to dismiss on his word about what was in the motions was based on a false recital of fact. The Burch & Cracchiolo defendants, filed a document styled as *Motion to Dismiss* and *Joinder* with the Verde Parties. This was a fifteen-page document that was not a *me-too* type of joinder described by Mr. Lazo.

46. In addition, Nell Hendon filed a more than seven-page unique and substantive motion for more definite statement with her joinder, which was to the Burch &

11

Cracchiolo motion.  It was false and misleading for Mr. Lazo to state that the remaining defendants had not as a matter of fact "really" filed any motions to dismiss.

47. Mr. Lazo's statement that settlement with the Trustee resolved the motions "for the most part" was also false.  Only 2 pages of the 27 page Verde Parties' motion involved the trustee's standing. *See* 2:16-ap-127-SGH Doc. 47.    It appears that less than single page of the Burch & Cracchiolo parties' motion actually involved an issue of the Trustee's standing.  *See* 2:16-ap-127-SGH Doc. 60.   Nell Hendon's motions never separately mentioned standing, and instead contained unique issues with respect to one complaint having 10 counts and only 5 substantive references to her, and the other complaint having 8 counts and only 7 substantive references to her.  *See* 2:16-ap-127-SGH Doc. 121 and 2:16-ap-518-SGH Doc. 11.

48. The Court entertained oral argument for more than an hour on the issues raised by the defendants in the motions, and even had to keep the Court staff late.   Ultimately, the Court issued a 44 page order granting Nell Hendon and most other parties dismissal with prejudice. *See* 2:16-ap-127-SGH Doc. 166.

**Opposition to Nell Hendon Motion to Dismiss and More Definite Statement**

49. Mr. Lazo repeatedly stated in the Opposition that Nell Hendon had received "$530,000" of the original $7.7m loan proceeds from the Plaintiffs.  *See* 2:16-ap-127-SHG Doc. 127.   This separate "$530,000" number being transferred to Nel Hendon as bandied about four times in the Opposition is nowhere in the *First Amended Complaint*. Lazo came up with this statement that *actually conflicts with the existing allegation in paragraph 39 that with respect to the use of Diversified's loan*.   The First Amended

Complaint states: "Debtor transferred approximately $530,033 to his own personal bank account alleging that it was a loan to repay defendant NELL HENDON". Thus, the allegation in the complaints is that the $530,033 went to Daniel Hendon, *not* Nell Hendon.[4]

50. Interestingly, the judgment of non-dischargeabilty is based on the Debtor having made a false statement about the use of the loan proceeds, specifically that $530,330.72 was supposed to go to Nell Hendon. The Debtor apparently claimed the need to pay back Nell Hendon the $530,330.72, but evidence was that money went to the Debtor instead. Diversified should be judicially estopped from claiming that Nell Hendon actually got the money, since it was her not getting that money that is the basis for the judgment. *See* 2:11-ap-1972-SGH Doc. 119.

**False Statements in Mr. Lazo Declarations**

51. Mr. Lazo has made three similar declarations that all contain the very same false personal attacks on me. Two declaration was filed in California.[5] The third declaration was filed in Arizona Bankruptcy Court in 2:11-ap-1972-SGH at docket 214. I will refer to the declaration at Docket 214 in Arizona for ease of reference, however, the same false allegations are in all three documents.

---

[4] Ironically, the allegation from the complaint about the Debtor getting the money was also repeated *four* times in the Opposition.

[5] Both were filed in 17-cv-00001 in the California Central District Court. One was signed on January 31, 2017 and was filed as "Exhibit B" under seal, perhaps as Docket 10, with an *Ex Parte Application For A Turnover Order And Immediate Freeze Of Any Leviable Assets Pending Issuance Of The Order; Memorandum Of Points And Authorities; And Declarations Of Marc Y. Lazo And Shahram Sodeifi In Suppor*t." The other appears at Docket 18.

52. In connection with Diversified's attempts to justify its execution of its judgment against the Spendthrift Trust in 2:11-ap-1972-SHG, Lazo stated under oath to this Court:

> and a **joint checking account with Peggy Jackson, account number ending in 9838,** which is the subject of Danny's frivolous claim of exemption.

See 2:11-ap-1972-SHG, Doc. 214 at ¶ 3 (Emphasis added). Lazo's basis of support for his sworn statement is identified as "Exhibit 1" from the bank. (Docket 214-1). That bank document actually identifies the "9838" account as "W&H HENDON REVOCABLE TRUST PEGGY JACKSON TRSTEE DANIEL HENDON TRSTEE U/A 4/3/2013". While an attorney can *argue* that the account should be considered a "joint checking account" based on some legal principal or other allegations of fact, Mr. Lazo skipped that step, simple made the conclusion himself, and *testified* to this Court as a *fact* that he personally knows it is Daniel Hendon's "joint checking account." His testimony about the account is inconsistent with the bank document upon which it was based. It has been rejected by this Court and the Magistrate in California. *See* Exhibit 19 (Magistrate Recommendation) and Exhibit 20 (2017-03-08 transcript, at p. 20-21). He also lied about the account being in California. *See* Exhibit 20 (2017-03-08 transcript, at p. 13, 20-21).

53. Mr. Lazo's falsely accuses me in paragraph 11 of his declaration at Docket 214:

> Robert Warnicke, an attorney who indicated that he represented the estate of the deceased Nell Hendon, previously advised me that Danny was not a beneficiary to Nell Hendon's estate and was not going to receive any assets, funds or property upon the death of Mrs. Hendon. Mr. Warnicke made these statements while knowing that his statements were not true and that Mrs. Hendon had established the Trust, for which Danny was the beneficiary. A true and correct copy of the W&N Revocable Trust is attached hereto as Exhibit 6. The Trust explicitly provides that Danny is both a trustee and the beneficiary of the Trust.

14

54. The supposed lie I made to Mr. Lazo took place in a telephone conversation on December 6, 2016. I sent an email the same day of our conversation which memorialized what I had said. A true and correct copy of our email chain related to the phone conversation is attached as Exhibit 13. My email accurately memorializing what I said was sent at 6:32 p.m. on December 6.

55. Our conversation on December 6 was in connection with Diversified's assertion in an email sent at 3:42 p.m., on December 3, 2016, that it was going to seek an "asset freeze" if the Estate would not agree to freeze its assets. Exhibit 13 (2016-12-3/6 emails, at p. 3-4). A true and correct copy of those emails is attached as Exhibit 13.

56. I was surprised by the demand, as the normal practice for a judgment creditor would have been to serve the Estate with a garnishment, so that any money due to Daniel Hendon would simply have to be paid directly to his judgment creditor. Instead, Diversified was threatening some additional litigation if the parties could not agree to some sort of asset freeze, one that might impact the administration of the Estate, including the defense of Diversified's vague claims against Nell Hendon in the lawsuits pending in this Court.

57. It was in this context that I had the telephone conversation on December 6, in which I told Mr. Lazo and Ms. Karbassi that Daniel Hendon was not a beneficiary under the Will and that the Estate was not going to make a distribution to him. During our call, I became concerned that Mr. Lazo seemed uncharacteristically distracted and quiet. As a direct result of his odd behavior, I told Mr. Lazo and Ms. Karbassi that I would send a confirming email, and at 6:32 p.m. on December 6, I sent that email. Exhibit 13.

15

58. The December 6, 6:32 p.m. email, accurately memorializes what I said in our phone conversation. It states that Daniel Hendon is not the beneficiary of the Will. Mr. Lazo and Ms. Karbassi have never claimed that my email of December 6 did not accurately memorialize my statements. In fact, Mr. Lazo acknowledges in paragraph 11 of his declaration, that to the extent Daniel Hendon is entitled to something from the death of Nell Hendon, it is from the Spendthrift Trust, not the Estate or at direction of the Will. Incredibly, he nonetheless falsely asserts under penalty of perjury that I made a statement knowing the statement was not true because he intentionally conflates the Estate with the Spendthrift Trust in order to attack my credibility.

59. The Will does not make Daniel Hendon the beneficiary, which is precisely what I said on December 6 and stated again in my email of that date. A true and correct copy of the Will is attached as Exhibit 14. This is what is important for a judgment creditor interested in the administration of a will to know.

60. Mr. Lazo sent me a follow up email at 8:19 pm on December 6. He asked: "Robert, was Danny ever a beneficiary? Who is and who ever was?" I immediately responded at 9:43 p.m. on December 6:

> As I have told I think all of you on the phone at different times, the "W&N Hendon Revocable Trust Dated April 2, 2013" is the beneficiary in the Will. This is the same trust the public record showed owned the house that I believe Nell previously lived in. I don't know the history.

A true and correct copy of both of these emails are on the first page of Exhibit 13.

61. Mr. Lazo's declaration at paragraph 11 suggests that I kept information about the beneficiary of the Will from him, yet my follow up email that is in Exhibit 13

demonstrates that I had correctly identified the Spendthrift Trust as the beneficiary of the Will.

62. I am not aware of any distribution to any beneficiary that has been made by the Estate. The Estate plans, first, to resolve Diversified's lawsuit against "Nell Hendon."

63. I never made any representation to Mr. Lazo that Daniel Hendon was not the beneficiary of the Spendthrift Trust. The emails show that Mr. Lazo never asked me about the Spendthrift Trust. The reason for this lack of follow-up is because Diversified already knew that Daniel Hendon was the beneficiary of the Spendthrift Trust. Mr. Lazo or his partner Mr. Browndorf, or perhaps both, told me that they were already aware that Daniel Hendon was the beneficiary of a trust. In a telephone conversation on October 25, 2016, Mr. Browndorf even told me that Daniel Hendon had offered Diversified the trust money as part of a settlement that Diversified had turned down.

64. Mr. Lazo's sworn declarations that I "knowingly" made a material misstatement to him about the disposition under the "estate" is false, and it is a game he is playing with words. He uses the word "estate" from an estate planning context to encompass the idea of a will, a probate, and a trust in order to depict me as a liar, when I was very specific about how I represent the "Estate." I was describing the "Will", and the beneficiary under the "Will" is not Daniel Hendon, it is the Spendthrift Trust.

65. Mr. Lazo is just trying to prejudice the court in his ultimate case against the Spendthrift Trust by not just trying to make me look not just bad, but also identifying me

as a key participant in a conspiracy to defraud. It was first made "under seal" and *ex parte* in a case to which I am not counsel.

66. The fact that Nell Hendon's death changed the beneficiary of the Spendthrift Trust from Nell Hendon to the contingent beneficiary, Daniel Hendon, has nothing to do with the Will or the Estate. It has everything to do with the Spendthrift Trust documents with which I had no responsibility in creating. It is also my understanding from reviewing the public record that Nell Hendon's home was transferred to the Spendthrift Trust years before she died. Thus, the Spendthrift Trust has received nothing from the Estate or through the Will.

67. Nell Hendon's death is not even the event that caused the Spendthrift Trust to become irrevocable. For instance, Mr. Lazo's declaration at paragraph 15 describes Nell Hendon as losing control of the Spendthrift Trust some months before her death and that the home was sold by the co-trustees on behalf of the Spendthrift Trust, rather than by the settlor.

68. To my knowledge, Diversified does not have a colorable claim to the home in which Nell Hendon had lived for many years. I have repeatedly requested information about the basis for the poorly drafted lawsuits against Nell Hendon, and the supposed damages suffered by Diversified. No proof or specific information has been offered that in any way supports any such claim.

69. As to Mr. Lazo's statements at paragraph 12 of his declaration, some of those are also false:

18

Mr. Warnicke, who is not licensed to practice in California, has now filed the claim of exemption on behalf of the Trust while knowing that the Trust is not a valid spendthrift trust, as Danny is in fact both the co-successor trustee and beneficiary of the Trust.

I did not authorize my name to be put on an exemption provided to the U.S. Marshall or filed by it in this matter. Mr. Lazo has now been told it was a mistake in the document sent to U.S. Marshall in the declaration of the responsible Nevada attorney. That was confirmed in open court in Arizona by the attorney whose name was intended to be on the document, (Ronald Warnicke). However, it appears that Mr. Lazo is so fixated on me that he refuses to accept the truth. Mr. Lazo has actually threatened to sue me over my supposed filing in California anyway in an email to me on March 7, 2017, a true and correct copy is attached as Exhibit 16 (See page 1).

70. I am also not aware that the Spendthrift Trust is invalid. It is my understanding that in Arizona it is not fatal to a spendthrift trust for a beneficiary to be a co-trustee. I am certainly not aware of any court decision collapsing the Spendthrift Trust, which I believe is how a trust is made invalid.

71. I have corresponded with Mr. Lazo about his personal attack on me that he made the at Docket 214 in 2:2011-ap-1972-SHG as well as an email to other attorneys in which he wrote: "Robert Warnicke has already aided in Daniel Hendons fraudulent transfers." Exhibit 16, at 1.

72. I sent an email asking Mr. Lazo to explain the basis of his personal attacks on me. The only thing he could reference is our telephone conversation that I memorialized in Exhibit 13, and that did not contain any false statements. He offered nothing on how I allegedly assisted Danny Hendon make fraudulent transfers. He is going to keep it secret

19

until he files a complaint against me. A true and correct copy of that entire correspondence is attached as Exhibit 15.

73. When I objected to being named as a defendant in a complaint, Mr. Lazo then offered no detail, but said it would actually be in a California complaint. *See* Exhibit 15, at 1. The implication is obvious, Mr. Lazo wants to make the frivolous matter he intends to bring as hard for me to defend as possible.

**I am not Special: Lazo is Universal in his Distain to Opposing Attorneys**

74. I was provided these emails by an attorney named James Till. Apparently thinking his email of December 31, 2016 would not be received until the next morning, Danny Hendon's lawyer wrote:

> Good morning and Happy New Year! I hope the holidays are treating you well. It appears that our respective clients recently had a discussion regarding a potential settlement. I was asked to follow-up with you to further discuss. Please let me know your availability and we can firm up a time to discuss.
> Best regards,

Mr,. Lazo wrote back, as only he could:

> No. we we [sic] have actually been learning that your client has been siphoning funds from his mother's estate. He is going to die before we settle with him. We are coming after him like never before. Happy new year.

Ironically, Mr. Lazo's client apparently confirmed shortly afterward that there actually had been settlement discussions between the parties. A true and correct copy of these emails that I have been provided is attached as Exhibit 17.

75. Of course, Ronald Warnicke has been threatened too. *See* Exhibit 16.

**Lazo has been Sanctioned for Knowingly Making False Statements to a Judge**

76. As referenced in his *pro hac vice* application, Mr. Lazo lied to a court about the reason why he could not attend a trial. He continued to lie about it when caught. A copy of what appears to be a California State Bar action against Mr. Lazo is attached as Exhibit 18. I obtained this copy from the California State Bar website.

**The Complaints Are Unsupported by Good Faith Allegations**

77. At the oral argument on the Rule 12 motions, Mr. Lazo defended the claims brought against Nell Hendon in early 2016, that vaguely refer to conduct as far back as 2007, by characterizing allegations of acts by her Spendthrift Trust after the summer of 2016 (and supposed acts by her Estate after she died in September of 2016) as somehow justifying the vague, inadequate and largely indecipherable claims he had certified after reasonable inquiry months earlier than the Summer of 2016 by filing the initial and then amended complaints.

78. Even if allegations about new and more recent events could support a complaint, his inability to articulate what was required under Rules 8 and 9 demonstrates that no reasonable good faith belief about a claim existed at the time the complaints were filed. All the allegations Mr. Lazo referred to were money going *to* Daniel Hendon. A transfer *to* Daniel Hendon is not a fraudulent transfer on the basis of Diversified's non-dischargeable judgment. Mr. Lazo must identify money *following* away from Daniel Hendon for there to be a fraudulent transfer.

79. The lack of any detail for the factual basis of the claims is because everything is based on pure speculation. Even Mr. Lazo had to concede that some counts of the complaints failed to assert a claim on legal grounds.

21

80. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 31ᵗʰ day of May, 2017 in Phoenix, Arizona.

/s/ Robert C. Warnicke
Robert C. Warnicke

Copies served this date via ECF
on all parties that have appeared.

Copies served this day via e-mail or U.S.
First-Class Mail, on the following
parties:

Christopher J. Pattock
OFFICE OF THE UNITED STATES TRUSTEE
230 N. First Avenue, Suite 204
Phoenix, AZ 85003-1706
Email: christopher.j.pattock@usdoj.gov
Marc Y. Lazo, Esq.
WILSON KEADJIAN BROWNDORF, LLP
62 Rail X Ranch Estates Place
Patagonia, AZ  85624
mcbrowndorf@whbllp.com
gkim@whbllp.com
mlazo@whbllp.com
ksalveson@whbllp.com
*Attorneys for*
*Diversified Funding Group, LLC*

Jerry L. Cochran
COCHRAN LAW FIRM, PC
2929 E. Camelback Rd., Suite 118
Phoenix, AZ 85016
jcochran@cochranlawfirmpc.com
Attorneys for Kelly Carroll-Hendon

Donald L. Gaffney
SNELL & WILMER L.L.P.
One Arizona Center
Phoenix, AZ 85004-2202
dgaffney@swlaw.com

22

Attorneys for TR&C DR Properties, LLC

Daniel E. Garrison
ANDANTE LAW GROUP, PLLC
Scottsdale Financial Center I
4110 North Scottsdale Road, Suite 330
Scottsdale, AZ 85251
dan@andantelaw.com
Attorneys for Official Committee of Unsecured Creditors


Alan A. Meda
BURCH & CRACCHIOLO PA
702 E. Osborn Rd, Suite 200
Phoenix, AZ 85014
ameda@bcattorneys.com
Attorneys for Daniel Lewis Hendon

James R. Harrison
O'STEEN & HARRISON, PLC
300 W Clarendon Ave #400
Phoenix, AZ 85013
jharrison@vanosteen.com
Attorneys for First Fidelity Bank, N.A.
G. Patrick Jennings
U.S. DEPARTMENT OF JUSTICE
Trial Attorney Tax Division
P.O. Box 683
Washington, DC 20044-0683
guy.p.jennings@usdoj.gov
Attorneys for United States

Carolyn J Johnsen
DICKINSON WRIGHT PLLC
1850 N. Central Avenue, #1400
Phoenix, AZ 85004-4568
cjjohnsen@dickinsonwright.com
Attorneys for Victoria A. Hendon

Jamin S. Neil
PITE DUNCAN, LLP
4375 Jutland Dr., Suite 200
P.O. Box 17933
San Diego, CA 92177-0933

23

jneil@piteduncan.com
Attorneys for CitiMortgage, Inc.

William Novotny
DICKINSON WRIGHT PLLC
1850 North Central Avenue, Suite 1400
Phoenix, AZ 85004
wnovotny@dickinsonwright.com
Attorneys for Vestar Arizona XLVIII, L.L.C.


Randy Nussbaum
NUSSBAUM GILLIS & DINNER, P.C.
14850 N. Scottsdale Road, Suite 450
Scottsdale, AZ 85254
rnussbaum@ngdlaw.com
Attorneys for Henry H. Lee

Josephine E Salmon
PITE DUNCAN, LLP
4375 Jutland Drive
P.O. Box 17933
San Diego, CA 92177-0933
ecfazb@piteduncan.com
Attorneys for JPMorgan Chase Bank, National
Association, as Successor-in-Interest to Washington
Mutual Bank, f/k/a Washington Mutual Bank, FA

By: */s/ Robert C. Warnicke*
Robert C. Warnicke

24